**IN THE UNITED STATES DISTRICT COURT FOR THE**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| T.C. ON BEHALF OF HER MINOR CHILD, S.C., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 3:17-cv-01098 |
| | ) | Judge Trauger |
| METROPOLITAN GOVERNMENT OF | ) | |
| NASHVILLE AND DAVIDSON COUNTY, | | |
| | ) | **LEAD CASE** |
| TENNESSEE, D/B/A METROPOLITAN | ) | |
| NASHVILLE PUBLIC SCHOOLS, | ) | |
| | ) | |
| Defendant. | ) | |

_____

| | | |
|---|---|---|
| JOHN DOE AND JANE DOE #1 ON BEHALF | ) | |
| OF THEIR MINOR CHILD, JANE DOE #2, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 3:17-cv-01159 |
| | ) | Judge Trauger |
| METROPOLITAN GOVERNMENT OF | ) | |
| NASHVILLE AND DAVIDSON COUNTY, | | |
| | ) | Member Case |
| TENNESSEE, D/B/A METROPOLITAN | ) | |
| NASHVILLE PUBLIC SCHOOLS, | ) | |
| | ) | |
| Defendant. | ) | |

_____

SALLY DOE ON BEHALF OF HER MINOR )
CHILD, SALLY DOE #2, )
                                     )
        Plaintiff, )
                                     )
v. )  Civil No. 3:17-cv-01209
                                     )  Judge Trauger
METROPOLITAN GOVERNMENT OF )
NASHVILLE AND DAVIDSON COUNTY, )
 
                                     )  Member Case
TENNESSEE, D/B/A METROPOLITAN )
NASHVILLE PUBLIC SCHOOLS, )
                                     )
        Defendant. )

_____

MARY DOE #1 ON BEHALF OF HER MINOR )
CHILD, MARY DOE #2, )
                                     )
        Plaintiff, )
                                     )
v. )  Civil No. 3:17-cv-01277
                                     )  Judge Trauger
METROPOLITAN GOVERNMENT OF )
NASHVILLE AND DAVIDSON COUNTY, )
 
                                     )  Member Case
TENNESSEE, D/B/A METROPOLITAN )
NASHVILLE PUBLIC SCHOOLS, )
                                     )
        Defendant. )

**MEMORANDUM**

Pending before the court in these consolidated cases are five sealed Motions for Summary Judgment. Four Motions for Summary Judgment were filed by the Metropolitan Government of Nashville and Davidson County d/b/a/ Metropolitan Nashville Public Schools ("MNPS"). (Docket No. 71 (regarding S.C.[1]); Docket No. 76 (regarding Jane Doe); Docket No. 82 (regarding Mary Doe); Docket No. 83 (regarding Sally Doe).) The plaintiffs have collectively filed a Response addressing all four MNPS motions (Docket No. 92), to which MNPS has filed a Reply (Docket No. 99). Jane Doe, Sally Doe, and Mary Doe have collectively filed a Motion for Partial Summary Judgment (Docket No. 87), to which MNPS has filed a Response (Docket No. 88). For the reasons discussed herein, MNPS's Motion for Summary Judgment regarding the claims of Sally Doe will be granted in part and denied in part, and all of the other motions will be denied.

**I. BACKGROUND**

"Section 901(a) of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), provides that '[n]o person in the United States shall, on the basis of sex, be excluded from

---

[1] The naming conventions used by the parties are, in the context of the cases' having been consolidated, somewhat confusing and will, therefore, be streamlined slightly by the court. Three of these plaintiff students have taken the fictive surname Doe (despite not sharing the same actual surname), along with different fictive first names. However, their mothers—who, alone or with the students' fathers, filed the suits on the students' behalf—have taken the same fictive first name/surname combinations as their daughters, differentiated from the daughters only numerically. For example, Mary Doe #1 is the mother of Mary Doe #2, Jane Doe #1 is the mother of Jane Doe #2, and so forth. The court will simply refer to each student by the chosen pseudonym, without a numerical modifier, and refer to any parent just as the student's parent—e.g., as "Mary Doe" and "Mary Doe's mother." When discussing procedural matters in this court, the court will use the unmodified pseudonym to refer to the student acting through her parent or parents. For the one plaintiff using a different naming convention—S.C., who is suing through her mother T.C.—the court will use "S.C." to refer to both the individual student and to T.C. when acting in this court on S.C.'s behalf.

participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.'" *Nat'l Collegiate Athletic Ass'n v. Smith*, 525 U.S. 459, 465–66 (1999). Title IX, like other federal antidiscrimination laws,[2] recognizes that discrimination can, in some cases, take the form of harassment. See *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 639 (1999). In 2016 and 2017, at least four female MNPS students, all minors, were videotaped[3] by other students while engaged in sexual encounters with male students on the premises of their respective MNPS schools. The resulting video files were circulated among the students' peers electronically. The plaintiffs, through their parents, have sued MNPS, arguing that its handling of the matters and general approach to harassment at its schools led to the deprivation of the plaintiffs' rights under Title IX and their onstitutional rights to equal protection.

## A. Title IX in MNPS

Federal regulations require that a recipient of funding under Title IX "shall designate at least one employee to coordinate its efforts to comply with and carry out its responsibilities under [Title IX rules], including any investigation of any complaint communicated to such entity alleging its noncompliance with [Title IX rules] or alleging any action which would be

---

[2] *See, e.g.*, *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998) (discussing harassment under Title VII); *Brown v. Metro. Gov't of Nashville & Davidson Cty.*, 722 F. App'x 520, 525 (6th Cir. 2018) (discussing harassment under the Age Discrimination in Employment Act); *Trepka v. Bd. of Educ.*, 28 F. App'x 455, 461 (6th Cir. 2002) (discussing harassment under the Americans with Disabilities Act); *Greenan v. Bd. of Educ. of Worcester Cty.*, 783 F. Supp. 2d 782, 788 (D. Md. 2011) (discussing harassment under the Pregnancy Discrimination Act).

[3] The parties use various terms to refer to the video recordings at issue here, including "videos" and "videotapes." The actual recordings appear all to have been made on mobile phones and thus were not, as a literal matter, "tapes," insofar as that term suggests the existence of an actual physical cartridge encasing spooled magnetic tape. Rather, the recordings existed as files on electronic devices. The court will use the various terms that may refer to a video recording interchangeably to refer to copies of the files.

prohibited by [Title IX rules]." 45 C.F.R. § 83.15(a). That employee is known as the recipient's "Title IX coordinator." The funding recipient must "notify all of its students and employees who work directly with students and applicants for admission of the name, office address and telephone number of the" Title IX coordinator. *Id.* MNPS's Title IX coordinator, from 2012 through the 2016–17 school year, was Julie McCargar. (Docket No. 92-25 at 18, 24.)

McCargar testified that, when she took the position of Title IX coordinator in 2012, no one from MNPS provided her with any training regarding what her duties were. (*Id.* at 21.) She did say, however, that she and others in her office received outside training and worked closely with the city's legal department in understanding how to conduct investigations. (*Id.* at 50.) She testified that, in contrast, principals and assistant principals did not, to her knowledge, receive training regarding how to conduct a Title IX investigation until late in her tenure as coordinator. (*Id.* at 50.) Principals and assistant principals also were not required to read the Dear Colleague letters that the Title IX coordinator was expected to read to stay abreast of federal Title IX policy. (*Id.* at 51–52.) Phyllis Dyer, who worked with McCargar and succeeded her as Title IX coordinator, explained that principals did finally receive some training at some time around or after May 2016 (Docket No. 92-18 at 54), although, as the facts below will show, when and if individual principals were trained appears to have varied.

Even before they received training, the principals and assistant principals were permitted to perform Title IX investigations themselves, rather than relying on the Title IX coordinator. (Docket No. 92-25 at 53, 59–60.) McCargar further testified that she could not recall ever telling the principals to contact her when they became aware of possible Title IX violations. (*Id.* at 59.) If the principal determined that an incident did, in fact, rise to the level of

a Title IX violation, only then would the principal inform the coordinator. (*Id.* at 79–82.)

The plaintiffs suggest, persuasively, that the policy McCargar described violates the guidance provided by the U.S. Department of Education's Assistant Secretary for Civil Rights in a Dear Colleague Letter issued on April 24, 2015. (Docket No. 1-5.) According to the letter, a Title IX funding recipient "must inform the Title IX coordinator of all reports and complaints *raising Title IX issues*, even if the complaint was initially filed with another individual or office or the investigation will be conducted by another individual or office." (*Id.* at 3 (emphasis added).) As the plaintiffs point out, the universe of complaints raising Title IX issues is presumably significantly larger than the universe of complaints where a principal has made an affirmative finding of a confirmed Title IX violation.

When asked about MNPS's compliance with the Department of Education's guidance, McCargar admitted that she was not informed of all complaints "raising Title IX issues," if "informed" meant that she was directly contacted in writing or by phone. While she did receive direct notice of cases where principals ultimately concluded that a violation had occurred, she was not informed in that manner where a complaint raised Title IX issues, but the principal ultimately found no violation. (Docket No. 92-25 at 95.) Rather, McCargar explained, she had interpreted the Department's guidance as requiring only that incidents that had raised Title IX issues, but that principals had not deemed to be violations, be entered into a "student management system," to which the coordinator had access. (*Id.* at 96.)

## B. Incident at Maplewood: Mary Doe and Jane Doe

Mary Doe and Jane Doe were freshmen at Maplewood High School when, on September 21, 2016, they were part of a sexual encounter involving the two of them and four older male

students in a school stairwell. Jane Doe has attested that, while she had expected there to be flirting and probably kissing in the stairwell, she did not expect and was not prepared for the sexual activity. She attested that she was intimidated by the age, size, and number of male students involved and, although she did not welcome the sexual activity, she "did not know how to get out of the situation." (Docket No. 92-8 ¶ 4.) Mary Doe has similarly attested that she did not expect or welcome sexual activity but was intimidated and did not know how to stop it. (Docket No. 92-10 ¶ 4.)

A male student videotaped the incident, and the video was ultimately circulated among the students' peers. (Docket No. 92-3 ¶¶ 19–20.) Jane Doe testified that she saw a light during the encounter but did not realize that it was from someone recording the activity. (Docket No. 76-4 at 20.) The parties agree that Mary Doe did not, at least immediately, know that the encounter had been taped. (Docket No. 92-3 ¶ 19.) Both girls have attested that they did not consent to being taped or to the tape's being circulated. (Docket No. 92-8 ¶ 5; Docket No. 92-10 ¶ 6.)

That night, Mary Doe told her mother that someone at school had held her down and put hickeys on her neck. She did not, at the time, reveal the extent of actual sexual activity involved in the encounter. (Docket No. 92-3 ¶¶ 12.) Mary Doe's mother contacted Assistant Principal Marvin Olige about the event, and Mary Doe, her mother, and her grandmother met with Olige and police officers stationed at the school as "School Resource Officers" ("SROs"). (*Id.* ¶¶ 13–14.) Mary Doe reiterated the inaccurate version of events she had told her mother and provided a written statement to that effect. (Docket No. 77-3.) The SROs, however, pressed Mary Doe about inconsistencies between her account and other information they had received,

and she admitted that the version of the story she had given her mother was inaccurate. Olige, the SROs, and Mary Doe's mother, however, appeared to remain unaware of the actual details of the encounter. (Docket No. 92-3 ¶ 18.)

The parties disagree about the precise series of events through which MNPS and the girls became aware that the video was being circulated but agree that, in the ensuing weeks, a number of people became aware of the video's existence and circulation. (*See id.* ¶¶ 19–23.) At some point, the girls became aware that other students had copies of the video. Jane Doe heard that, in connection to the circulation of the video, people were calling her demeaning sexual names like "whore" and "slut." (Docket No. 92-8 ¶ 6.) Jane Doe's brother also became aware of the video and informed her parents. (Docket No. 76-4 at 28.) On October 12, 2016, Jane Doe's parents reported the video to school officials and met with SROs and Assistant Principal Olige. (Docket No. 89 ¶ 43; Docket No. 92-3 ¶ 24.) Upon learning that Mary Doe was the other female student in the video, Olige pulled her out of class to be questioned. (Docket No. 89 ¶ 44.)

