# IN THE UNITED STATES DISTRICT COURT FOR THE
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| T.C. ON BEHALF OF HER MINOR CHILD, S.C.,<br><br>    Plaintiff,<br><br>v.<br><br>METROPOLITAN GOVERNMENT OF<br>NASHVILLE AND DAVIDSON COUNTY,<br>TENNESSEE, D/B/A METROPOLITAN<br>NASHVILLE PUBLIC SCHOOLS,<br><br>    Defendant. | Civil No. 3:17-cv-01098<br>Judge Trauger<br><br>LEAD CASE |
| JOHN DOE AND JANE DOE #1 ON BEHALF<br>OF THEIR MINOR CHILD, JANE DOE #2,<br><br>    Plaintiff,<br><br>v.<br><br>METROPOLITAN GOVERNMENT OF<br>NASHVILLE AND DAVIDSON COUNTY,<br>TENNESSEE, D/B/A METROPOLITAN<br>NASHVILLE PUBLIC SCHOOLS,<br><br>    Defendant. | Civil No. 3:17-cv-01159<br>Judge Trauger<br><br>Member Case |
| SALLY DOE ON BEHALF OF HER MINOR<br>CHILD, SALLY DOE #2,<br><br>    Plaintiff,<br><br>v.<br><br>METROPOLITAN GOVERNMENT OF<br>NASHVILLE AND DAVIDSON COUNTY,<br>TENNESSEE, D/B/A METROPOLITAN<br>NASHVILLE PUBLIC SCHOOLS,<br><br>    Defendant. | Civil No. 3:17-cv-01209<br>Judge Trauger<br><br>Member Case |

| | |
|---|---|
| MARY DOE #1 ON BEHALF OF HER MINOR CHILD, MARY DOE #2, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Civil No. 3:17-cv-01277 ) Judge Trauger |
| METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, TENNESSEE, D/B/A METROPOLITAN NASHVILLE PUBLIC SCHOOLS, | ) ) Member Case ) ) ) |
| Defendant. | ) ) |

**MEMORANDUM & ORDER**

The Metropolitan Government of Nashville and Davidson County d/b/a/ Metropolitan Nashville Public Schools ("MNPS") has filed a Motion for Certificate of Appealability (Docket No. 103), to which the plaintiffs have filed a Response (Docket No. 105), and MNPS has filed a Reply (Docket No. 110). For the reasons set out herein, MNPS's motion will be granted and the court's consideration of the consolidated cases will be stayed.

**I. BACKGROUND**

The plaintiffs are four female MNPS students who were videotaped by other students while engaged in sexual encounters with male students on the premises of their respective MNPS schools. The resulting video files were circulated among the students' peers electronically. A more detailed account of the plaintiffs' individual cases can be found in the court's May 6, 2019 Memorandum. (Docket No. 101 at 4–21.) The plaintiffs, through their parents, have sued MNPS under Title IX, a federal statute forbidding sex discrimination in educational institutions that receive federal funding, 20 U.S.C. § 1681(a), as well as 42 U.S.C. § 1983. The plaintiffs split their claims into "before" claims, based on MNPS's actions leading up to the underlying

2

incidents, and "after" claims, based on MNPS's handling of the incidents after having become aware of them. Following discovery, MNPS filed several Motions for Summary Judgment. (Docket Nos. 71, 76, 82, 83.) On May 6, 2019, the court denied all those motions in full, with the exception of the motion regarding the claims of plaintiff Sally Doe, which the court granted in part and denied in part, granting MNPS summary judgment with regard to Sally Doe's "after" claims but not her "before" claims. (Docket No. 101 at 52.) Because the court's Order did not resolve the plaintiffs' claims, it was not appealable, by right, to the Sixth Circuit Court of Appeals. On May 20, 2019, MNPS filed a motion seeking a certificate of appealability, which would allow it to apply for an interlocutory appeal. MNPS identified two questions, based on its reading of the court's ruling, that, it argues, justify an interlocutory appeal:

> 1. Whether, in a "before" theory under Title IX, actual notice can be established using district wide statistics that are not accompanied by expert witness testimony.
>
> 2. Whether the circulation of a sexually explicit video is akin to a sexual assault and, thus, in and of itself, can constitute severe and pervasive harassment that can subject a school system to Title IX liability.