Jane Doe's mother has attested that she told Olige and the SROs that the video had been made without Jane Doe's knowledge or consent and "circulated at the school and other places." (Docket No. 92-7 ¶ 3.) She further attested that, in the meeting, Olige and the SROs focused mainly on whether the underlying sexual conduct was forcible rape. (*Id.* ¶ 5.) She described her perception of Olige's approach to the matter as follows:

> The principal's reaction was as though it was no big deal. There was no indication that anyone was going to be punished, suspended, or expelled. The principal never indicated there would be any investigative procedure by the school. The principal never informed us of any action the school would take to ensure that my child would be safe from this type of activity or from any retaliatory acts for reporting the activity. [Mary Doe] was simply sent back to class, as though nothing had happened, and they wanted to handle my daughter the same way.

(*Id.* ¶ 7.) Jane Doe and Mary Doe confirm that Olige's questioning was focused on whether forcible rape had occurred. (Docket No. 92-8 ¶ 7; Docket No. 92-10 ¶ 5.)

Olige did not take any notes during the October 12 meetings. (Docket No. 89 ¶ 45.) He did have Jane Doe and a male student write out statements regarding the incidents, but those statements were eventually shredded and are, therefore, not in the record. (*Id.* ¶ 50.) Olige testified that he did not know why the statements were shredded, but MNPS maintains that the shredding was inadvertent. (*Id.*; Docket No. 77-1 at 30–31.) Olige did not tell Maplewood Executive Principal Keely Mason about the sexual activity or the video file until after at least one of the underlying lawsuits had been filed. (Docket No. 89 ¶ 55.) Olige also did not refer the students or their parents to MNPS's Title IX coordinator; nor did he suggest to them that a Title IX investigation would or should occur. (Docket No. 76-4 at 50.)

Olige did not contact Mary Doe's mother to inform her that the incident that they had discussed earlier had included, not merely hickeys, but at least some students having sex and that a video had been made. Mary Doe's mother only learned those details later, during the summer between her daughter's freshman and sophomore years. (Docket No. 92-9 ¶¶ 5–6.) MNPS suggests that, because Olige did not view the video himself, he did not specifically know that Mary Doe had engaged in sexual activity beyond hickeys. At the very least, however, he did know that she was in a video involving a sexual encounter in which other minor students had sex.

Jane Doe attested that, following the meeting, she was "scared to remain at Maplewood." (Docket No. 92-8 ¶ 11.) The day after the meeting with Olige or shortly thereafter, Jane Doe's parents enrolled her in a new school, and she never returned to Maplewood. (Docket No. 76-4 at

30–31.) MNPS concedes that, although Olige knew that Jane Doe's parents were concerned and planned to seek a transfer away from Maplewood, he "did not take steps to reassure the family that their daughter would be safe if she stayed at Maplewood, nor did he reassure the family that there was no need to pull her out of school." (Docket No. 89 ¶ 54.) Jane Doe's mother has characterized the school to which she transferred as having less comprehensive classroom and extracurricular opportunities. Moreover, Jane Doe had been participating in a "College Zone" program at Maplewood, which was intended to help students prepare for and gain admission to college, but her new school did not offer such a program. (Docket No. 92-7 ¶¶ 12–13.) Jane Doe ultimately failed tenth grade at the new school. (*Id.* ¶ 15.)

At first, Mary Doe remained at Maplewood. She has described substantial taunting and bullying she received at Maplewood related to the video, including students calling her "nasty" and saying she "got a train run on" her. She says that she complained to school personnel about the bullying, but they "didn't do anything about it." (Docket No. 92-10 ¶ 11.) She said that, when she would make a new friend, students would then target and bully the friend for "hanging around a nasty person." (*Id.* ¶ 13.) According to Mary Doe, at one point a boy grabbed her thighs and told her he wanted her to do the same thing to him as she had done in the video. She claims that she told Olige about the event but that he took no action that she was aware of. (*Id.* ¶ 14.)

Mary Doe eventually attended a meeting with Maplewood Dean of Students Jamie Hall and another person about the events and her coping with them. Doe testified that she had informed Hall that she had been having suicidal thoughts in the wake of the incident. In her deposition, Mary Doe described the following exchange:

They said it was, like, a game called ["]Exposed["] that the seniors do. And I was

> like, I don't know what that is. . . . I was talking to, I think, Ms. Hall, and she was talking to me—who was I talking to? Who else was in there? There was somebody else in there. And I was upset, at the moment, and I was crying. She was like, What is wrong with you? It was about the situation. She was like, It's the game. It's a game that the seniors play, and you shouldn't worry about it. It's not nothing you should want to kill yourself over and all this. I was like, But it's a video of me out there that I didn't know nothing about, so I should really be upset about it.

(Docket No. 92-23 at 77.) Mary Doe—who attested that she had, prior to these events, been a content and gregarious Maplewood student—concluded that she could not be happy at Maplewood and transferred to another school. (Docket No. 92-10 ¶ 16.) Mary Doe's mother has stated that she felt she had no reasonable alternative but to seek the transfer. (Docket No. 92-9 ¶ 8.) Mary Doe has said that she still gets harassed at the new school due to the video, but only occasionally. (Docket No. 92-10 ¶ 17.)

Olige elected not to punish any of the students involved in the sexual activity or videotaping "beyond verbal discipline," because it was "an opportunity to impart some wisdom and life instruction," and he "did not want to subject the students to potential humiliation and discipline for a consensual act." No other, higher-level administrator was involved in his decision. (Docket No. 89 ¶¶ 61–62; *see* Docket No. 70-16 at 11.)

MNPS provides schools with a two-page "Bullying and Harassment Reporting Form" that includes spaces for specifying what offenders did and what, if any, electronic communications were used. (Docket No. 70-17 at 1–2.) Olige testified that he knew that, if he had filled out such a form, it would have begun a process of the school's determining whether a Title IX violation had occurred. (Docket No. 77-1 at 104.) However, he did not fill out a reporting form related to any of the events involving Jane Doe and Mary Doe. (Docket No. 89 ¶

66.) Olige testified that, if he had ever been instructed by the district to refer cases involving circulation of sexual videos of students to the school's executive principal or to the Title IX coordinator, he would have done so. (Docket No. 77-1 at 87.)

Another Maplewood Assistant Principal, Isaiah Long, testified that, in his view, MNPS standard operating procedures, effective as of May 2016, required an assistant principal who became aware of sexual activity being taped at school to report the activity to the executive principal. He further testified that such actions would have warranted substantial punishment, regardless of whether the underlying sexual activity had been consensual. Long, however, was not made aware of the events at issue here until after litigation began. (Docket No. 89 ¶¶ 70–73.) Executive Principal Mason agreed that she should have been informed of the events and that the reporting form should have been used for any sexual cyberbullying on the Maplewood campus. (*Id.* ¶¶ 77–81.) Mason testified that, had she been aware of the events, she would have punished the students involved. She further testified that she would have treated the release of a sexually explicit video of a student without the student's consent as itself requiring discipline. (*Id.* ¶ 89; Docket No. 70-12 at 68.)

The handling of the matter by Olige and the SROs did result in a referral to local police. On October 19, 2016, Detective Michael Adkins of the Metropolitan Nashville Police Department interviewed Mary Doe and Jane Doe about the incident. (Docket Nos. 76-1 & -2.) In the interviews, the girls characterized the sexual activity as consensual. (Docket No. 76-1 at 22; Docket No. 76-2 at 10.) However, Jane Doe told Detective Atkins that she had not known that she was being recorded during the encounter, although she did, as she would later testify, see a boy turning off the flash on his phone at the end. (Docket No. 76-1 at 22–23.) She told Adkins

that she found out that the video had been circulated about a week later, when her cousin told her she had seen it. (*Id.* at 26.) Mary Doe told Detective Atkins that she was completely unaware that she was being filmed and only learned of it later, once the video had been circulated. (Docket No. 76-2 at 8.) The record does not show that any criminal prosecutions resulted.

Jane Doe, through her parents, filed her Complaint on August 16, 2017. (Case No. 3:17-cv-01159, Docket No. 1.) Mary Doe, through her mother, filed a Complaint pleading the same causes of action on September 18, 2017. (Case No. 3:17-cv-01277, Docket No. 1.) Counts I and II of the Complaints are for Title IX violations related to MNPS's actions, respectively, before and after the stairwell incident. Count III is a claim under 42 U.S.C. § 1983, based on MNPS's failure to train its employees with regard to sexual harassment. Count IV is a claim under 42 U.S.C. § 1983, based on MNPS's deliberate indifference to ongoing harassment. (Case No. 3:17-cv-01159, Docket No. 1 ¶¶ 53–73; Case No. 3:17-cv-01277, Docket No. 1 ¶¶ 38–58.)

## C. First Incident at Hunters Lane: Sally Doe

On February 21, 2017, Sally Doe—then a freshman at Hunters Lane High School —engaged in a sexual encounter with a boy, O.B., in a Hunters Lane boys' restroom. (Docket No. 92-4 ¶ 3.) Sally Doe has attested that she was pulled into the restroom and did not understand or expect that sexual activity was going to occur, she was pressured to engage in the sexual activity, and, although she did not physically fight the sexual activity, she was scared, did not know how to prevent it, and did not consider it welcome. She stopped the sexual activity before completion. (Docket No. 92-6 ¶ 4.) The encounter was recorded on video—Sally Doe believes, by O.B. with his phone. Sally Doe attested that she did not realize she was being recorded and did not welcome or consent to the recording. (*Id.* ¶ 5.)

The same day, administrators learned that Sally Doe had been seen in or going into the restroom with O.B., and Assistant Principal Melanie McDonald pulled Sally Doe out of class to explain the situation. McDonald asked Sally Doe what she had been doing in the boys' restroom and if she had had sex while there. Sally Doe responded that she had not had sex in the restroom. (Docket No. 83-1 at 16–17.) McDonald had Sally Doe provide a written statement about the matter, and, in the statement, Doe stated only that she and O.B. had gone into the bathroom to discuss something. (Docket No. 83-4 at 23.) Both students were placed on "overnight suspension." (Docket No. 83-2 at 2–3.) The next day or the day after, Sally Doe and her mother met with Assistant Principal Nicole Newman, and Sally Doe admitted to having kissed O.B. but not to the sexual activity. (Docket No. 83-1 at 21–22; Docket No. 83-2 at 9.)

About a month and a half later, on April 7, 2017, another female student, with whom Sally Doe had apparently had a personal falling out, posted the video of the February 21 bathroom encounter on Instagram and "tagged"[4] Sally Doe. Sally Doe does not know how the girl who posted the video obtained it. (Docket No. 92-4 ¶¶ 5–6.) Several of Sally Doe's friends and acquaintances saw the video when it was posted. Sally Doe does not know exactly how many of her peers viewed the video but testified that she believed that "it was a lot of people." (Docket No. 83-1 at 26.) The same day that Sally Doe first saw the video, her mother found out about the video from a family member who, presumably, had seen or become aware of the

---

[4] "Tagging" refers to including another person's user name in a social media post, often to indicate that the post depicts the "tagged" person and/or to inform the "tagged" person of the post by causing that user to receive a notification. For example, a person who posted a photograph of herself with her best friend might "tag" the best friend to indicate that she is the other person in the picture and let her know that the photo has been posted.

Instagram post. (*Id.* at 24.)

The next day, Sally Doe's mother went to Hunters Lane to alert the school of the situation. She met with Assistant Principal Newman, who was in charge of overseeing ninth grade students, and an SRO. (Docket No. 70-3 at 42–43; Docket No. 83-1 at 26; Docket No. 89 ¶¶ 1, 5.) Newman's recollection of the meeting is limited. Newman testified that she does not remember whether she asked Doe who was circulating the video. Newman also does not recall whether she took notes. (Docket No 70-3 at 49.) Sally Doe's mother has attested that she told Newman that she "wanted [her] daughter protected and if that meant that the boy involved had to be suspended or expelled, then that is what should occur." (Docket No. 92-5 ¶ 4.) She also attested that Newman and the SROs focused their questions on the issue of forcible rape and did not raise the issue of a possible Title IX violation or the possibility that the underlying events may have been non-forcible but unwelcome. (*Id.* ¶ 7.)