(Docket No. 103 at 1–2.)

## II. LEGAL STANDARD

Interlocutory appeals may be granted when there is substantial ground for differing opinions regarding a controlling issue of law and when an immediate appeal from the order would materially advance the ultimate termination of the litigation. 28 U.S.C. § 1292(b). Interlocutory appeals are an exception to the general policy against piecemeal appellate review embodied in the final judgment rule. *Iron Workers Local Union No. 17 Ins. Fund v. Philip Morris Inc.*, 29 F. Supp. 2d 825 (S.D. Ohio 1998). Therefore, certification under section 1292(b) is to be "sparingly" applied. *Vitols v. Citizens Banking Co.*, 984 F.2d 168, 170 (6th Cir. 1993);

3

*Kraus v. Bd. of Cty. Road Comm'rs*, 364 F.2d 919, 922 (6th Cir. 1966). Avoiding a piecemeal appeal is preferable except in the extraordinary type of case contemplated by § 1292(b). *Cardwell v. Chesapeake & Ohio Ry. Co.*, 504 F.2d 444, 446 (6th Cir. 1974); *Kraus*, 364 F.2d at 922.

Section 1292(b) applies to interlocutory orders that are not otherwise appealable and requires the existence of three elements: (1) the order must involve a controlling question of law; (2) there must be substantial ground for difference of opinion about it; and (3) immediate appeal must materially advance the ultimate termination of the litigation. *In re City of Memphis*, 293 F.3d 345, 350 (6th Cir. 2002); *Cardwell*, 504 F.2d at 446. While review is discretionary, "[i]nterlocutory appeal is favored where reversal would substantially alter the course of the district court proceedings or relieve the parties of significant burdens." *Gaylord Entm't Co. v. Gilmore Entm't Group*, 187 F. Supp. 2d 926, 957 (M.D. Tenn. 2001) (Haynes, J.) (citation omitted). Moreover, interlocutory appeal is "most appropriate early in the proceedings," *id.*, and in "protracted and expensive litigation, where failure to resolve a question of law early in the case could lead to the placement of an enormous burden on the parties." *In re James River Coal Co.*, 2006 WL 3761965, at *3 (M.D. Tenn. 2006) (citation and internal quotation marks omitted).

### III. ANALYSIS

**A. Timeliness of Motion**

The plaintiffs argue that MNPS's motion is untimely pursuant to 28 U.S.C. § 1292(b), which provides:

> When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals which would have jurisdiction of an appeal of such action

4

> may thereupon, in its discretion, permit an appeal to be taken from such order, *if application is made to it within ten days after the entry of the order*: Provided, however, That application for an appeal hereunder shall not stay proceedings in the district court unless the district judge or the Court of Appeals or a judge thereof shall so order.

28 U.S.C.A. § 1292(b) (emphasis altered). MNPS responds that, by its plain language, the ten-day deadline for seeking an interlocutory appeal applies to the filing of an application to appeal with the Sixth Circuit, not the filing of a motion seeking a certificate of appealability with the district court. MNPS's reading of the language of the statute is persuasive. The statute leaves some room for ambiguity by requiring an "application" to be filed "within ten days after the entry of *the order*," when, in practice, district courts often decide an issue with one order and certify appealability in a second, separate order. In context, however, it is clear that the "application" mentioned is the "application to [the Sixth Circuit]." Accordingly, it would make little sense to begin the ten-day limitations period until an order of the district court makes such an application possible.

The court agrees with those courts that have held that "[s]ection 1292(b) does not impose" a "deadline for requesting certification from a district court." *McKinstry v. Sergent*, No. CIV. 11-133-ART, 2012 WL 3731304, at *3 (E.D. Ky. Aug. 28, 2012); *see also In re City of Memphis*, 293 F.3d at 348 ("[A]n application for appeal must be made within 10 days after the entry of the district court's certification order."). That is not to say that a district court would be remiss in denying such a motion based on its having been filed following an unreasonable delay. *See McKinstry*, 2012 WL 3731304, at *3. The 14-day lapse between the court's Order and MNPS's motion, however, was not unreasonable. The court, accordingly will consider MNPS's motion on the merits.