Newman did not, to her recollection, inform the executive principal of Hunters Lane, Susan Kessler, about the events. (Docket No. 89 ¶ 5.) Newman testified that she could not recall receiving any training, either at Hunters Lane or outside Hunters Lane, on how to conduct a Title IX investigation. (Docket No. 70-3 at 108.)

The record includes an email exchange between Sally Doe's mother and Newman, beginning on April 11, 2017. (Docket No. 83-7 at 1–6.) Sally Doe's mother described the bullying that Doe was apparently facing at school. Other students were "yelling and throwing things at her as she walk[ed] down the hallway," so much so that she had to put her headphones in to attempt to drown them out. (*Id.* at 5.) O.B. "tried to fight her . . . in front of a large crowd" and "told her he was going to have someone . . . beat her up." (*Id.*) "A student in one of her classes had the video[] and was talking to the teacher about it[,] even offer[ing] to show the

teacher," although the teacher refused. (*Id.*) Sally Doe's account of events confirms that she was taunted by her peers with sexually demeaning names such as "ho" and "slut" and that O.B. threatened her. (Docket No. 92-6 ¶ 8.)

On April 12, 2017, Sally Doe's mother wrote, "There is absolutely no way I can send my child to this detrimental environment every day." (*Id.* at 5.) Newman expressed her concern for what Sally Doe was experiencing and set up a meeting with Sally Doe's father for the next day to "talk and figure out a plan to get [Sally Doe] thr[ough] the rest of the year." (*Id.* at 4.) Sally Doe's mother responded that Sally Doe's father had tried to encourage Sally Doe to speak to Newman more about the situation, but that Sally Doe had said there was "no point" because the Hunters Lane administration "c[ould]n't control everyone." Sally Doe's mother wrote that she, too, was concerned that "[i]t's just too many children to reprimand." (*Id.*) Sally Doe's parents pulled her out of Hunters Lane for the remainder of the year, and she was allowed to complete her exams at home. (Docket No. 83-1 at 29.)

By April 18, 2017, the video was, as far as the parties know, off of social media. (Docket No. 92-4 ¶ 18.) Sally Doe, however, continued to suffer occasional taunting or provocation from other students related to the video. That summer, Sally Doe participated in a summer program at Hunters Lane, and she, during the program, had an altercation with a boy about the video. (Docket No. 83-1 at 37.) Sally Doe returned to Hunters Lane the next year and, at one point, was mocked by another student about the video in front of her then-boyfriend. Afterwards, an assistant principal found her crying in a stairwell. (*Id.* at 39–40.) Sally Doe originally received an overnight suspension for missing class, but her mother went into the school the next day and explained the situation, after which the suspension was taken off of Sally Doe's record. (*Id.* at 41–42.)

In November 2017, a male student touched Sally Doe's buttocks without her permission while taking a picture. Thereafter, the student and Sally Doe's boyfriend got into a fight. Sally Doe, her boyfriend, and the student who took the picture while groping her were all suspended based on the fight. Although the disciplinary documentation of the incident does not mention Sally Doe's earlier problems with the video, it does not rule out the possibility that Sally Doe's resultant reputation played a role in the boy's actions.(Docket No. 83-10 at 5.)

Later that school year, Sally Doe was involved in an altercation, during which a student brought up the video. (Docket No. 83-1 at 44.) By the 2018–19 school year, however, the active harassment of Sally Doe had stopped. (Docket No. 92-4 ¶ 22.)

Meanwhile, Nashville police had begun a criminal investigation of O.B. arising out of the creation and dissemination of the video. O.B. was ultimately convicted of sexual exploitation of a minor. (Docket No. 92-4 ¶¶ 10–11.) Police records show that O.B. had previously been investigated, while in middle school, for having allegedly inappropriately touched a female student. (Docket No. 83-4 at 16.) He has now withdrawn from MNPS. (Docket No. 92-4 ¶ 23.)

On August 31, 2017, Sally Doe, through her mother, filed her Complaint. (Case No. 3:17-cv-1209, Docket No. 1.) Counts I and II of the Complaint are for Title IX violations related to MNPS's actions, respectively, before and after the bathroom incident. Count III is a claim under 42 U.S.C. § 1983, based on MNPS's failure to train its employees with regard to sexual harassment. Count IV is a claim under 42 U.S.C. § 1983, based on MNPS's deliberate indifference to ongoing harassment. (*Id.* ¶¶ 38–56.)

### D. Second Incident at Hunters Lane: S.C.

On April 17, 2017, S.C., also a freshman at Hunters Lane, was involved in a sexual encounter with a male student, J.J., on school premises during the students' lunch hour.

According to S.C., all of the sexual activity that she engaged in was coerced and unwelcome, although she did not know how to stop it. (Docket No. 92-11 ¶ 4.) Another female student, S.D., recorded the encounter on video. (Docket No. 92-1 ¶¶ 1, 3.) S.C. testified that S.D. had—unbeknownst, at first, to S.C.—come into the room during the encounter and that, by the time S.C. saw S.D., S.D. already appeared to be recording the encounter on her phone. (Docket No. 71-1 at 20.) Later that day, when S.C. was preparing to get on the school bus home, S.D. approached S.C. and informed S.C. that, as S.C. would later describe it, "the video was out and . . . everybody had it." (Docket No. 92-1 ¶ 7; Docket No. 71-1 at 23.) S.C. left school for the day without informing any teachers or administrators about the sexual encounter or the video. (Docket No. 92-1 ¶ 8.) When S.C. got home, she told her mother that she had had sex for the first time, but she did not tell her mother that a video had been taken of the incident. At some point that night, however, a friend sent the video to S.C.'s mother, who became angry at S.C. (Docket No. 71-1 at 27–28.)

A little after 9:30 p.m. that night, Executive Principal Kessler received a Facebook message from a "community member" with the video attached. (Docket No. 92-1 ¶ 11; Docket No. 74 ¶ 3.) Kessler claims that, by early the next morning, she had "begun [a] formal investigation of the incident." (Docket No. 74 ¶ 5.) Kessler worked with her assistant principals as well as the school's SROs to further the investigation, and Detective Robert Carrigan, a police detective dedicated to investigating sex crimes, also came to the school. (*Id.*)

Detective Carrigan interviewed S.C. and, after the interview, informed S.C.'s mother that the sexual encounter had been consensual. (Docket No. 92-1 ¶ 16.) S.C. gave a written statement to Kessler and did not state that she had been forced into the encounter. (Docket No. 74-1 at 1.) She did, however, state that she had wanted to stop both the encounter and the videotaping but

"just couldn't get the urge to say no." (*Id.*) According to Kessler, there was nothing about the content of the video itself suggesting that the sexual activity was non-consensual, and S.C. appeared, in the video, to have been aware of the taping. (Docket No. 74 ¶¶ 7–8.) According to S.C., police, as part of their questioning of her, told her that she could be prosecuted for the creation of child pornography and suggested that, because J.J. had not struck or otherwise violently forced her, the activity was consensual. (Docket No. 92-11 ¶¶ 7–8.) S.C.'s mother also stated that police suggested that S.C. could be prosecuted for child pornography offenses and that, because J.J. had not struck her on the video, it was clear that she had been a willing participant. (Docket No. 92-12 ¶¶ 6, 8.)

Ultimately, the school punished eight students, including J.J., S.C., and S.D., for their involvement in the sexual encounter and/or creating or distributing the video. (Docket No. 92-1 ¶ 20; Docket No. 71-1 at 38.) The other students punished were three male and two female students, all of whom were found to have shared the video. (Docket No. 74 ¶ 9.) All of the students received the same punishment, a three-day suspension. (*Id.* ¶ 13.) According to S.C. and her mother, Kessler assured them that the matter would "blow over in one day," a prediction that they found shocking. (Docket No. 92-11 ¶ 12; Docket No. 92-12 ¶ 14.)

S.C. attested that she had heard of the practice of "exposing" since the sixth grade and understood it to mean the sharing of sexual photos and/or videos that were not intended to be shared. According to her, at one point, a website had existed specifically for that purpose within the Nashville area, using the name "615exposed." She believed that at least two other incidents of "exposing" had occurred at Hunters Lane before the events involving her; one of those prior instances appears, from S.C.'s description, to have been the Sally Doe incident, while the other involved activity in a baseball dugout. (Docket No. 92-11 ¶ 11.)

S.C. never returned to Hunters Lane, ultimately moving to another school outside the MNPS system. (Docket No. 92-1 ¶ 19.) She testified that another student, R., "put [the video] on Pornhub" two days after it was recorded, which he told her about via Snapchat. (Docket No. 71-1 at 35–36.) S.C. testified that, although she left Hunters Lane, she was taunted about the video "mostly every day" by being called "a ho," "nasty," or "worthless." (*Id.* at 35.) The taunting came from both peers in her neighborhood and at her new school. (*Id.* at 37.) She also testified that S.D. made violent threats toward her and her family due to S.C's having "snitched" on her. S.C.'s mother reported those threats to the police. (*Id.* at 39.) Two male students also sent messages "warning" S.C., although she did not characterize those messages to be as threatening as S.D.'s. (*Id.* at 45–46.) S.C.'s mother confirms that S.C. and S.C.'s sister received threats and that she complained to the school and police about the threats.(Docket No. 92-12 ¶¶ 11–12.)

S.C. concedes that Kessler had no knowledge of anything in J.J.'s disciplinary history that would have suggested that he was at risk of harassing any female student. (Docket No. 92-1 ¶ 23.) Nor was there anything in the disciplinary records of the students punished for distributing the video that would have alerted Kessler to the possibility that they were particularly predisposed to engage in such an activity. (*Id.* ¶ 25.) Kessler testified that she had never heard the term "exposing" used to refer to the practice of MNPS students' circulation of other students' sexual pictures or videos before this lawsuit. (*Id.* ¶ 26.)

On July 31, 2017, S.C.'s mother sued MNPS on her behalf. (Docket No. 1.) Counts I and II of her Amended Complaint are for Title IX violations related to MNPS's actions, respectively, before and after the bathroom incident. Count III is a claim under 42 U.S.C. § 1983, based on MNPS's failure to train its employees with regard to sexual harassment. Count IV is a claim under 42 U.S.C. § 1983, based on MNPS's deliberate indifference to ongoing harassment.

(Docket No. 6 ¶¶ 41–61.)

## II. LEGAL STANDARD

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To win summary judgment as to the claim of an adverse party, a moving defendant must show that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim. Once the moving defendant makes its initial showing, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Conversely, to win summary judgment as to her own claims, a moving plaintiff must demonstrate that no genuine issue of material fact exists as to all essential elements of her claims. "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. 242, at 252. An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

## III. ANALYSIS

**A. Private Cause of Action Under Title IX**

"The express statutory means of enforcement" of Title IX "is administrative: The statute directs federal agencies that distribute education funding to establish requirements to effectuate the nondiscrimination mandate, and permits the agencies to enforce those requirements through 'any . . . means authorized by law,' including ultimately the termination of federal funding." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 280–81 (1998) (quoting 20 U.S.C. § 1682). The existence of an administrative, funding-based enforcement mechanism does not, however, necessarily preclude additional means of supporting a federal spending program's guarantees, such as private enforcement by those whom the program is intended to benefit. To that end, the Supreme Court has long recognized that "Title IX implies a private right of action to enforce its prohibition" that can be brought by or on behalf of the students harmed by a Title IX violation. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005) (citing *Cannon v. Univ. of Chicago*, 441 U.S. 677, 690–693 (1979)).