5

**B. Notice**

Title IX does not impose liability for a school system's failure to address harassment within its schools unless the school system had "enough knowledge of the harassment that it reasonably could have responded with remedial measures to address the kind of harassment upon which plaintiff's legal claim is based." *Staehling v. Metro. Gov't of Nashville & Davidson Cty.*, No. 3:07-0797, 2008 WL 4279839, at *10 (M.D. Tenn. Sept. 12, 2008) (Echols, J.) (quoting *Folkes v. N.Y. Coll. of Osteopathic Med.*, 214 F. Supp. 2d 273, 283 (E.D.N.Y. 2002); citing *Johnson v. Galen Health Institutes, Inc.*, 267 F. Supp. 2d 679, 687 (W.D. Ky. 2003)). That rule flows from the principle that a Title IX recipient can only be sued for damages based on harassment by a student or teacher if the recipient's actions were "clearly unreasonable in light of the *known circumstances*." *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 648 (1999) (emphasis added). Typically, this standard requires a plaintiff to show that a school district acted "with deliberate indifference to known acts of harassment." *Id.* at 633. Those "known acts of harassment," however, do not have to have been perpetrated by the same individual harasser whose actions ultimately gave rise to the plaintiff's claim. *See Patterson v. Hudson Area Schs.*, 551 F.3d 438, 449 (6th Cir. 2009).

The court relied on a number of facts to hold that a reasonable finder of fact could conclude that MNPS had actual notice of harassment in its schools that was sufficient to support the plaintiffs' claims. A school resource officer assigned to MNPS schools testified that he was aware of numerous instances of students' sexual pictures and videos circulating at school. (Docket No. 101 at 25–26.) A detective who investigated such matters testified that similar issues had arisen in every MNPS high school and every MNPS middle school. (*Id.* at 26.) Moreover, the incident involving two of the plaintiffs predated the incidents involving the others,

6

and MNPS personnel were aware of the first incident before the latter incidents occurred. There was also some evidence of a potential additional incident, involving a sexual encounter recorded in a school dugout, that is not part of this litigation. (*Id.* at 27.) Accordingly, there was substantial evidence that MNPS personnel were or should have been aware of a risk of sexually abusive and harassing behavior involving sexual pictures and videos of its students.

MNPS's formulation of its issue for appeal does not address any of the aforementioned evidence. It chooses, instead, to focus on one aspect of the court's analysis: the court's reliance on cumulative documentation of disciplinary incidents involving student sexual misconduct in MNPS schools. In discovery, the plaintiffs sought and received information about disciplinary incidents involving inappropriate sexual activity at MNPS schools from the 2012-13 school year through the 2015-16 school year. In light of the voluminous nature of the results, the plaintiffs, in addition to providing the court a full list of incidents, offered their tabulation of the number of incidents uncovered, finding over 950 instances of sexual harassment, over 1200 instances of inappropriate sexual behavior, 45 instances of sexual assault, and 218 instances of inappropriate sexual contact. (Docket No. 101 at 26.) The court, in its notice analysis, cited those tabulations but stressed that it was not relying on the plaintiffs' specific numbers, because "it is not the precise number of incidents that matters, but [whether] the incidents were pervasive enough to give MNPS notice of the problem it faced." (Docket No. 101 at 26 n.5.) Accordingly, "[e]ven if the court excluded [the plaintiffs'] tabulations, the plaintiffs could simply point . . . to the documents themselves."[1] (*Id.*) The court also went beyond merely the counting of the incidents and cited specific prior incidents that shared features with the plaintiffs' situations, particularly

---

[1] The court notes, however, that the Federal Rules of Evidence do provide avenues through which a party can submit a summary of data into evidence, *see* Fed. R. Evid. 1006, or, in the alternative, present such a summary as a pedagogical device, *see* Fed. R. Evid. 611(a). *See United States v. Bray*, 139 F.3d 1104, 1111 (6th Cir. 1998); *Gomez v. Great Lakes Steel Div., Nat. Steel Corp.*, 803 F.2d 250, 257 (6th Cir. 1986).

with regard to the making and/or circulation of sexual pictures or videos of students. (*Id.* at 26 (citing Docket No. 92-14 at 97, 102, 146, 162).) Nevertheless, MNPS construes the court's analysis as relying on the principle that "actual notice can be established using district wide statistics that are not accompanied by expert witness testimony."