In *Gebser v. Lago Vista Independent School District*, the Supreme Court addressed the question of whether and when a Title IX funding recipient may be liable for damages arising out of sex-based harassment by a teacher. 524 U.S. at 218. In attempting to "define the contours of that liability," *id.*, the Court held that, as in actions under 42 U.S.C. § 1983, an institution's liability for the actions of an individual could not be premised on a theory of vicarious liability or *respondeat superior*. *Id.* at 285. Rather, the Court held that, "in cases . . . that do not involve official policy of the recipient entity, . . . a damages remedy will not lie under Title IX unless an official who at a minimum has authority to address the alleged discrimination and institute corrective measures on the recipient's behalf ha[d] actual knowledge of discrimination in the recipient's program and fail[ed] to adequately respond." *Id.* at 290.

On one hand, the holding in *Gebser*, by precluding simple vicarious liability in favor of a focus on the culpability of the institution, erected a hurdle for plaintiffs seeking to recover for harms done to them at school. The focus on institutional responsibility, however, also eliminated any need to rely on the employer/employee relationship as essential to establishing liability. The rationale for liability arising out of an institution's failure to address harassment by a teacher could just as easily be applied to its failure to address harassment by a student's peers. Accordingly, in *Davis v. Monroe County Board of Education*, 526 U.S. 629, the Supreme Court extended the holding in *Gebser* to apply to Title IX cases involving student-on-student harassment. The Court, however, made clear that a school is not liable for all student-on-student harassment. The school's "deliberate indifference must, at a minimum, 'cause [students] to undergo' harassment or 'make them liable or vulnerable' to it." *Id.* at 645 (quoting Random House Dictionary of the English Language 1415 (1966); Webster's Third New International Dictionary 2275 (1961)).

The Court in *Gebser* had considered whether a school could be liable under Title IX for the ongoing harassment of one student plaintiff by one particular peer, concluding that liability was appropriate so long as the school had acted "with deliberate indifference to known acts of harassment" that were "so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit." *Id.* at 633. The Sixth Circuit, however, has extended the holdings in *Gebser* and *Davis* to allow liability where the funding recipient was deliberately indifferent to prior acts of harassment against the plaintiff by different third-party perpetrators. *Patterson v. Hudson Area Schs.*, 551 F.3d 438, 449 (6th Cir. 2009); *Vance v. Spencer Cty. Pub. Sch. Dist.*, 231 F.3d 253, 259 (6th Cir. 2000).

With regard to what would constitute deliberate indifference, the Sixth Circuit has held

that, "[w]here a school district has actual knowledge that its efforts to remediate are ineffective, and it continues to use those same methods to no avail, such district has failed to act reasonably in light of known circumstances." *Vance*, 231 F.3d at 261. However, it has also cautioned that "[d]eliberate indifference" in the context of liability for sexual misconduct, "does not mean a collection of sloppy, or even reckless, oversights; it means evidence showing an obvious, deliberate indifference to" the underlying conduct or risk. *Doe v. Claiborne Cty., Tenn. ex rel. Claiborne Cty. Bd. of Educ.*, 103 F.3d 495, 508 (6th Cir. 1996).

As this court has previously observed, Title IX claims based on harassment or abuse can roughly be separated into two types—"before" claims and "after" claims. "Before" claims focus on a school's actions before an underlying incident (or, at least, before the school's knowledge of that incident) and consider whether the school acted adequately to prevent and prepare for foreseeable risks of harassment or abuse. "After" claims, in contrast, consider the school's response after it learns of an underlying incident to determine whether the school met its obligation to handle the matter without deliberate indifference to its potential discriminatory effect. *See Doe v. Univ. of Tenn.*, 186 F. Supp. 3d 788, 791 (M.D. Tenn. 2016). In a case such as this one, however, involving the dissemination of recorded material, that terminology may be somewhat misleading. While it is simple enough to identify a time "before" the events at issue in this case, the nature of digital media complicates the inquiry of when, if ever, one can say that the parties reached the time "after." Once illicit, private images or videos of a person have been distributed electronically, there may be no guarantee that the person can ever be totally confident that their circulation has been stopped. *See Paroline v. United States*, 572 U.S. 434, 440 (2014) (discussing circulation of child pornography on the internet). In extreme cases, an electronic depiction of a brief, traumatic (or even simply private) experience in one's life may go on to be

transmitted to thousands of computers and devices, for years or even decades after the original event. *Cf. id.* In that regard, the better terminology might not be "before" and "after," but "before" and "during"—before the depiction was created and during the indefinite period thereafter when it could resurface at any time. Nevertheless, the before/after distinction is helpful in clarifying the nature of the claims at issue here, and both parties use that terminology. The court will as well.

1. Lack of Notice Necessary for "Before" Claims

MNPS argues that, with regard to the plaintiffs' "before" claims, it lacked sufficient notice or actual knowledge of any underlying risk of sexual harassment to qualify for liability under Title IX. Although some general risk of sexual harassment and circulation of illicit pictures or videos in schools might be obvious enough, MNPS argues that it did not have any basis for suspecting that any of the particular students involved in these incidents posed a risk of engaging in such behavior. MNPS also points to the lack of evidence that its personnel, with perhaps a few exceptions, were specifically aware of an "exposing" trend among its students.

Regardless of whether particular MNPS personnel knew specifically of the use of the term "exposing," there is ample evidence to allow a jury to conclude that MNPS was on notice of the risk of the dissemination of sexual images of its students without their consent, as well as the possibility of subsequent harassment of the students depicted. First, the risk at issue in this case is an obvious and inevitable danger, given the ages of the students involved and the realities of media and communication technology in this decade. More importantly, however, MNPS schools themselves had witnessed numerous cases that confirmed that risk. One of the SROs who worked at Hunters Lane testified that he could not even put a number on how many instances of students' "sexting pictures" he had dealt with, but estimated that "maybe a dozen"

had been "brought to [his] attention" from 2012 to 2017. (Docket No. 83-5 at 26.) He estimated having seen five to ten cases involving sexual videos. (*Id.* at 27.) In all those cases, he testified, he informed the Hunters Lane administration. (*Id.*) Detective Carrigan testified that behaviors similar to those at issue in these cases have occurred in every MNPS high school and middle school, although he clarified that he was not necessarily referring to the dissemination of videos that themselves had been filmed on campus. (Docket No. 92-15 at 24–25.)

The plaintiffs sought discovery from MNPS regarding disciplinary incidents related to sexual harassment, sexual assault, inappropriate sexual behavior, and/or inappropriate sexual contact at MNPS schools from the 2012-13 school year through the 2015-16 school year. The documentation that they received showed over 950 instances of sexual harassment, over 1200 instances of inappropriate sexual behavior, 45 instances of sexual assault, and 218 instances of inappropriate sexual contact. (*See* Docket Nos. 92 at 16; Docket No. 92-14 1–95.) There were also numerous incidents specifically involving digital communications. Indeed, many of the incidents described involved students taking and/or distributing sexually explicit photographs or videos of themselves and/or other students. (*See, e.g.*, Docket No. 92-14 at 97, 102, 146, 162.) Regardless of whether one might challenge those numbers on the margins,[5] it is plain that MNPS, through its teachers and administrators, had ample reason to know that inappropriate sexual behavior, including behavior involving sexual pictures and videos, was widespread in MNPS schools.

---

[5] The plaintiffs point out that the list provided is almost certainly underinclusive, because it omits cases where no discipline was imposed as well as cases that, despite involving sexual activities, were not coded as such in MNPS systems. It is also possible that the list may be overinclusive with regard to some entries—for example, if a student was actually innocent of the actions alleged but the incident was not recorded as such. In any event, it is not the precise number of incidents that matters, but that the incidents were pervasive enough to give MNPS notice of the problem it faced. For the same reason, MNPS's argument that the court should disregard the plaintiffs' tabulations has no weight. Even if the court excluded those tabulations, the plaintiffs could simply point a jury to the documents themselves.

Moreover, the events involving Mary Doe and Jane Doe in 2016 only added to the notice of the problem available to MNPS before the events involving Sally Doe and S.C. at Hunters Lane. There is also some evidence that Hunters Lane itself experienced a similar, earlier instance of the same problem, involving the circulation of the video of students engaged in sexual activity in an allegedly on-campus dugout. (*See, e.g.*, Docket No. 71-1 at 25; Docket No. 92-11 ¶ 11; Docket No. 92-32 at 84–91.)

MNPS would have the court erect an artificial barrier around known risks related to widespread misbehavior in favor of a rule that only imposes Title IX liability if a school was aware of a particular problem student or student group likely to commit harassment or a particular student who was especially at risk of being targeted. Nothing in the logic of Title IX or the caselaw construing it supports such a rule. The Title IX standard recognized by the Supreme Court and the Sixth Circuit looks to what is a "clearly unreasonable response in light of the *known circumstances*." *Vance*, 231 F.3d at 260 (quoting *Davis*, 526 U.S. at 648) (emphasis added). There is no basis for excluding from the "known circumstances" a school district's knowledge that a problem is widespread and recurring throughout its student population. Nor is there any reason to assume that Title IX categorically permits a school district to turn a blind eye to the group dynamics in which harassment sometimes thrives. *See Patterson*, 551 F.3d at 448–49 (holding that a school's "isolated success with individual perpetrators cannot shield [it] from liability as a matter of law" in a case where a student "suffered harassment over many school years perpetrated by various students"). Title IX requires only that the school have "enough knowledge of the harassment that it reasonably could have responded with remedial measures to address the kind of harassment upon which plaintiff's legal claim is based." *Staehling v. Metro. Gov't of Nashville & Davidson Cty.*, No. 3:07-0797, 2008 WL 4279839, at

*10 (M.D. Tenn. Sept. 12, 2008) (Echols, J.) (quoting *Folkes v. N.Y. Coll. of Osteopathic Med.*, 214 F.Supp.2d 273, 283 (E.D.N.Y. 2002); citing *Johnson v. Galen Health Institutes, Inc.*, 267 F. Supp. 2d 679, 687 (W.D. Ky. 2003)). Actual knowledge of a serious, widespread problem is at least enough to allow a district to reasonably respond in some way, even if it cannot predict or prevent every future incident.

The reasoning that MNPS wishes the court to graft into Title IX, moreover, would not be adopted by any reasonable person or entity with regard to any other risk. When a driver leaves for work in the morning, he does not know that he is likely to have a collision with a *particular* other driver at a *particular* intersection. But the driver still drives safely, because he knows of a general risk of accidents. By the same token, MNPS does not know that any particular school is likely to have a fire, but that presumably does not stop it from stocking its fire extinguishers and making sure the sprinklers work. Lack of knowledge of a more specific risk does not exonerate one from deliberate indifference to a known general risk.[6] In any event, MNPS had more than merely a general knowledge of the risks at issue, because its disciplinary records are replete with instances of actual notice that its students might behave in the manner described by the plaintiffs.

While it may be true that MNPS did not, for the most part,[7] have warning about the specific students addressed in these cases or the specific acts that would occur, those facts are

---

[6] Indeed, even the case that MNPS cites in support of the its proposed rule acknowledges that it "does not foreclose the possibility of Title IX liability based on a defendant's knowledge of prior harassment of victims other than the plaintiff by different perpetrators." *Doe v. Bibb Cty. Sch. Dist.*, 83 F. Supp. 3d 1300, 1309 (M.D. Ga. 2015), *aff'd*, 688 F. App'x 791, 796 (11th Cir. 2017) ("[W]e do not foreclose the possibility that a plaintiff may demonstrate adequate notice based upon similar prior incidents that involve different victims and perpetrators."). (*See, e.g.*, Docket No. 78 at 8.)