MNPS's argument seems to envision a special rule for "statistics" that does not apply to any other type of evidence offered to establish notice. It is worth focusing, therefore, on what exactly it means to characterize the evidence on which the court relied as "statistics." The court's discussion of notice did not cite to any sophisticated statistical analysis. There were no regressions, slopes, or extrapolations. The evidence that the court cited, to the extent that it could be called statistical, relied on the simplest type of statistic there is: counting—specifically, the counting of identifiable, individual incidents documented in MNPS's own records. It is often said that laypeople, and attorneys in particular, need to remember that "[t]he plural of anecdote is not data"—meaning that one should not mistake one or two incidents for a robustly demonstrated statistical phenomenon. *United States v. Anthem, Inc.*, 855 F.3d 345, 380 (D.C. Cir. 2017). As true as that may be, there is a kernel of truth underlying the joke—namely, that what people call "data" or "statistics" is merely the aggregation of individual observations in such volume that those observations have to be discussed numerically. That numerical language, however, does not negate the reality of the individual incidents observed. In other words, while 950 instances of sexual harassment may be a statistic, 950 instances of sexual harassment are also just *950 instances of sexual harassment*. Indeed, the only reason that it makes sense to speak of the plaintiffs' evidence as statistical is that the incidents of inappropriate sexual conduct in MNPS schools were simply so numerous. That fact may be less supportive of MNPS's "lack of notice" defense than MNPS thinks it is.

8

Moreover, MNPS's argument that an expert was necessary here relies on an analogy that ignores the purpose for which the evidence was offered. MNPS cites cases in which courts found particular data to be unhelpful because there was no expert evidence explaining whether the numbers presented showed a departure from the norm. For example, in *Martin v. City of Taylor*, No. 05-70367, 2006 WL 1779394, at *9 (E.D. Mich. June 26, 2006), the court found raw data of the number of civil rights complaints against a department to be "meaningless" in terms of demonstrating an unconstitutional policy, because there were no comparator data sets from other similarly-sized jurisdictions showing that the defendant jurisdiction was an outlier. *Id.*; *see also Thomas v. City of Chattanooga*, 398 F.3d 426, 431 (6th Cir. 2005) (holding that the court could not infer police department policy from raw statistics about use of excessive force without comparator statistics from other jurisdictions). By the same principle, comparison statistics would be necessary to demonstrate, for example, that a school district has an unusually severe sexual harassment problem. When evidence is offered only to establish notice, however, comparison evidence is beside the point, because Title IX imposes an obligation not to be deliberately indifferent to known risks of sexual harassment, whether those risks are unusual or not. Notice is not negated by the fact that other school systems were put on notice, as well, by similar patterns in their own schools.

Nevertheless, MNPS is correct that the question of notice in this case presents issues on which reasonable legal minds may differ. As the court has observed, notice serves two complementary roles in a Title IX harassment case. First, actual notice of harassment within a school system is required for any potential Title IX liability related to harassment to arise. *See Davis*, 526 U.S. at 633. MNPS's argument focuses on that part of the analysis, arguing that the court should have applied a more stringent notice standard before concluding that MNPS had