[7] The investigation of O.B. in middle school suggests that MNPS did have some general notice of a possible propensity by him to engage in inappropriate and unwanted sexual behavior.

relevant to the adequacy of the school district's preventive actions, not whether it was on sufficient notice of the risk of harassment to give rise to an obligation not to be deliberately indifferent. Because MNPS was not on notice of any risks involving these specific students, it had no obligation to take any targeted steps to preemptively protect the plaintiffs or restrain the other students involved. That lack of specific knowledge does not, however, excuse the district from its responsibility not to recklessly disregard the widespread risk of which it *was* aware. No one could have looked at the information available to MNPS by 2016 and doubted that it was fully on notice that it needed to be prepared to deal with the risk of sexual misconduct and harassment at its schools, including, specifically, harassment involving the electronic distribution of sexual depictions of its students. Because the plaintiffs have produced facts sufficient to establish notice of a risk of harassment, MNPS can be held liable for harms caused by its deliberate indifference to that risk.

2. Unwelcomeness of Sexual Activity

MNPS argues next that the plaintiffs' claims should fail because (1) the evidence is insufficient to show that the underlying sexual encounters were unwelcome and (2) insofar as the encounters were unwelcome, MNPS was, at least in some of the cases, not informed of that fact and therefore had no duty to respond accordingly. The plaintiffs respond that they have presented evidence that none of the underlying sexual encounters was welcome and that the plaintiffs never consented to the creation and dissemination of the videos.

MNPS is correct that the Sixth Circuit has suggested, at least in an unpublished case, *Winzer v. School District for the City of Pontiac*, that "sexual activity among students who are voluntary participants, absent any evidence of unwelcome sexual advances," is insufficient to support a Title IX sexual harassment claim. 105 F. App'x 679, 681 (6th Cir. 2004). What

MNPS's argument neglects to account for, however, is that that rule, by its own language, assumes voluntary participation, not in merely some sexual behavior, but in the specific behavior at issue in the claim. Courts have recognized that circulation of sexual videos and related harassment can give rise to distinct Title IX issues, even if a school is not liable, under Title IX, for claims related to the initial underlying sexual encounter. *See, e.g.*, *Butters v. James Madison Univ.*, 145 F. Supp. 3d 610, 618, 621 (W.D. Va. 2015) (recognizing Title IX claim based on circulation of video of off-campus sexual assault, despite plaintiff's conceding that the school did not have liability for the assault). By the same principle, a student can allege harassment related to the non-consensual circulation of her sexually suggestive or explicit photos, regardless of whether she played a role in the creation of the photos or even took them herself. *See, e.g.*, *Doe v. Town of Stoughton*, No. CIV.A. 12-10467-PBS, 2013 WL 6498959, at *2 (D. Mass. Dec. 10, 2013); *Logan v. Sycamore Cmty. Sch. Bd. of Educ.*, No. 1:09-CV-00885, 2012 WL 2011037, at *6 (S.D. Ohio June 5, 2012).

The circulation of sexual photos or videos is a distinct set of events that must be considered in its own right for any Title IX implications. For MNPS's defense to prevail, then, the plaintiffs would need to have been voluntary participants, not only in the sexual encounters, but also in the creation and dissemination of the videos. The plaintiffs, however, were not voluntary participants in the circulation of the videos. Many were unaware that they were being taped, and others came to notice or suspect taping only after it had begun. None of the plaintiffs, however, actively assented to being taped or voluntarily participated in the video's circulation.

There are, moreover, disputed issues of fact with regard to whether the underlying sexual encounters involved elements of unwelcomeness that might support a finding of harassment, particularly in light of the plaintiffs' affidavits. All of the plaintiffs have characterized the

underlying encounters as at least unwelcome. Even the caselaw cited by MNPS makes clear that "unwelcome sexual advances" can form the basis of liability, despite the fact that a student ultimately voluntarily participates in sexual activity with a party making those advances. *Winzer*, 105 F. App'x at 681. Indeed, it is well-settled that "the fact that sex-related conduct was 'voluntary,' in the sense that the complainant was not forced to participate against her will, is not a defense to a sexual harassment suit." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 68 (1986); *accord Wisniewski v. Pontiac Sch. Dist.*, 862 F. Supp. 2d 586, 597 (E.D. Mich. 2012); *see also J.M. ex rel. Morris v. Hilldale Indep. Sch. Dist. No. 1-29*, 397 F. App'x 445, 455 (10th Cir. 2010) (acknowledging that consent did not preclude a finding of actionable harassment under Title IX); *Chancellor v. Pottsgrove Sch. Dist.*, 529 F. Supp. 2d 571, 576 (E.D. Pa. 2008) (explaining, in Title IX case, that, based on the allegations at issue, "consent [was] not a defense"); *cf. Bouveng v. NYG Capital LLC*, 175 F. Supp. 3d 280, 312 (S.D.N.Y. 2016) (explaining differences in elements between sexual harassment and sexual battery).

The Sixth Circuit's mention, in *Winzer*, of "unwelcome sexual advances" recognizes two layers of complexity that a myopic focus on consent to sexual contact would fail to take into account. First, by acknowledging that sexual advances may have been unwelcome, regardless of the existence of later voluntary sexual activity, the Sixth Circuit has recognized that sexual interactions may be multi-staged and multi-faceted; consent at one stage does not necessarily imply consent or welcomeness at every other. Second, by emphasizing the issue of welcomeness, rather than merely consent, the Sixth Circuit accounts for the fact that, even if sexual activity is consensual, the underlying interaction may be sufficiently unwanted or unwelcome that its intrusion into an educational setting can contribute to an environment of discriminatory harassment. For example, a student might face unwanted, harassing sexual overtures but

ultimately consent to sexual activity out of a sense of social pressure. The student's decision to engage in the sex act itself, however, does not absolve the school of its responsibility to take appropriate steps to address the environment that allowed the unwanted advance to happen, if it has notice that a discriminatory environment had arisen. For the same reason, an environment in which girls consent to sex but are then subjected to severe, gendered harassment and humiliation is not rendered Title IX-compliant by the initial consent.

The circulation of private sexual videos without consent, alone, would be sufficient to preserve a Title IX claim from a defense based on the voluntariness of the underlying sexual activity. Moreover, enough questions exist regarding the characterization of the underlying sexual encounters that the court cannot conclude, for the purposes of summary judgment, that all aspects of those encounters were welcome. The court, accordingly, will not grant MNPS summary judgment on that ground.

3. Basis of Sex

MNPS argues next that the circulation of the videos depicting the plaintiffs cannot form the basis of a Title IX claim because the videos depicted both the plaintiffs and the boys involved and, therefore, humiliated, exposed, and/or otherwise interfered with the education of male and female students equally. Accordingly, any harm that the plaintiffs suffered would not have been on the basis of sex, and the plaintiffs' claims would fail because they cannot establish causation.

As the Sixth Circuit has recognized, where harassment involves actions of an explicitly sexual or gendered nature, the question of whether that harassment amounted to sex discrimination is different than it would be in a case where, for example, a supervisor, teacher, or peer was simply accused of being abusive to others in a non-sexual, gender-neutral way. *See*

*Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 271 (6th Cir. 2009); *see also* David S. Schwartz, *When Is Sex Because of Sex? The Causation Problem in Sexual Harassment Law*, 150 U. Pa. L. Rev. 1697, 1700 (2002) (observing that courts have generally recognized that "sexual conduct per se establishe[s] the 'causation' element necessary under Title VII to prove that the conduct was 'because of sex.'"). In a case involving abusive but non-sexual, facially gender-neutral behavior, it is necessary for the plaintiff to introduce additional facts establishing that the abusive behavior was somehow discriminatorily applied—for example, that a supervisor was abusive toward women more often than men. Otherwise, while the behavior may have been worthy of condemnation—and may even have been "harassment," as the term is commonly used—the behavior would not have been discriminatory. *Gallagher*, 567 F.3d at 272. Abusive behavior that is explicitly sexual or gender-coded in nature, however, may have a discriminatory effect, even if it is technically visited upon men as well as women. For example, the Sixth Circuit has recognized that the public use of "'sex specific' words," such as "'bitch,' 'whore,' and 'cunt' that . . . may be more degrading to women than men" may, if sufficiently severe and pervasive, amount to sexual harassment, even if men are exposed to the words as often as women. *Id.* (quoting *Reeves v. C.H. Robinson Worldwide, Inc.*, 525 F.3d 1139, 1144 (11th Cir. 2008), *reh'g en banc granted, opinion vacated*, 569 F.3d 1290 (11th Cir. 2009), *same result reached on reh'g en banc*, 594 F.3d 798 (11th Cir. 2010)).

Although both male and female students had their privacy violated by these events, the plaintiffs' claims under Title IX are not based on the bare violation of their privacy interests. Under Title IX, what matters is whether the plaintiffs' educations were disrupted in a manner that amounted to discrimination. In order for MNPS's argument to succeed, then, the facts would have to suggest that male and female students faced the same level of educational disruption

from being the subjects of circulated sexual videos. The plaintiffs, however, have produced ample evidence based on which a jury could find to the contrary. The girls describe being called graphic, obviously gendered names in the wake of the tapings. The sexual and social dynamics they describe are not ones that treated male and female students equally in terms of the stigma and embarrassment associated with the dissemination of sexual recordings. To the contrary, the bullying described follows the easily recognizable script of treating women and girls as uniquely tainted and lessened by their engagement in sexual activity—a dynamic with which MNPS administrators, as ordinary people living in the world, were undoubtedly familiar.[8] A reasonable juror, therefore, could conclude that male and female students were not harmed equally by MNPS's failure to prevent the development of a culture of digital sexual humiliation in its schools.

MNPS argues next that the circulation of the videos, at least in some of the cases, could not amount to sexual harassment because there is evidence that the students engaged in circulating them were motivated by "personal animus," which MNPS suggests is mutually exclusive with sexual harassment. MNPS's argument appears to be based on assumption—unsupported by caselaw—that the determinative question with regard to causation in a sexual harassment case is the harasser's subjective understanding of his or her own motivations. To the contrary, the Supreme Court has explained that a court must look to the "real social impact of . . . behavior," "judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" *Oncale*, 523 U.S. at 75 (quoting *Harris*

---

[8] Particularly strangely, MNPS suggests that the plaintiffs' sexual harassment allegations are somehow negated by the fact that female students were involved in the taping and/or dissemination of the videos. (*See, e.g.*, Docket No. 72 at 11.) It is well-settled that it is no defense to sexual harassment that a perpetrator was of the same sex as the victim. *See Oncale*, 523 U.S. at 82.

*v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993)). Accordingly, while sexual harassment—in the words of the case MNPS cites in support of this argument—must be "gender-*oriented*," *Davis*, 526 U.S. at 651 (emphasis added), that determination can be made, "irrespective of the harasser's motivation." *Gallagher*, 567 F.3d at 271. Harassers may have any of a range of personal motivations—desire, revenge, peer pressure, jealousy, or even just general sadism, to name a few. All of those motivations, however, can play a role in driving discriminatory behavior. A person seeking revenge, for example, might find gendered sexual humiliation to be a particularly effective tool for tormenting her target. If the content and nature of harassment is gender-oriented and results in a denial of equal educational benefits on the basis of sex, the murky depths of the harasser's psychology are no defense to a Title IX claim. That is particularly true where, as here, the harasser is not even an employee of the defendant, and the defendant is being sued based on its institutional failures, not the motivation of any one person. Because a reasonable juror could conclude that the harassment in these cases amounted to discrimination on the basis of sex, MNPS is not entitled to summary judgment in that regard.

4. Severity/Pervasiveness

MNPS argues next that the behavior to which the plaintiffs were subjected was not sufficiently severe or pervasive to give rise to a claim for sexual harassment. "[W]hile 'severe and pervasive conduct' is a familiar phrase—one borrowed from the 'hostile work environment' jurisprudence of Title VII—it has a distinct application in Title IX." *Hoffman v. Saginaw Pub. Sch.*, No. 12-10354, 2012 WL 2450805, at *6 (E.D. Mich. June 27, 2012) (citing *Meritor Sav. Bank*, 477 U.S. at 67; *Davis*, 526 U.S. at 651). A school is not perfectly analogous to a workplace, and minor students are not perfectly analogous to adults. Accordingly, some behaviors that plainly would be out of place in a workplace may be tolerable in a school setting

as part of the ordinary social development of the school's students. *See Davis*, 526 U.S. at 651–52 (noting that, because, "at least early on, students are still learning how to interact appropriately with their peers," it is unsurprising that they may "engage in insults, banter, teasing, shoving, pushing, and gender-specific conduct that is upsetting"). As in the Title VII context, however, the line between what gives rise to a cause of action and what does not is determined, not by some abstract question of what behavior is acceptable, but rather by returning to the conceptual basis of the statutory protection at issue: discrimination. Accordingly, while it may be impossible to ensure that students will never be cruel, inappropriate, or unfair with their peers, a cause of action arises "where the behavior is so severe, pervasive, and objectively offensive that it denies its victims the equal access to education that Title IX is designed to protect." *Id.* at 652.