9

any Title IX duty to take steps to address the risk of sexual harassment in its schools. As the court has pointed out, however, the question of whether there is sufficient notice to create some duty is not the only way that Title IX accounts for a recipient's type and degree of notice. Notice comes up again, in defining the scope of a funding recipient's duty and the standard of care it must exercise. A school system will only be held liable if its actions were "clearly unreasonable in light of the known circumstances." *Id.* at 648. Accordingly, a school system with less notice or notice that is only general in nature will typically have more leeway under Title IX than a school system with strong notice of a specific threat. The court's view has been that, as long as notice plays its proper role in this second inquiry, there is no reason to apply too stringent an approach when answering the all-or-nothing question of whether notice was sufficient to impose at least *some* Title IX duty not to be deliberately indifferent to the known risk. The court recognizes, however, that many courts have been hesitant to allow any potential for liability to arise out of notice that is only general in nature. *See, e.g.*, *Roskin-Frazee v. Columbia Univ.*, No. 17 CIV. 2032 (GBD), 2018 WL 6523721, at *5 (S.D.N.Y. Nov. 26, 2018); *Tubbs v. Stony Brook Univ.*, No. 15 CIV. 0517 (NSR), 2016 WL 8650463, at *9 (S.D.N.Y. Mar. 4, 2016); *Doe v. Bibb Cty. Sch. Dist.*, 83 F. Supp. 3d 1300, 1307–08 (M.D. Ga. 2015), *aff'd*, 688 F. App'x 791 (11th Cir. 2017); *Schaefer v. Las Cruces Pub. Sch. Dist.*, 716 F. Supp. 2d 1052, 1081 (D.N.M. 2010); *Ross v. Corp. of Mercer Univ.*, 506 F. Supp. 2d 1325, 1356 (M.D. Ga. 2007).

This is a developing area of the law, and no definitive signposts exist in this circuit for when a Title IX funding recipient is on sufficient notice of risk to give rise to a duty not to be deliberately indifferent. Resolution of the issue, moreover, would be controlling on at least many of the claims in the case, as that term is used in the interlocutory appeal context. "A legal issue is controlling," for the purposes of interlocutory appeal, "if it could materially affect the outcome

10

of the case." *See In re City of Memphis*, 293 F.3d at 351 (citing *In re Baker & Getty Fin. Servs., Inc. v. Nat'l Union Fire Ins. Co.*, 954 F.2d 1169, 1172 n.8 (6th Cir. 1992)). It is possible that the Sixth Circuit might adopt a rule on this issue that would render trial consideration of some or all of the plaintiffs' "before" claims unnecessary. Alternatively, consideration by the Sixth Circuit might, at the very least, provide guidance on the governing standard that would apply at trial. Finally, a better understanding of how the Sixth Circuit will resolve this issue may assist the parties in evaluating their respective positions and determining if there is a possibility of settling the plaintiffs' claims without the necessity of trial. Accordingly, while the court does not find MNPS's formulation of the question presented to create a sufficient ground for interlocutory appeal, the underlying issue, properly framed, is a strong candidate for a certificate of appealability.

### C. Severity and Pervasiveness

In order for sexual harassment to rise to the level of actionable discrimination under Title IX, it must be "so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit." *Davis*, 526 U.S. at 633. The court held that the plaintiffs' allegations and supporting evidence were sufficient to allow a finder of fact to conclude that they had met that standard. In addressing the issue of severity and pervasiveness, the court wrote that, "[d]espite the fact that the caselaw speaks in terms of conduct that is 'severe *and* pervasive' it is well settled that relatively isolated incidents, if sufficiently egregious, can satisfy the standard for sexual harassment." (Docket No. 101 at 37 (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). As an example illustrating that principle, the court cited the fact that "[m]ost courts [that] have addressed the issue have concluded that even a single incident of rape is sufficient to establish that a child was subjected to severe, pervasive, and

11

objectively offensive sexual harassment for purposes of Title IX." *Lopez v. Metro. Gov't of Nashville & Davidson Cty.*, 646 F. Supp. 2d 891, 913 (M.D. Tenn. 2009) (Echols, J.) (citing *J.K. v. Ariz. Bd. of Regents*, No. CV 06-916-PHX-MHM, 2008 WL 4446712, at *12 (D. Ariz. 2008); *Kelly v. Yale Univ.*, No. Civ. A. 3:01-CV-1591, 2003 WL 1563424, at *3 (D. Conn. 2003); *Doe v. Dallas Indep. Sch. Dist.*, No. CIV.A.3:01-CV-1092-R, 2002 WL 1592694, at *6–7 (N.D. Tex. 2002); *Ross v. Mercer Univ.*, 506 F.Supp.2d 1325, 1358 (M.D. Ga. 2007)). The court stressed, however, that it was citing those cases only as an example and that they are not determinative here, because, while the plaintiffs have alleged that the underlying sexual encounters were unwelcome, and at least one plaintiff characterized the sexual activity as coercive, their claims were not staked on the premise that they were raped, as the term was understood in the cited cases. Moreover, the harassment alleged extended beyond the initial sexual encounters to include (1) the taking of the videos without consent and, in most of the cases, without the plaintiff's knowledge; (2) the circulation of the videos; and (3) post-incident peer harassment in varying degrees, depending on the plaintiff.