There can be little doubt that a juror could conclude that the conduct at issue here was severe and objectively offensive. MNPS presumably needs no reminder of the extraordinary seriousness with which our justice system treats the dissemination of graphic sexual depictions of minors. Indeed, Congress has determined that involvement in the production and distribution of child pornography may warrant imprisonment for years or even decades. *See* 18 U.S.C. § 2252A(b)(1). The potential psychological harms of being included in such images are well documented. *See Paroline*, 572 U.S. at 440. It would be strange if criminal laws treated these matters as possessing the highest level of gravity and yet Title IX did not even consider the conduct "severe" or "objectively offensive." Unsurprisingly, then, multiple courts have found that circulation of sexual pictures or videos and accompanying harassment can rise to the level of severity necessary to support a harassment claim. *See Butters*, 145 F. Supp. 3d at 619; *Doe v. Town of Stoughton*, No. CIV.A. 12-10467-PBS, 2013 WL 6195794, at *2 (D. Mass. Nov. 25,

2013); *Logan*, 2012 WL 2011037, at *6; *but see Higgins v. Saavedra*, No. CIV 17-0234 RB/LF, 2018 WL 327241, at *8 (D.N.M. Jan. 8, 2018) (holding that insults after circulation of video of student showering were insufficiently pervasive to give rise to a sexual harassment claim); *Tyrrell v. Seaford Union Free Sch. Dist.*, 792 F. Supp. 2d 601, 629 (E.D.N.Y. 2011) (holding that "insults, name-calling and pushing" following circulation of picture of off-campus sexual assault were not sufficiently severe and pervasive to give rise to a Title IX claim).

What is left, then, is MNPS's argument that the harassment to which the plaintiffs were subjected was not pervasive. There is variation, among the plaintiffs, with regard to how widely they were mocked or bullied by other students after their tapes were circulated. Even for the plaintiffs whose post-video fallout was less severe, however, the initial circulation of the videos is sufficient to allow a juror to conclude that it amounted to a denial of equal access to education. Despite the fact that the caselaw speaks in terms of conduct that is "severe *and* pervasive" it is well settled that relatively isolated incidents, if sufficiently egregious, can satisfy the standard for sexual harassment. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (observing that even "isolated incidents" can alter the terms and conditions of employment, if "extremely serious"). For example, "[m]ost courts which have addressed the issue have concluded that even a single incident of rape is sufficient to establish that a child was subjected to severe, pervasive, and objectively offensive sexual harassment for purposes of Title IX." *Lopez v. Metro. Gov't of Nashville & Davidson Cty.*, 646 F. Supp. 2d 891, 913 (M.D. Tenn. 2009) (Echols, J.) (citing *J.K. v. Ariz. Bd. of Regents*, No. CV 06-916-PHX-MHM, 2008 WL 4446712, at *12 (D. Ariz. 2008); *Kelly v. Yale Univ.*, No. Civ.A. 3:01-CV-1591, 2003 WL 1563424, at *3 (D. Conn. 2003); *Doe v. Dallas Indep. Sch. Dist.*, No. CIV.A.3:01-CV-1092-R, 2002 WL 1592694, at *6–7 (N.D. Tex. 2002); *Ross v. Mercer Univ.*, 506 F.Supp.2d 1325, 1358 (M.D. Ga. 2007)). While the cases

currently before the court do not include allegations of forcible rape, they do involve substantial violations of the students' sexual autonomy, which is relevant to just how pervasive the ensuing conduct needed to be to rise to the level of actionable harassment.

Moreover, it is inaccurate to characterize these cases as involving simple, isolated events. Being taped during sexual activity without permission would be an isolated event. The video's being sent to another person is a second event. The next transmission is a third. Although the evidence does not (and likely never could) show how widely the plaintiffs' videos were circulated, there is ample evidence that the circulation, or at least the availability, of the videos was widespread. Indeed, the impossibility of knowing how widely the videos were disseminated is part of why the conduct was so serious. In a contemporary high school, there is little that is more "pervasive" than electronic communication.

The court notes, also, that, insofar as the plaintiffs were taunted less in the wake of the circulation of the videos than they could have been, that was largely the result of most of their parents' perceiving the humiliation that their children were likely to face—as well as the schools' apparent inability to prevent that humiliation—and quickly withdrawing the students from the schools. If anything, MNPS's attempted defense is only possible because the underlying situations got so out of control, so fast, that the students fled. A reasonable juror could conclude that, by the time they did so, the harassment had already reached an actionable level.

For the foregoing reasons, the evidence is sufficient for a reasonable juror to conclude that the conduct to which each of the plaintiffs was subjected was so severe, pervasive, and objectively offensive that it denied her equal access to education. The court, accordingly, will not grant MNPS summary judgment on that ground.

5. Deliberate Indifference

Finally, MNPS argues that, even if claims of the type plaintiffs have raised might, in theory, be viable, they have not identified facts sufficient for a jury to conclude that MNPS's actions, either before or after the videos of the plaintiffs were circulated, were deliberately indifferent. In order to establish deliberate indifference, a plaintiff must show that school administrators responded to the known risk of harassment in a way that was "clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648.

As the plaintiffs' evidence makes clear, the problem of students' creation and circulation of sexual images and videos is widespread in MNPS. The district's approach to such matters, therefore, potentially implicates the education and futures of numerous students—including both the students depicted and those who circulated the videos. The Sixth Circuit has stressed that, while a district facing known sexual harassment "must respond and must do so reasonably in light of the known circumstances," "no *particular* response is required" in order to comply with Title IX. *Vance*, 231 F.3d at 260–61 (emphasis added). Accordingly, "courts should avoid second-guessing school administrators'" selection of one particular policy or response over another. *Stiles ex rel. D.S. v. Grainger Cty., Tenn.*, 819 F.3d 834, 848 (6th Cir. 2016) (citing *Davis*, 526 U.S. at 648; *Vance*, 231 F.3d at 260). The court, moreover, cannot assume that the only acceptable path is the strictest or most aggressive one, employing the harshest possible discipline against perpetrators, the most invasive surveillance of students' activities and communications, and the most rigorous and time-intensive administrative attention to the problem from school personnel. There are legitimate countervailing concerns that might lead a school district to take a more moderate approach. The bar that a plaintiff in a case such as these must clear, therefore, is high—not merely that schools could have handled matters differently or even that they could have handled them better, but that the district's decisions took it clearly

outside the bounds of the reasonable execution of its duties to its students and the federal government under Title IX.

    **a. "Before" Claims.** The plaintiffs argue that the harassment they received was, at least in part, the product of widespread failures of training, coordination, and monitoring by MNPS administrators. As a result, the plaintiffs argue, the district did not realize the depth of the problem it faced, did not train teachers or administrators on how to properly address or respond to incidents involving circulation of inappropriate student pictures or videos, and did not take adequate steps either to prevent harassment or to have in place adequate structures to support students who were the victims of it.

    The plaintiffs first argue that the district's policies and poor training resulted in the failure of its Title IX coordinator to be informed of, or realize the depth of, the problems within the district regarding the circulation of sexual pictures and videos. For example, the punishment of students involved in the distribution of the video of S.C. had been coded, in MNPS's systems, as "severe disruption of school activities," a designation that did not flag them as Title IX-related and, therefore, did not result in the Title IX coordinator's being notified. (*See* Docket No. 92-18 at 75.) A contemporaneous e-mail exchange about the incident and surrounding events included a number of high-level administrators, including Executive Principal Kessler and MNPS Director Shawn Joseph, but did not include the Title IX coordinator. (Docket No. 92-13 at 75–78.) That misclassification and lack of involvement of the coordinator, the plaintiffs argue, was typical.

    In her deposition in these cases, McCargar, as the Title IX coordinator at the relevant times, was questioned about when a principal should consider events involving on-campus sexual activity and filming to implicate Title IX. She explained that her position was that, if

sexual activity at school was consensual, then that activity would not, in and of itself, amount to a Title IX issue and would not need to be reported to her. She continued that the consensual taping of sexual activity also would not, in and of itself, be a Title IX issue that would require the involvement of the Title IX coordinator. McCargar, however, conceded that, if a tape of students engaged in sexual activity were circulated on social media and it led to the students' being harassed at school, "the potential for a Title IX compliance issue would come into place." (Docket No. 92-25 at 74, 77–89.)

Finally, McCargar was asked whether she, as Title IX coordinator, "t[ook] any steps to ensure that there was any punishment sufficient to deter sexual videotaping of students and/or dissemination of sexting pictures of students." She responded:

> Well, first thing, I actually was not aware that that activity was going on. I hadn't heard about it, no. So—so my answer would be, no, I didn't do anything, because, first thing, I wasn't even aware it was going on. And as far as any kind of discipline if that activity had been going on, I didn't get involved with that because I didn't know the activity was going on.

(*Id.* at 121–22.) She clarified shortly thereafter that she had been generally aware of some "incidents like this, but no one specifically told [her] about specific incidents or how numerous they were." (*Id.* at 138.) When asked whether she considered it "a problem that the Title IX coordinator [wa]sn't made aware that this type of activity was going on and therefore could not take steps to try to remediate the behavior," she replied, "Let's say that I—if I had to look at it now, I wish I knew that there were these incidents, but I didn't know." (*Id.* at 122.)

McCargar's successor, Dyer, provided some context regarding how the Title IX coordinator's duties were structured during the relevant time period. Dyer explained that, while MNPS, as required, did have a designated Title IX coordinator, Title IX coordinator was not that person's sole job. Rather, the duties of Title IX coordinator were rolled into the job of the

executive director of federal programs, who is responsible for ensuring that federal funding from all applicable federal programs, not just Title IX, is obtained and integrated into MNPS's budget. (Docket No. 92-18 at 22.) Title IX does not require the Title IX coordinator to perform that job full-time. The April 24, 2015 Dear Colleague Letter, however, addressed the benefits of doing so:

> Designating a full-time Title IX coordinator will minimize the risk of a conflict of interest and in many cases ensure sufficient time is available to perform all the role's responsibilities. If a recipient designates one employee to coordinate the recipient's compliance with Title IX and other related laws, it is critical that the employee has the qualifications, training, authority, and time to address all complaints throughout the institution, including those raising Title IX issues.

(Docket No. 1-5 at 3.) Dyer admitted that there were many days when she did not devote any time to Title IX matters, with weeks sometimes passing without her performing any Title IX-specific duties. (Docket No. 92-18 at 22, 36.) When asked whether it was "true that [she] spend[s] most of [her] time making sure that [the multimillion-dollar federal funding figure for a particular year] is received by [the] Metro school system," Dyer responded, "Yes." (*Id.* at 23.) When asked about the division of responsibilities between principals and the coordinator, Dyer's position largely echoed McCargar's, with the coordinator's responsibilities only arising after a principal affirmatively determined that a violation occurred. (*Id.* at 64–65.) She confirmed that she, like McCargar, was not made aware of the incidents at issue in these cases. (*Id.* at 89–91.)

Despite the fact that MNPS's policies relied on principals to involve the Title IX coordinator, Kessler testified that she could not remember contacting the coordinator, in her capacity as principal of Hunters Lane, about any Title IX issue at any point during the 2016–17 school year. (Docket No. 92-21 at 37.) When asked why the incident involving S.C. had not been treated as an instance of harassment under Title IX, Kessler explained as follows:

Kessler: Because the . . . situation was a consensual sexual act. She also consented to be videotaped. When I dealt with the situation, it was only dealing with that particular incident, and then she didn't return back to school. She was issued a penalty, et cetera. But sexual harassment has to be unwanted. And once she had told me that she consented to participate, it wasn't a sexual harassment investigation.