MNPS characterizes the court's holding as concluding that "circulation of a sexually explicit video is akin to a sexual assault and, thus, in and of itself, can constitute severe and pervasive harassment that can subject a school system to Title IX liability." Insofar as the court's analysis was amenable to that reading, it will clarify the issue here. The court did not attempt to, and Title IX does not ask or require it to, calculate some equivalency between the plaintiffs' actual experiences and other hypothetical types of sexual harassment or abuse. As the court explained, the yardstick against which a Title IX harassment allegation is to be judged is not whether the harassment was objectively "akin to" some other form or type of sexual mistreatment in an abstract sense, but whether the harassment, in light of the totality of the

12

circumstances, "deprived [the plaintiffs] of access to the educational opportunities or benefits provided by the school." *Davis*, 526 U.S. at 650. The events alleged by the plaintiffs and supported by their proffered evidence were not merely severe but also extraordinarily disruptive of the educational process, leading most of the plaintiffs to leave their preferred schools and creating a significant obstacle to each plaintiff's ongoing participation in school life. Moreover, the plaintiffs' experiences were not isolated events in the same manner as a single rape or a single sexual assault; circulation of the videos involved or implicated numerous students, over an indefinite period of time. The plaintiffs who were spared the worst post-incident harassment only avoided that harassment because their parents foresaw the danger and quickly kept them home and/or moved them to new schools. The disruptions in the plaintiffs' educations, in other words, were real and documented. One need not engage in a crass ranking of traumatic sexual experiences against each other to conclude that a reasonable juror could find actionable harassment based on the plaintiffs' facts.

Nevertheless, as with the notice issue, MNPS has, despite its framing, identified a genuinely contestable issue on which appellate guidance is relatively limited. The norms and dangers of constant electronic communication and documentation were simply not contemplated by most of the existing Title IX case law. As courts have recognized, moreover, there are legitimate risks to defining actionable peer-on-peer sexual harassment in the school setting too broadly, particularly with regard to younger students who are still developing the capacities for empathy, foresight, and judgment needed to humanely and appropriately navigate the adult world. *See Davis*, 526 U.S. at 651–52 (noting that, "at least early on, students are still learning how to interact appropriately with their peers" and may "engage in insults, banter, teasing, shoving, pushing, and gender-specific conduct that is upsetting"). It is at least debatable where

13

the line should be drawn in a case such as this, including at the summary judgment stage.

The plaintiffs point out that, even if the Sixth Circuit were to conclude that circulation of sexual videos of the plaintiffs was insufficiently severe and pervasive to amount to actionable harassment, other aspects of their claims might remain, such as the fact that they were subjected to unwelcome sexual encounters on school grounds. That fact, though, merely affects the scope of the determinative question, not whether there is one. The question of how a court should consider the issue of unwelcomeness in a case such as this is itself a largely unresolved area of the law. Accordingly, while the plaintiffs are correct that MNPS's formulation of the question presented is flawed, those flaws can be rectified to uncover a genuinely contestable determinative issue.