Counsel: Did she ever tell you she consented to a videotape being circulated within the . . . school?

Kessler: I didn't ask her that.

(*Id.* at 44.) When asked whether the nonconsensual circulation of a sex video at school could constitute a Title IX issue, Kessler answered that "hypothetically, it could or it couldn't." (*Id.* at 45.) Kessler emphasized that whether an issue ended up being addressed at the district level often depended on whether parents were unhappy with its handling at the school level. (*Id.* at 83.)

In other words, the responsibility for ensuring Title IX compliance was vested in the Title IX coordinator, but the coordinator, contrary to Department of Education guidance, over-relied on principals to identify which cases should be brought to her attention; the principals, in turn—at least insofar as Kessler was typical—over-relied on parents to let them know whether an incident had been adequately addressed. In some cases, moreover, even executive principals were excluded from the process because assistant principals did not understand that involving the executive principals, let alone the Title IX coordinator, was necessary.

One immediately apparent flaw in MNPS's approach is that, by addressing matters at the highest level only when parents complained, MNPS was likely to neglect students who, through no fault of their own, were not fortunate enough to have highly engaged, assertive, and skeptical parents. Even with regard to students whose parents were highly involved, however, the ability

of parents to effectively advocate for their children would have required the parents to know their children's Title IX rights and how to assert them. MNPS's efforts to educate parents, however, were limited. Dyer cited the district's 2016–17 Student-Parent Handbook as an example of how the district had informed parents and students of their Title IX rights, as did Director Joseph. (Docket No. 92-18 at 58; Docket No. 92-29 at 52; *see* Docket No. 92-13 at 19.) The Handbook includes a short section on Civil Rights Compliance that briefly lists Title IX as among the antidiscrimination laws with which MNPS must comply and provides an address for the Title IX coordinator with little additional detail about a student's rights. (Docket No. 92-13 at 68.)

Based on the foregoing, a reasonable juror could conclude that MNPS was deliberately indifferent with regard to its approach to the circulation of sexual videos and images of students, up to and through the dates of all of the incidents at issue here. The court has no doubt that the problem is a difficult one and that schools and school districts may reasonably disagree about the best approach without running afoul of Title IX. What the plaintiffs have alleged, however—and what a reasonable juror might infer from the facts presented—is not simply the selection of one policy over another, but a failure to build, or at least use, the basic structures that would have made even an attempt at an appropriate response possible. MNPS did not perceive the depth of its problem, despite having the mechanisms for doing so and despite its ground-level personnel being widely aware of what was going on. In a large school system, some decentralization of responsibility is likely inevitable. But the role of a Title IX coordinator is to *coordinate*. A reasonable juror, however, could look at the facts presented and see, not coordination, but a mass of already-busy, non-expert individual principals and assistant principals dealing with a new and systemic problem on an essentially ad hoc basis, with little support from the high-level

administrators who were supposed to be the ones making sure that Title IX issues were properly addressed. The court cannot conclude that that failure, as a matter of law, did not amount to deliberate indifference.

A reasonable juror, moreover, could conclude that the structural problems that the plaintiffs have identified were exacerbated by a fatally flawed understanding of the Title IX issues raised among the principals who were, despite the Department of Education's warnings, acting as gatekeepers of what the Title IX coordinator would address. At least some of the MNPS administrators' discussions of the underlying events show a myopic focus on the consensualness of the underlying sexual contact, at the expense of considering whether the circulation of the videos itself could have had Title IX implications. The court stresses that there is nothing wrong with administrators inquiring into, and giving great weight to, whether or not sexual activity on campus was consensual; the possibility of rape and sexual assault on campus has implications both for Title IX and well beyond it. As an antidiscrimination statute, however, Title IX is not *only* concerned with consent to sexual activity, particularly when other aspects of an incident involved unwelcome actions taken without the affected student's consent. There is, moreover, nothing novel about that need to consider a broader set of issues. No competent human resources manager in any workplace would look at widespread circulation of personal sexual videos among employees, without the consent of those depicted, and then close the book on the matter because the initial sexual contact was consensual. While the school setting presents unique challenges that workplaces do not, the same wider focus is required.

Based on the foregoing, the plaintiffs have demonstrated that a reasonable juror could find deliberate indifference with regard to their "before" claims. The court, accordingly, will not grant MNPS's request for summary judgment in that regard.

**b. "After" Claims.** Department of Education guidelines describe a school's responsibilities after learning of peer-on-peer sexual harassment as follows:

> If a student sexually harasses another student and the harassing conduct is sufficiently serious to deny or limit the student's ability to participate in or benefit from the program, and if the school knows or reasonably should know about the harassment, the school is responsible for taking immediate effective action to eliminate the hostile environment and prevent its recurrence. As long as the school, upon notice of the harassment, responds by taking prompt and effective action to end the harassment and prevent its recurrence, the school has carried out its responsibility under the Title IX regulations. On the other hand, if, upon notice, the school fails to take prompt, effective action, the school's own inaction has permitted the student to be subjected to a hostile environment that denies or limits the student's ability to participate in or benefit from the school's program on the basis of sex.

U.S. Dept. of Education Office of Civil Rights, Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties § V.B.2 (internal footnotes omitted).[9] The Department's guidance identifies three dimensions in which a school should "tak[e] effective corrective actions": first, it must act to "stop the harassment"; next, the school must take reasonable steps to "prevent [the harassment's] recurrence"; finally, the school must do what it can to "remedy the effects on the victim that could reasonably have been prevented had it responded promptly and effectively." *Id.*

Because these cases involve alleged ongoing failures of MNPS to recognize and address the Title IX issues raised by the underlying events, the facts supporting the plaintiffs' "after" claims overlap substantially with those supporting their "before" claims. For example, Principal Kessler's testimony that she classified S.C.'s case as not involving harassment because she concluded that the initial sexual activities were consensual supports both the "before" and "after" theories. It supports the "before" theory because it shows that Kessler—who, as principal, had been charged with performing functions that federal authorities contemplated being performed

by the Title IX coordinator—had not been appropriately trained and instructed in identifying all of the Title IX dimensions of events involving circulation of sexual videos. The same event supports the "after" theory because the result of Kessler's decision was that no Title IX investigation was initiated and no Title IX-focused response was considered.

Many of MNPS's arguments against the "after" claims, moreover, are mere reiterations of the arguments the court has already addressed involving, for example, severity and pervasiveness or the fact that male students also appeared in the videos. The court will not reiterate its analysis on those points.

Nevertheless, the plaintiffs' "after" claims do pose distinct factual and legal questions. The "before" claims involved MNPS's notice of—and alleged failure to recognize and address—a widespread problem that threatened the Title IX rights of its student population broadly and generally. Accordingly, the kind of structural and conceptual missteps that the plaintiffs have identified had particular salience to those claims; a failure to recognize and appropriately understand the problem precluded the possibility of an adequate, district-wide response, which, a reasonable juror could conclude, increased the risk of harassment faced by the plaintiffs. When considering the response to each individual case, however, those high-level errors may carry less weight. It is entirely possible for a school to handle a specific situation appropriately, even if it has not been given the kind of guidance and support that it should have by the district. Accordingly, the court will consider MNPS's response to each of the underlying incidents separately.

Also, although none of the plaintiffs has sought summary judgment with regard to their "before" claims, all but S.C. have sought summary judgment with regard to their "after" claims.

---

[9] Available at https://www2.ed.gov/about/offices/list/ocr/docs/shguide.html.

Accordingly, the court must consider not only whether those plaintiffs' claims should survive summary judgment but whether the plaintiffs are entitled to summary judgment themselves.

*Jane Doe and Mary Doe*

Jane Doe and Mary Doe have introduced ample evidence pursuant to which a jury could conclude that Maplewood significantly mishandled their cases. Specifically, a reasonable juror could conclude that MNPS acted clearly unreasonably by failing to identify the events as cyberbullying; failing to classify them as a potential Title IX violation; failing to involve the school's executive principal; failing to inform the Title IX coordinator; failing to punish those involved in the creation and dissemination of the tape; and failing to provide Jane Doe and Mary Doe assurances that the school would take steps necessary to ensure, insomuch as possible, that they would be able to continue their educations without disruption related to the video or related harassment. Indeed, although MNPS does not concede liability, even it does not appear to endorse the school's handling of the matter, which ran counter to district policy and other MNPS employees' understanding of their duties. MNPS points out, however, that merely failing to follow its own policies is not necessarily a Title IX violation. MNPS also argues, based primarily on a case from the Eastern District of Tennessee, *Doe v. Hamilton County Board of Education*, 329 F. Supp. 3d 543, 571 (E.D. Tenn. 2018), that even a clearly unreasonable response to harassment cannot form the basis for a Title IX claim, unless it led to future, additional instances of harassment.

MNPS is correct that Title IX does not create a cause of action based solely on a recipient's failure to follow its internal procedures. *See Gebser*, 524 U.S. at 291–92. MNPS may even be correct that a clearly unreasonable—but ultimately harmless—response would also be insufficient to establish liability. For example, in *Hamilton County Board of Education*, a school

official at first seemed to suggest a cover up of violent hazing—a clearly unreasonable step—but that potential cover up quickly fell by the wayside when the victim's injuries brought the incident immediately to light. Although some later harassment did occur, the school had no knowledge of it. The court concluded, therefore, that the aborted cover up alone did not give rise to liability under Title IX. 329 F. Supp. 3d at 571.

A reasonable juror, however, could conclude that what Jane Doe and Mary Doe have presented is more than merely an inconsequentially botched response. Their situation involved, among other things, the creation of a video that, for all they knew at the time, could have resurfaced at any moment during any ordinary school day. Accordingly, in order for Jane Doe and Mary Doe to be able to participate fully in school life and receive their educations unimpeded, a jury could reasonably conclude that they needed, at a minimum, some indication that the school took the circulation of the video seriously as a distinct issue. The school's response, however, provided no such assurances. To the contrary, Assistant Principal Olige apparently took the view that the only thing that mattered, from a harassment standpoint, was that the girls had seemingly consented to the initial sexual activity. He did not even inform Mary Doe's mother when he learned there was a video. A reasonable juror could conclude that Jane Doe and Mary Doe were justified in inferring that the school did not take seriously the ongoing threat that the video played to their dignity, privacy, and ability to receive an education. In response, Jane Doe left the school immediately—likely a significant disruption in her education—and Mary Doe had to deal with the anxiety and distraction of continuing to go to Maplewood without a basis for believing that the administration would protect her. Indeed, when she brought the issue up to the dean of students, the dean—presumably in an attempt to be supportive—seemed to minimize the video and suggest that nothing could be done about it.

Finally, after enduring bullying to the point that she considered it unbearable, she, too, transferred. A reasonable juror could conclude that the effects of MNPS's mishandling of the matter were sufficiently severe that it constituted a distinct contribution by the school to the denial of an equal education to Jane Doe and Mary Doe, in addition to MNPS's errors leading up to the incident. The court, accordingly, will not grant summary judgment to MNPS with regard to the "after" claims of those students.

The plaintiffs, however, have also fallen short of establishing that summary judgment in their favor is appropriate. Under the standard adopted by the Supreme Court and the Sixth Circuit, the determinative question with regard to liability is whether the school's response was clearly unreasonable. That highly factual question is beyond what the court can resolve at the summary judgment stage here, particularly given the genuine challenges faced by a school district in attempting to craft a response to the problem of sexual cyberbullying.