### D. Appealability and Stay

Interlocutory appeal pursuant to 28 U.S.C. § 1292(b) is typically reserved for "exceptional cases where a decision of the appeal may avoid protracted and expensive litigation." *Frantz v. City of Pontiac*, No. 04-CV-72904, 2005 WL 8154763, at *1 (E.D. Mich. Apr. 15, 2005) (quoting *Kraus*, 364 F.2d at 921). It is not clear how protracted the litigation in this case is likely to be, given that trial is currently set for next month. That trial, however, appears likely to be complex and expensive, as well as potentially highly demanding for individual witnesses, including the plaintiffs. If some or all of the plaintiffs' claims are non-viable, then it would benefit the court and the parties to know that sooner rather than later. Moreover, if the claims are viable, trial will be facilitated by as much guidance as possible regarding the contours of liability in a case such as this in the Sixth Circuit. An interlocutory appeal of potentially determinative questions of law is, therefore, justified.

Based on the foregoing, the court concludes that it is appropriate to issue MNPS a

14

certificate of appealability pursuant to 28 U.S.C. § 1292(b) with regard to two issues:

> 1. Whether the court erred in denying MNPS summary judgment on its "before" claims based on a lack of sufficient notice, where MNPS did not have actual knowledge of a specific history of harassment involving the plaintiffs, the perpetrators of the harassment,[2] or a specific program or activity in which the plaintiffs and/or perpetrators were enrolled other than the general education program.
>
> 2. Whether the court erred as a matter of law in denying MNPS summary judgment on the ground that the plaintiffs were unable to produce facts sufficient to support a finding of sexual harassment that was so severe, pervasive, and objectively offensive that it effectively barred the plaintiffs' access to an educational opportunity or benefit.

There is substantial ground for disagreement regarding how those questions should be answered; they are determinative of some or all of the plaintiffs' claims; and addressing the underlying legal issues now would be likely to materially advance the resolution of this litigation. It is, of course, up to MNPS how it wants to characterize these issues to the Sixth Circuit, but the holding of this court is that the above formulations, not MNPS's, are necessary to render the issues controlling.

Section 1292(b) permits, but does not require, the court to stay proceedings while a party seeks an interlocutory appeal. A district court "has broad discretion to stay proceedings as an incident to its power to control its own docket." *Clinton v. Jones*, 520 U.S. 681, 706–07 (1997) (citing *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936)). "The power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes [on] its docket with economy of time and effort for itself, for counsel and for litigants, and the entry of such an order ordinarily rests with the sound discretion of the District Court." *F.T.C. v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 626–27 (6th Cir. 2014) (quoting *Ohio Envtl. Council v. U.S.*

---

[2] As the court noted in its opinion, this premise does not apply to Sally Doe's claims, because the male student involved in her sexual encounter did have a history of investigation for sexual assault. (Docket No. 101 at 28 n.7.)

*Dist. Court*, 565 F.2d 393, 396 (6th Cir. 1977)). When considering whether to stay proceedings pending the resolution of an appeal, the court typically considers "(1) whether the defendant has a strong or substantial likelihood of success on the merits; (2) whether the defendant will suffer irreparable harm if the district court proceedings are not stayed; (3) whether staying the district court proceedings will substantially injure other interested parties; and (4) where the public interest lies." *Baker v. Adams Cty./Ohio Valley Sch. Bd.*, 310 F.3d 927, 928 (6th Cir. 2002).

This case is currently set for trial beginning on July 16, 2019. It would make little, if any, sense to grant a certificate of appealability if the court did not also stay proceedings until the Sixth Circuit either declines the appeal or has fully considered it.[3] The court, accordingly, will stay proceedings in this court while MNPS pursues its appeal.

## IV. CONCLUSION

For the foregoing reasons, MNPS's Motion for Certificate of Appealability (Docket No. 103) is hereby **GRANTED**. All deadlines and hearings scheduled in this case, including the trial set to begin on July 16, 2019, are hereby **CONTINUED** until further order of the court and the court's consideration of the case is **STAYED** until such time as (1) MNPS fails to timely apply for an interlocutory appeal, (2) the Sixth Circuit denies MNPS's application, or (3) the interlocutory appeal is resolved.

It is so **ORDERED**.

_____
ALETA A. TRAUGER
U.S. District Judge

---

[3] The court also notes that a stay would likely allow the court the opportunity to benefit from any opinion issued in the pending interlocutory appeal in *Kollaritsch v. Mich. State Univ. Bd. of Trustees*, 285 F. Supp. 3d 1028, 1033 (W.D. Mich. 2018).