*Sally Doe*

Sally Doe's case, like the situation at Maplewood, involved an assistant principal who failed to inform the school's executive principal of the underlying events and failed to initiate a referral to the Title IX coordinator. Assistant Principal Newman's handling of the matter, however, differed substantially from the course of action taken at Maplewood. At Maplewood, Assistant Principal Olige treated the events involving Jane Doe and Mary Doe as primarily involving on-campus consensual sex, largely neglecting the distinct issues posed by the circulation of the video. Newman, on the other hand, clearly demonstrated concern and understanding that the video, itself, was harming Sally Doe and interfering in her education. At least based on what is in the record, Olige at Maplewood did little, if anything, to work with the students' parents to try to develop a plan for moving forward. Newman, in contrast, maintained

close communication with Sally Doe's parents and worked with them in the decision to temporarily remove Sally Doe from the school. Finally, whereas the punishment of the other students involved in the video at Maplewood was minimal, one of the students involved in Sally Doe's case was actually criminally prosecuted—which, the parties agree, is a significantly harsher consequence than arises in most cases involving student sex videos or pictures. While Hunters Lane itself was not the party responsible for the criminal prosecution, the involvement of SROs in its response suggests that the administrative and law enforcement responses to events must be judged together.

In her briefing, Sally Doe faults Newman for failing to give Doe and her mother assurances about specific additional steps that were being taken to prevent ongoing harassment. She does not, however, explain what those assurances should have been. The email exchange between Newman and Sally Doe's mother, moreover, shows an open discussion of the issues Sally Doe faced and the difficulties of protecting her over the short term. Indeed, a reasonable educator might conclude that it would have been doing Sally Doe a disservice to paint her mother an unrealistic picture of how successfully the school could protect her. Without identifying a more specific substantive failure that led to the denial of Sally Doe's Title IX rights, the second guessing of Newman's approach is insufficient to allow a jury to find deliberate indifference.

Sally Doe also argues that the school's response should be treated as the equivalent of having done nothing, because Newman failed to refer the matter up the chain of command, and the record does not show that the school itself administered any discipline in the matter. If MNPS truly did nothing in response to sexual harassment, that decision, the Sixth Circuit has suggested, would, categorically, amount to deliberate indifference or at least give rise to a

presumption thereof. *See Vance*, 231 F.3d at 260–61. The assertion that the school did nothing, though, is simply factually untrue. To say that Hunters Lane did nothing is to assume that the only actions that a school can take are either bureaucratic or punitive. Newman, instead, opted for an approach that focused on attempting to provide Sally Doe and her family support, including in their ultimate decision to temporarily withdraw her from Hunters Lane. The court cannot treat that approach as a total abdication of responsibility such that an inference of deliberate indifference would arise.

What is left, then, is the fact that Newman failed to involve Executive Principal Kessler, and the school failed to make a Title IX referral, along with the fact that Sally Doe was taunted or bullied a few more times once she returned to Hunters Lane. Title IX, however, is not a strict liability statute for any time a student is bullied, and it does not become one simply because a school made procedural errors. There is nothing in the record to suggest that, if a Title IX referral had been made, the future mistreatment of Sally Doe would have been prevented. While Sally Doe, like the other plaintiffs, has presented facts sufficient to support a plausible case that MNPS's systemic failures to address the risk of student-on-student sexual harassment contributed, prospectively, to her denial of equal educational benefits, she has not identified facts that would permit a jury to conclude that MNPS's reaction to her specific case would support an additional finding of liability. The court, accordingly, will grant MNPS summary judgment with regard to that aspect of Sally Doe's claims and deny summary judgment to Sally Doe.

### *S.C.*

In S.C.'s case, as in the others, MNPS personnel failed to involve the Title IX coordinator, despite the matter's having raised colorable Title IX issues. Moreover, the Hunters Lane administration's response to the underlying events bore more resemblance to Maplewood's

mishandling of the stairwell incident than to Assistant Principal Newman's comparatively perceptive handling of the events involving Sally Doe at Hunters Lane. Executive Principal Kessler, like Assistant Principal Olige, exhibited a narrow focus on the underlying sexual conduct at the expense of recognizing the unique issues presented by the circulation of the video. Kessler testified that she concluded that, because she believed that S.C. had consented to the sexual activity and to the creation of the video, there was simply no harassment issue to address because "harassment has to be unwanted." (Docket No. 92-21 at 44.) Setting aside the fact that Kessler appears to have conflated not objecting to the videotaping with consenting to the videotaping, Kessler's approach neglected to acknowledge that the unwanted circulation of the video posed a distinct sexual harassment threat.

It may be impossible for a school district to fully shield a student from taunting or bullying after an incident such as the ones at issue here, and Title IX does not expect or require a funding recipient to do so. A reasonable juror could conclude, however, that a school district owes the student, at a minimum, a meaningful assurance that the school recognizes that the circulation of the video poses a distinct and significant risk of harm to the student's education. Without such an assurance, the message sent to the student is that, by engaging in recorded sexual activity, she has forfeited the right to the school's protection from future harassment. S.C., having received no such assurance, was left to assume that she would have to fend for herself against the ongoing harassment she continued to endure, and she, as a result, left Maplewood, disrupting her education in the process. Based on those facts, a reasonable juror could conclude that MNPS's handling of her case gave rise to liability on her "after" claim.

## B. Section 1983

The plaintiffs' theories of liability under section 1983 largely mirror their claims under

Title IX, and, as the court has explained, the caselaw involving Title IX ensures that shared questions will govern many aspects of both types of claim. To state a claim under section 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States and must show that the violation was committed by a person acting under color of law. *West v. Atkins*, 487 U.S. 42, 48 (1988). The plaintiffs allege that MNPS violated their rights to equal protection under the Fourteenth Amendment. The Sixth Circuit has recognized that a failure to adequately address student-on-student harassment may give rise to a violation of equal protection. *See Stiles*, 819 F.3d at 851. One manner of establishing a violation, the court has held, is via a "deliberate indifference standard" that is "'substantially the same' as the deliberate indifference standard applied in Title IX cases." *Id.* at 852 (quoting *Williams ex rel. Hart v. Paint Valley Local Sch. Dist.*, 400 F.3d 360, 369 (6th Cir. 2005)).

As under Title IX, a government is responsible under § 1983 only for its "own illegal acts. [It is] not vicariously liable under § 1983 for [its] employees' actions." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (internal citations and quotation marks omitted). Under § 1983, a local government entity can only be held liable if the plaintiff demonstrates that the alleged federal violation was a direct result of its official policy or custom. *Burgess v. Fisher*, 735 F.3d 462, 478 (6th Cir. 2013) (*citing Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 693 (1978)); *Regets v. City of Plymouth*, 568 F. App'x 380, 2014 WL 2596562, at *12 (6th Cir. June 10, 2014)). A plaintiff can make a showing of an illegal policy or custom by demonstrating one of the following: (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom or tolerance or acquiescence of federal rights violations. *Burgess*, 735 F.3d at 478.

The plaintiffs argue that MNPS is liable under section 1983 because (1) its deliberate indifference led to their harassment and the resultant denial of their equal access to education; and (2) MNPS personnel's mishandling of their cases and the issues surrounding them were the result of MNPS's policy of inadequate training and supervision. With regard to the deliberate indifference argument, much of the same analysis set forth above applies, and the court will not repeat it here. The plaintiffs have produced facts sufficient for a jury to conclude that MNPS was deliberately indifferent to the problem of sexual harassment related to the circulation of sexual pictures and/or videos depicting its students and that, as a result of that deliberate indifference, the plaintiffs were put at greater risk of, and ultimately subjected to, severe, pervasive, and objectively offensive harassment that resulted in discrimination on the basis of sex.

MNPS argues that the plaintiffs' section 1983 deliberate indifference claims should nevertheless fail because they cannot establish that the harassment they experienced was the result of a municipal policy or custom. The plaintiffs, however, have both identified specific policies they challenge, such as MNPS's Title IX referral policy, and decisions by officials with final decision-making authority, such as McCargar. A reasonable jury could, therefore, find that they have established municipal liability.

The plaintiffs' failure-to-train claims also overlap substantially with their Title IX claims, albeit with a somewhat more specific focus. "To succeed on a failure to train or supervise claim, the plaintiff must show: (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Regets*, 568 F. App'x at 394 (quoting *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006)). With regard to inadequate supervision, the plaintiffs point to McCargar's decision, as

Title IX coordinator, to delegate the decision regarding whether an incident should be treated as implicating Title IX to non-expert, minimally trained principals. They further point out that there appears to have been no effort, by McCargar or anyone else, to monitor trends at MNPS schools involving harassment related to sexual pictures or videos. McCargar testified that she was only very generally aware that any such problem existed, without any knowledge of its extent or of any specific instances.

Dyer's account of how her time is spent as Title IX coordinator bolsters the case that supervision was minimal. Dyer described going lengthy periods of time without performing Title IX duties at all. (Docket No. 92-18 at 36.) She admitted that the majority of her time spent on Title IX issues was devoted to "making sure that the federal funding and federal grants are properly requested and that the presentation to the Federal Government is made so that these federal grants and federal benefits flow into the Metro Nashville school system." (*Id.* at 22.) As important as those duties may be, a reasonable juror could conclude that the approach Dyer described was evidence that MNPS personnel were not being adequately supervised and monitored by the official charged with Title IX compliance.

With regard to inadequate training, the plaintiffs argue that MNPS was slow in implementing its policies regarding sexual harassment and in providing the training necessary for ground-level teachers and administrators to carry out that policy. Some training was rolled out to principals and assistant principals beginning during the 2016–17 school year, but McCargar testified that she was not aware of any training given to them regarding how to conduct Title IX investigations prior to that. (Docket No. 92-25 at 50.) Executive Principal Kessler testified that she did not receive the training until spring of 2017 and that, prior to that training, she did not understand or follow MNPS's standard operating procedure regarding Title

IX issues. (Docket No. 92-21 at 41.) The testimony of the principals in this case, moreover, generally did not demonstrate that they had been trained to have a full grasp of Title IX policy related to harassment. Based on the foregoing, a reasonable juror could conclude that MNPS's failure to adequately supervise and train its administrators regarding Title IX and how to handle student-on-student harassment resulted in the deprivation of the plaintiffs' constitutional right to equal protection in MNPS schools. The court, accordingly, will not grant MNPS summary judgment on the plaintiffs' section 1983 claims.

## C. Request for Injunctive Relief

Finally, MNPS argues that the court should grant it summary judgment with regard to the plaintiffs' requests for injunctive relief. The injunctive relief initially sought by the plaintiffs was formulated broadly—e.g., that MNPS be required "to comply with the requirements of Title IX as outlined in the [Department of Education's] 'Dear Colleague' letters." (Docket No. 1 at 9.) MNPS argues that that type of general edict to comply with the law lacks the specificity required by Rule 65 of the Federal Rules of Civil Procedure.

The Sixth Circuit, however, has recognized that such "obey-the-law injunctions" may be "justified by the facts of the case" in some instances. *Perez v. Ohio Bell Tel. Co.*, 655 F. App'x 404, 412 (6th Cir. 2016). In any event, the plaintiffs' complaints leave room for a more detailed injunction by also requesting whatever additional relief the court deems appropriate. (*See, e.g.*, Docket No. 1 at 9.) The court, therefore, has the option of crafting supplemental provisions, adding more specific duties to an injunction if needed. Indeed, the plaintiffs have suggested some more specific requirements that the court might choose. (*See* Docket No. 92 at 34.) The court cannot preclude the possibility that injunctive relief may be necessary, should the plaintiffs prevail, and the general relief initially requested may form an appropriate backbone for that

relief. The court, accordingly, will not grant summary judgment to MNPS with regard to the availability of injunctive relief.

## IV. CONCLUSION

For the foregoing reasons, MNPS's Motion for Summary Judgment regarding Sally Doe (Docket No. 83) will be granted in part and denied in part. MNPS will be granted summary judgment with regard to Sally Doe's Count II but none of Sally Doe's other claims. All of the other pending Motions for Summary Judgment (Docket No. 71; Docket No. 76; Docket No. 82; Docket No. 83; Docket No. 87) will be denied.

An appropriate order will enter.

ENTER this 6th day of May 2019.

_____
ALETA A. TRAUGER
U.S. District Judge