**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **S.C.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:17-cv-01098** |
| | ) | **Judge Aleta A. Trauger** |
| **METROPOLITAN GOVERNMENT OF** | ) | |
| **NASHVILLE AND DAVIDSON COUNTY,** | ) | |
| **TENNESSEE, d/b/a METROPOLITAN** | ) | |
| **NASHVILLE PUBLIC SCHOOLS,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## FINDINGS OF FACT & CONCLUSIONS OF LAW

On July 20th and 21st, 2021, the court held a bench trial on claims brought by S.C. against the Metropolitan Nashville Public Schools ("MNPS"), in which S.C., now an adult, was formerly a student. S.C. asserts claims under Section 901(a) of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), and 42 U.S.C. § 1983. For the reasons set out herein, the court will enter a verdict in favor of S.C. on the Title IX count and in favor of MNPS on the § 1983 count.

## I. PROCEDURAL BACKGROUND

### A. Commencement and Early Stages of Litigation

This case involves MNPS's handling of an incident that occurred on April 17, 2017, and the subsequent fallout from that incident. In short, S.C. was a 15-year-old freshman at MNPS's Hunters Lane High School ("Hunters Lane"), when another student videorecorded sexual activities that occurred between S.C. and a male student on school property. S.C. maintains that she did not consent to either the sexual activity, which she characterizes as a rape, or to the

recording of that activity, let alone any dissemination of the recording to third parties. Nevertheless, the video—which was, by any reasonable definition, child pornography—spread quickly, both between S.C.'s peers and on third-party websites. S.C., facing both humiliation related to the video and threats from other students related to her cooperation in MNPS's investigation of the incident, completed the remainder of the school year from home, after which her family moved to a different county. On July 31, 2017, S.C.'s mother sued MNPS on her behalf. (Doc. No. 1.) Because S.C. has now reached adulthood, she is pursuing the claims in her own right. (*See* Doc. No. 142 (Agreed Order Substituting Party).)

As troubling as S.C.'s predicament was, it was not unique. To the contrary, three other MNPS students—all girls—also filed suit alleging the same basic pattern of events: each girl was part of a sexual encounter on school property that she considered unwelcome; each sexual encounter was videorecorded with a cell phone; each video was disseminated to third parties; each girl's education was severely disrupted; and each girl believed both that errors by MNPS contributed to the initial events and that MNPS had made matters worse by mishandling the situations after it learned of them. Accordingly, each plaintiff asserted both so-called "before" and "after" claims—that is, both claims that MNPS's actions prior to the underlying incidents contributed to those incidents and claims alleging that MNPS's actions after the incidents contributed to further disruption of the students' educations.

The court consolidated the cases, and, following discovery, MNPS filed several Motions for Summary Judgment. (Doc. Nos. 71, 76, 82, 83.) On May 6, 2019, the court denied those motions in full, with the exception of the motion regarding the claims of another Hunters Lane student, Sally Doe,[1] which the court granted in part and denied in part. Specifically, the court

---

[1] The court has addressed the confusing naming conventions of these cases before and will not belabor the issue here, other than to say that the court will refer to each student by her chosen pseudonym, without

granted MNPS summary judgment with regard to Sally Doe's "after" claims but permitted her "before" claims to proceed. (Doc. No. 101 at 52.)

Because the court's Order did not fully resolve the plaintiffs' claims, it was not appealable, by right, to the Sixth Circuit Court of Appeals. On May 20, 2019, MNPS filed a motion seeking a certificate of appealability pursuant to 28 U.S.C. § 1292(b), which would allow it to apply for an interlocutory appeal. The court considered MNPS's argument in the context of the existing caselaw regarding claims based on student-on-student sexual misconduct and ultimately issued MNPS a certificate of appealability with regard to two issues:

> 1. Whether the court erred in denying MNPS summary judgment on its "before" claims based on a lack of sufficient notice, where MNPS did not have actual knowledge of a specific history of harassment involving the plaintiffs, the perpetrators of the harassment, or a specific program or activity in which the plaintiffs and/or perpetrators were enrolled other than the general education program.
>
> 2. Whether the court erred as a matter of law in denying MNPS summary judgment on the ground that the plaintiffs were unable to produce facts sufficient to support a finding of sexual harassment that was so severe, pervasive, and objectively offensive that it effectively barred the plaintiffs' access to an educational opportunity or benefit.

(Doc. No. 112 at 15.)

## B. Intervening *Kollaritsch* Decision and Remand

The court recognized that the two questions covered by the certificate of appealability were of central importance to the plaintiffs' cases and, accordingly, stayed proceedings until any appeal could be resolved. While MNPS's petition for permission to appeal was pending in the Sixth Circuit, however, a panel of that court issued an opinion in an unrelated case involving

---

any numerical modifier, and will simply refer to the student's mother, insofar as necessary, as that student's mother. Accordingly, while the parties have referred to one student as Sally Doe #2 and her mother as Sally Doe #1, the court will refer to those two individuals, respectively, as Sally Doe and Sally Doe's mother. These conventions are not an issue with regard to S.C. and her mother, T.C., who have helpfully gone by initials.

unwanted sexual contact between adult college students, *Kollaritsch v. Michigan State University Board of Trustees*, 944 F.3d 613 (6th Cir. 2019), that has, as a practical matter, dictated much of the course of this litigation since that opinion was issued.

The plaintiffs in *Kollaritsch* were four women students at Michigan State University ("MSU") who had filed claims under Title IX and § 1983, alleging that they had been assaulted by male peers and who took issue with the university's handling of their allegations. *Kollaritsch*, 944 F.3d at 618. *Kollaritsch*'s similarity to the cases then pending in this court was limited— *Kollaritsch*, after all, involved a different type of student, subjected to a distinguishable pattern of undesirable behavior, at a different type of educational institution. The opinion that resulted from the college students' claims in *Kollaritsch*, however, was strikingly broad—so much so that one member of the panel who concurred in most of the majority's reasoning filed a separate opinion, lamenting that the majority's pronouncements amounted to "exercis[ing] a lawmaking power that [the courts] do not rightfully possess." *Id.* at 630 (6th Cir. 2019) (Rogers, J., concurring) (quoting Pierre Leval, Judging Under the Constitution: Dicta about Dicta, 81 N.Y.U. L. Rev. 1249, 1250 (2006)). Nevertheless, the full majority opinion in *Kollaritsch* commanded two votes, and the opinion was published, making it the law of this circuit.

Because *Kollaritsch* was central to the course of this litigation and remains central to how the court must examine S.C.'s remaining claims, a brief examination of the details of *Kollaritsch* may be helpful. The *Kollaritsch* plaintiffs had been assaulted by fellow students and "contend[ed] that the [MSU] administration's response [to their assaults] was inadequate, caused them physical and emotional harm, and consequently denied them educational opportunities." *Kollaritsch*, 944 F.3d at 618. The district court had dismissed some, but not all, of the plaintiffs' claims, and MSU pursued an interlocutory appeal. *Id.* The Sixth Circuit concluded that all of the

4

claims should be dismissed and expressly held that, to prevail on a Title IX claim arising out of peer harassment, "a student-victim plaintiff must plead, and ultimately prove, that the school had actual knowledge of actionable sexual harassment and that the school's deliberate indifference to it resulted in further actionable sexual harassment against the student-victim, which caused the Title IX injuries." *Id.* at 618. The court further held that the initial sexual harassment giving notice and the later sexual harassment giving rise to the claim "must be inflicted against the same victim," meaning that a "plaintiff 'cannot . . . premise the [further harassment] element of her Title IX claim on conduct [by the perpetrator] directed at third parties." *Id.* at 621–22 (quoting *Pahssen v. Merrill Cmty. Sch. Dist.*, 668 F.3d 356, 363 (6th Cir. 2012); citing *Patterson v. Hudson Area Sch.*, 551 F.3d 438, 451 (6th Cir. 2009) (Vinson, J., dissenting)) (alterations in original). In other words, after a student experiences sexual harassment, and the school becomes aware of the harassment, "at least one more (*further*) incident of harassment"—attributable to the school's improper response to the original harassment—"is necessary to state a claim." *Id.* at 621.

The Sixth Circuit therefore concluded that, "[b]ecause none of the plaintiffs . . . suffered any actionable sexual harassment *after* the school's response, they . . . [could not] meet the causation element" required to establish liability of the government under Title IX or § 1983. *Id.* at 618. The court also rejected the possibility that the school's mishandling of the initial harassment might itself give rise to a claim, without the need for an additional post-notice incident. "A student-victim's subjective dissatisfaction with the school's response," the court wrote, "is immaterial to whether the school's response caused the claimed Title IX violation." *Id.* at 618. Even if that "subjective dissatisfaction" is entirely reasonable and interferes in the student's education, it is an injury attributable to the initial harassment—for which the school,

5

under *Kollaritsch*, is not responsible—and therefore cannot be the basis for liability on the part of the school.

The Sixth Circuit grounded some of its reasoning in traditional principles of antidiscrimination law, but it also—like the Supreme Court in the lead case on these matters, *Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 652 (1999)—relied on a presumed congressional intent not to overly burden schools in light of the inevitability of some peer-on-peer misconduct. *See Kollaritsch*, 944 F.3d at 620 ("[W]e think it unlikely that Congress would have thought [a single incident of student-on-student harassment] sufficient to rise to [an actionable] level in light of the inevitability of student misconduct and the amount of litigation that would be invited by entertaining claims of official indifference to a single instance of one-on-one peer harassment." (emphasis omitted)) (quoting *Davis*, 526 U.S.at 652–53). These concerns are legitimate and understandable; Congress may have, if asked, even agreed with the Sixth Circuit's assessment. None of that, however, changes the fact that these judicially imposed guardrails are not based on the language of Title IX itself and are difficult to define and apply.

The ruling in *Kollaritsch*, of course, did not, in and of itself, change anything about the posture of this case. On January 24, 2020, however, the Sixth Circuit issued an Order reversing this court's earlier ruling and remanding the case. The court wrote:

> We delayed ruling on Metro's petition pending the outcome of *Kollaritsch* . . . , which raised similar issues. In *Kollaritsch*, we indicated that "a student-victim plaintiff must plead, and ultimately prove, that the school had actual knowledge of actionable sexual harassment and that the school's deliberate indifference to it resulted in further actionable sexual harassment against the student-victim, which caused the Title IX injuries." In *Kollaritsch*, we noted that the initial sexual harassment that triggers a school's notice and the later sexual harassment caused by its unreasonable response "must be inflicted against the same victim." That analysis could affect the district court's decision. But we think it prudent to let the district court decide, in the first instance, *Kollaritsch*'s effect (if any) on these facts.

6

(Doc. No. 113 at 2 (citations omitted).) The court vacated this court's summary judgment decision and remanded the case, rendering the previously ruled-on summary judgments once again pending.

On remand, the plaintiffs argued that *Kollaritsch* had no bearing on their claims, while MNPS took the opposite position: that *Kollaritsch* was not only on point but mandated an award of summary judgment to MNPS on every remaining claim. This court did not find either position to be ultimately persuasive. In its opinion on remand, issued on September 25, 2021, the court noted that *Kollaritsch* had not negated the underlying general principle that, pursuant to the Supreme Court's opinion in *Davis*, a school system can be held liable for Title IX damages related to student-on-student harassment, if the school system's "deliberate indifference . . . , at a minimum, 'cause[d] [the student] to undergo' harassment or 'ma[d]e [the student] liable or vulnerable' to it." 526 U.S. at 645 (quoting Random House Dictionary of the English Language 1415 (1966); Webster's Third New International Dictionary 2275 (1961)). (Doc. No. 124 at 18.) The court concluded, however, that *Kollaritsch* had, in effect, drastically increased the requirements for what level and type of foreknowledge was necessary to establish that deliberate indifference. In this court's earlier opinion, it had specifically rejected the argument that a school could defeat Title IX liability simply by demonstrating that it lacked prior knowledge of a threat specific to the individual plaintiff whose later harassment formed the basis of the claim. Rather, the court concluded, some risks could be so clearly established at a general level that it would make no sense to require specific warning with regard to any individual student:

> [T]here is ample evidence to allow a jury to conclude that MNPS was on notice of the risk of the dissemination of sexual images of its students without their consent, as well as the possibility of subsequent harassment of the students depicted. First, the risk at issue in this case is an obvious and inevitable danger, given the ages of the students involved and the realities of media and communication technology in this decade. More importantly, however, MNPS

schools themselves had witnessed numerous cases that confirmed that risk. . . .

[Nevertheless,] MNPS would have the court erect an artificial barrier around known risks related to widespread misbehavior in favor of a rule that only imposes Title IX liability if a school was aware of a particular problem student or student group likely to commit harassment or a particular student who was especially at risk of being targeted. Nothing in the logic of Title IX or the caselaw construing it supports such a rule. The Title IX standard recognized by the Supreme Court and the Sixth Circuit looks to what is a "clearly unreasonable response in light of the *known circumstances*." [*Vance v. Spencer Cty. Pub. Sch. Dist.*, 231 F.3d 253, 260 (6th Cir. 2000)] (quoting *Davis*, 526 U.S. at 648) (emphasis added). There is no basis for excluding from the "known circumstances" a school district's knowledge that a problem is widespread and recurring throughout its student population. Nor is there any reason to assume that Title IX categorically permits a school district to turn a blind eye to the group dynamics in which harassment sometimes thrives. *See Patterson*, 551 F.3d at 448–49 (holding that a school's "isolated success with individual perpetrators cannot shield [it] from liability as a matter of law" in a case where a student "suffered harassment over many school years perpetrated by various students"). Title IX requires only that the school have "enough knowledge of the harassment that it reasonably could have responded with remedial measures to address the kind of harassment upon which plaintiff's legal claim is based." *Staehling v. Metro. Gov't of Nashville & Davidson Cty.*, No. 3:07-0797, 2008 WL 4279839, at *10 (M.D. Tenn. Sept. 12, 2008) (Echols, J.) (quoting *Folkes v. N.Y. Coll. of Osteopathic Med.*, 214 F.Supp.2d 273, 283 (E.D.N.Y. 2002); citing *Johnson v. Galen Health Institutes, Inc.*, 267 F. Supp. 2d 679, 687 (W.D. Ky. 2003)). Actual knowledge of a serious, widespread problem is at least enough to allow a district to reasonably respond in some way, even if it cannot predict or prevent every future incident.

The reasoning that MNPS wishes the court to graft into Title IX, moreover, would not be adopted by any reasonable person or entity with regard to any other risk. When a driver leaves for work in the morning, he does not know that he is likely to have a collision with a particular other driver at a particular intersection. But the driver still drives safely, because he knows of a general risk of accidents. By the same token, MNPS does not know that any particular school is likely to have a fire, but that presumably does not stop it from stocking its fire extinguishers and making sure the sprinklers work. Lack of knowledge of a more specific risk does not exonerate one from deliberate indifference to a known general risk.

(Doc. No. 101 at 25–28.) On remand, however, the court recognized that such reasoning, whatever its merits or lack thereof, was untenable after *Kollaritsch*, which included a forceful rejection of the premise that a school's Title IX obligations related to student-on-student

harassment could arise from general knowledge of risk. (*See* Doc. No. 124 at 31–32.)

Accordingly, this court held that the standard set forth by the Sixth Circuit in *Kollaritsch*, among other things, categorically foreclosed each plaintiff's "before" claims, because those claims were based on MNPS's alleged failure to protect each individual student from a general risk of harassment, before any harassment involving that particular student occurred. (Doc. No. 124 at 32.) The court considered the possibility that the rule of *Kollaritsch* might be confined to cases involving adults in a higher education setting, but the court concluded that, while the practical and logical support for drawing such a line was considerable, it was impossible to square that distinction with the reasoning of the Sixth Circuit's opinion. This court wrote:

> [T]here may be serious grounds for concern about the breadth of the *Kollaritsch* decision. For one thing, the Sixth Circuit, in announcing a general rule applicable to all Title IX peer harassment claims, did not appear to account for the extraordinarily significant differences between the various educational settings in which Title IX applies. A rule that liability only attaches after a school learns of an incident and fails to prevent a repeat of that incident might make a certain amount [of] sense when one is discussing a university, whose students are mostly adults over whom the institution exercises very limited control. In contrast, however, the power exercised by a high school or middle school over its students "is custodial and tutelary, permitting a degree of supervision and control that could not be exercised over free adults." *Vernonia School Dist. 47J v. Acton*, 515 U.S. 646, 655 (1995). It strikes this court as questionable that Congress intended for a middle school or high school to have no Title IX duty whatsoever to protect its students from peer sexual assault, as long as the school does not know that a specific student is likely to be assaulted. This court, however, is precluded from treating the type of school or the age of the students involved as a ground for distinguishing *Kollaritsch*, because the majority opinion in *Kollaritsch* made abundantly clear that it was extrapolating the principle it announced from the Supreme Court's opinion in *Davis*, which involved a fifth grader. If the rule in *Kollaritsch* follows from *Davis*, then that rule applies just as much to . . . Hunters Lane as it did to MSU.

(*Id.*)[2]

---

[2] The Sixth Circuit has since acknowledged the difference between harassment between minor students and harassment between adults, albeit somewhat in passing, in an *en banc* opinion. *See Foster v. Bd. of Regents of Univ. of Mich.*, 982 F.3d 960, 970 (6th Cir. 2020). That opinion, however, did not purport to overrule, modify, or supersede the standard set forth in *Kollaritsch*. Indeed, such an overruling or

The court then turned to the remaining "after" claims. Unlike "before" claims, "after" claims are not categorically incapable of satisfying *Kollaritsch*, because they involve actions taken by a school after it has knowledge of at least one instance of harassment. The hurdle that *Kollaritsch* erected for such claims is nevertheless considerable, because *Kollaritsch*, as this court explained, "requires at least one additional incident of actionable harassment to occur after school officials learn of the precipitating incident." (*Id.* at 33.) Such a rule, the court noted, reflects a strikingly narrow conception of a school's obligations after a child has been sexually harassed. Past guidance from the U.S. Department of Education, for example, has suggested that Title IX requires a school that learns of sexual harassment to take "prompt and effective action calculated to end the harassment, prevent its recurrence, and, as appropriate, remedy its effects." U.S. Dept. of Education Office of Civil Rights, Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties prmbl (Jan. 19, 2001) (rescinded). Such an approach is consistent with schools' educational responsibilities in other situations. For example, when discrimination on the basis of disability interferes with a child's education, her school may have an obligation, not only to stop the underlying practice, but to provide additional "compensatory education" services to catch the child up. *See Bd. of Educ. of Fayette Cty., Ky. v. L.M.*, 478 F.3d 307, 316 (6th Cir. 2007). It certainly seems like it would make sense for a school in which a student's education was disrupted by on-campus sexual harassment to have an obligation at least to *try* to get her education back on track. *Kollaritsch*, though, rejects that any such theory could be the basis for liability. Instead, the school's sole obligation is to take reasonable steps to try to ensure that no additional, future instance of "actionable harassment" occurs on the school's watch. As long as no second

modification was likely not even a possibility, given that the driving element addressed by *Kollaritsch*— the extent and type of notice required for a duty to arise—was not an issue in that case, which involved a

harassing event occurs, the school, under *Kollaritsch*, is off the hook—even if the reason that there was no more ongoing harassment was that the student literally *fled the school system* for alternate educational arrangements in reaction to the school's mishandling of her case.

The court, therefore, was required to scrutinize each "after" claim to determine whether it included subsequent, post-initial-incident instances of harassment plausibly attributable to the actions of MNPS. With regard to plaintiff Jane Doe—who immediately transferred to a new school to avoid future harassment—the court was required to grant summary judgment to MNPS. (*See* Doc. No. 124 at 34–35.) MNPS urged the court to reach the same conclusion with regard to S.C., because S.C. did not physically attend Hunters Lane after her initial incident. The court noted, however, as will be discussed in more detail, that S.C. remained a "homebound" Hunters Lane student for a period after the initial incident in her case and that she had produced some evidence that, during that time, she had been harassed by students seeking to discourage her participation in MNPS's investigation into the events. The court accordingly held that S.C. might still have a valid "after" claim, even under *Kollaritsch*. The court reached the same general conclusion with regard to one other plaintiff, Mary Doe, who had also suffered additional, post-incident harassment. (*Id.* at 41.)

On March 24, 2021, MNPS and Mary Doe filed a Joint Motion for the Entry of an Agreed Order of Dismissal, informing the court that they had resolved Mary Doe's claims. (Case No. 3:17-cv-1277, Doc. No. 28.) The court granted the motion, leaving S.C. as the only plaintiff remaining. On July 20th and 21st, 2021, the court held a bench trial on her claims. The trial record also incorporated a number of depositions and exhibits beyond the testimony delivered in court. The court now makes findings of fact based on the evidence in the record.

## II. FACTS

---

situation in which notice of a recurring, individual problem was established.

**A. Events and Circumstances Prior to Incident of April 17, 2017**

1. S.C.'s Pre-Incident Life

S.C. was born in 2001. From her birth until after the events giving rise to this case, she lived in Madison, Tennessee, with her mother, who is going by "T.C." for the purposes of this litigation. S.C. and T.C. shared their home with S.C.'s stepfather and three younger siblings, as well as, for a time, S.C.'s grandmother, who passed away shortly before the events at issue in this case. (Tr. Vol. 1 at 21-25, 90.) S.C. has described her family as close and her mother as strict; T.C. tightly limited the activities that S.C. could participate in outside of school, leaving S.C. and her siblings to rely on their church community for much of their outside-of-school interaction with their peers. (*Id.* at 25–26, 87, 90–91.) S.C. attended Madison Middle School, where her grades were mostly in the range of Bs and Cs, and, in the 2016–17 school year, she continued her schooling at Hunters Lane as a freshman. At least at first, she continued receiving, more or less, the same grades as she had in middle school. (*Id.* at 64, 82–86.)

2. Peer-on-Peer Sexual Harassment in MNPS Schools

Coming of age is often a difficult time for both students and those who teach them. There have likely always been challenges associated with educating children as they navigate the difficult path to sexual maturity; modern educators, however, must address those challenges, not merely in the ways that their forebearers did, but also in the context of the vast and often at least partially concealed network of electronic communications that modern children, like modern adults, inhabit. MNPS and Hunters Lane had tools and procedures for attempting to address these daunting issues, however imperfectly, which preexisted the events of this case.

Many of those tools operated, explicitly or implicitly, against the backdrop of the school system's obligations under Title IX, which "provides that '[n]o person in the United States shall,

on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.'" *Nat'l Collegiate Athletic Ass'n v. Smith*, 525 U.S. 459, 465–66 (1999) (quoting 20 U.S.C. § 1681(a)). Title IX, like other federal antidiscrimination laws,[3] has been construed to recognize that discrimination can, in some cases, take the form of harassment that is so severe that it interferes in the equal treatment of the individual harassed. *See Davis*, 526 U.S. at 639. Such discriminatory harassment may come from school employees, but, as the court has already discussed, the Supreme Court has recognized that a school may face liability under Title IX for student-on-student harassment to which the school itself was deliberately indifferent. *Id.* at 645. Accordingly, while not every incident related to students' sexual communications and activities bears directly on the school's Title IX obligations, Title IX is implicated where harassment rises, or threatens to rise, to the level of having the practical effect of subjecting a student to an inferior education on the basis of her sex.

Federal regulations require that a recipient of funding under Title IX "shall designate at least one employee to coordinate its efforts to comply with and carry out its responsibilities under [Title IX rules], including any investigation of any complaint communicated to such entity alleging its noncompliance with [Title IX rules] or alleging any action which would be prohibited by [Title IX rules]." 45 C.F.R. § 83.15(a). That employee is known as the recipient's "Title IX coordinator." The funding recipient must "notify all of its students and employees who work directly with students and applicants for admission of the name, office address and

---

[3] *See, e.g.*, *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998) (discussing harassment under Title VII); *Brown v. Metro. Gov't of Nashville & Davidson Cty.*, 722 F. App'x 520, 525 (6th Cir. 2018) (discussing harassment under the Age Discrimination in Employment Act); *Trepka v. Bd. of Educ.*, 28 F. App'x 455, 461 (6th Cir. 2002) (discussing harassment under the Americans with Disabilities Act); *Greenan v. Bd. of Educ. of Worcester Cty.*, 783 F. Supp. 2d 782, 788 (D. Md. 2011) (discussing harassment under the Pregnancy Discrimination Act).

13

telephone number" of the Title IX coordinator. *Id.* MNPS's Title IX coordinator, from 2012 through the 2016–17 school year, was Julie McCargar, who also served more broadly as MNPS's Executive Director of Federal Programs. (McCargar Dep. at 8, 18, 24.) When McCargar left her position at the end of the 2016–17 school year, Phyliss Dyer became the new Title IX coordinator and Executive Director of Federal Programs. (Dyer Dep. at 5, 10–11.)

An April 24, 2015 "Dear Colleague" letter from the then-Assistant Secretary for Civil Rights, Catherine Lhamon, provided guidance about, among other things, the particular duties and challenges facing Title IX coordinators. Part of the coordinator's duties, the letter explained, was keeping track of and coordinating investigations into incidents that might implicate a school's Title IX obligations:

> The Title IX coordinator's primary responsibility is to coordinate the recipient's compliance with Title IX, including the recipient's grievance procedures for resolving Title IX complaints. Therefore, the Title IX coordinator must have the authority necessary to fulfill this coordination responsibility. The recipient must inform the Title IX coordinator of all reports and complaints raising Title IX issues, even if the complaint was initially filed with another individual or office or the investigation will be conducted by another individual or office. The Title IX coordinator is responsible for coordinating the recipient's responses to all complaints involving possible sex discrimination. This responsibility includes monitoring outcomes, identifying and addressing any patterns, and assessing effects on the campus climate.

(Pl. Ex. 33 at 3.)

The 2015 letter also addressed the question of whether a Title IX recipient should make Title IX coordinator a full-time position or instead should, like MNPS had done, merely allocate the coordinator's responsibilities to an official with a wider portfolio of duties. The letter explained that a full-time coordinator was not required but that there were significant benefits to having one:

> Designating a full-time Title IX coordinator will minimize the risk of a conflict of interest and in many cases ensure sufficient time is available to perform all the

role's responsibilities. If a recipient designates one employee to coordinate the recipient's compliance with Title IX and other related laws, it is critical that the employee has the qualifications, training, authority, and time to address all complaints throughout the institution, including those raising Title IX issues.

(*Id.*)

McCargar testified that she had read the Dear Colleague letter. (McCargar Dep. at 51.) The evidence, however, suggested that she was not as involved in the handling of investigations implicating Title IX as the letter envisioned. Not all incidents raising Title IX issues were reported to her, and MNPS's system for tracking disciplinary incidents, in practice, allowed some incidents with sexual characteristics to nevertheless be logged using codes that did not indicate their sexual nature or the potential Title IX implications. (*Id.* at 94–99; *see also* Majors Dep. at 33–37, 44–46, 59–63 (discussing disciplinary codes).) As a result, McCargar did not have a full picture of the scope of the challenges facing MNPS regarding student-on-student harassment, particularly student-on-student harassment involving the circulation of sexual videos and images. That lack of a full understanding of the problem translated to a general lack of uniform policies and emphasis regarding how such problems should be handled at MNPS schools. Rather, school administrators were frequently left to handle such incidents themselves, based on their own judgment, training, and expertise.[4] (*See* McCargar Dep. at 116–34.)

MNPS students and parents were given a Student-Parent Handbook setting forth a number of school policies. (Tr. Vol. 1 at 245; Def. Ex. 10.) The Handbook included an acknowledgment that MNPS had a responsibility to comply with Title IX, and it gave the contact

---

[4] MNPS presented evidence at trial suggesting that, since the events giving rise to this case, MNPS has taken steps to improve its handling of Title IX issues and particularly the issue of peer-on-peer harassment. (*See, e.g.*, Tr. Vol. 2 at 88–101.) These steps include the creation of a full-time position of Executive Director of Civil Rights and Title IX Coordinator, which, at the time of trial, was held by an attorney. (*Id.* at 89.) While those improvements might be relevant to S.C.'s request for injunctive relief, if the court found that request to be otherwise supported, the recent changes in policy are not relevant to the issue of liability, because they occurred after S.C. had left MNPS altogether. The court, however,

information for the Title IX coordinator. (Def. Ex. 10 at 439.) That notice explained that Title IX "prohibits discrimination on the basis of sex" but did not otherwise explain the statute or the role of the coordinator. (*Id.*) The Handbook also informed students and parents generally that they had the right to bring any concerns (about anything school-related) to teachers and administrators and receive a timely response. (*Id.* at 404.)

Testimony at trial confirmed that there was, in fact, a widespread problem of students' circulating sexual pictures and videos of themselves and their peers in MNPS schools. S.C. testified that she was aware of such incidents even in middle school. (Tr. Vol. 1 at 120.) The practice, she said, was known among her peers as "exposing," and it was common knowledge among students that it occurred. (*Id.* at 121.) S.C. testified that she was shown multiple such videos by another student during class at Hunters Lane. (*Id.* at 122–23.) Her perception, at the time, was that school administrators had not done much to respond to such incidents. (*See id.* at 122, 130.) Rather, as S.C. described it, the primary result of a student's being "exposed" was that that student—if a girl—would be "bullied, mocked, ridiculed, [and] made fun of" by her peers, while any male student involved would be treated like "the most popular person in school." (*Id.* at 131.)

S.C. further testified that Hunters Lane never held any meeting for students to explain to them what to do if a situation involving such videos arose, nor did the school, at any time that S.C. could recall, explain—or even mention—to its students the school system's Title IX responsibilities or the specific role of the Title IX coordinator. (*Id.* at 130.) S.C. recalled having attended multiple orientations at MNPS schools and testified that, while those orientations had addressed issues such as tardiness and dress code violations, no one at the orientations ever explained what would happen if sexual activity, consensual or non-consensual, occurred at

acknowledges that MNPS has taken what appear to be earnest steps to improve its capabilities in this area.

school. (*Id.* at 134.) Sexualized physical contact between students at school, however, was widespread according to S.C.; she saw students passionately kissing in the hallways "almost every day," and, according to her, teachers merely "walked past them like nothing was happening." (*Id.*)

Hunters Lane Executive Principal, Dr. Susan Kessler, was asked at trial about the earlier, allegedly circulated videos that S.C. described. Dr. Kessler had not heard of some of the videos, and she expressed skepticism that they could have been circulated widely without her hearing about it. (Tr. Vol. 2 at 20–21.) Regarding one video—allegedly involving sexual activity in a Hunters Lane baseball dugout—Dr. Kessler acknowledged that the video had been reported to her and that she had investigated it, but she stated that Hunters Lane administrators had never been able to confirm that the video, in which no participant's face was visible, had actually been filmed at Hunters Lane. (*Id.* at 22.) Dr. Kessler stated that S.C.'s speculation that Hunters Lane had not investigated videos in the past was false. (*Id.* at 23.) Testimony from at least one assistant principal confirmed that the school had been aware of the video as well as the possibility and apparent belief, by students, that it had been filmed at Hunters Lane. This testimony also confirmed that the dugout incident and the circulation of the dugout video occurred and were widely known about prior to the event involving S.C. (Young Dep. at 84–85, 89–90.)

Finally, MNPS's own disciplinary records confirm that the school system was aware of an ongoing risk of inappropriate sexual conduct in MNPS schools. (*See* Pl. Ex. 21, 26.) As MNPS points out, the court lacks details about most of the prior incidents involving other students and is not able to make specific findings about most individual examples. What matters for the purposes of this case, however, is not those details, but what MNPS knew about the

problems it faced. In the aggregate, the disciplinary statistics and documentation compiled by MNPS confirmed that inappropriate sexual activity involving students, including harassment and assault, were a real, non-speculative risk at its schools, including Hunters Lane. That fact may be unremarkable—Detective Robert Carrigan, for example, testified that, in his experience, all schools have some problems along these lines, which the court finds plausible. (Carrigan Dep. at 23–24.) Indeed, the fact that the risks at issue in this case are so obvious and undeniable is a large part of why this court has struggled with the Sixth Circuit's exacting specific notice requirement. However, insofar as one might argue that there was a lack of general notice that such a problem actually existed in MNPS schools, the court can now say, based on evidence admitted at trial, that that argument would be affirmatively belied by the facts.

### 3. MNPS Training

MNPS/Hunters Lane personnel underwent some formal training on issues relevant to this case. Dr. Kessler testified that she and some other Hunters Lane administrators attended a Tennessee Department of Education training on "Civil Rights and Education" that addressed, among other things, Title IX. (Tr. Vol. 2 at 7–8; Def. Ex. 7.) That training included PowerPoint slides explaining that bullying and harassment could, if sufficiently severe, persistent, or pervasive, give rise to civil rights violations. (Def. Ex. 7 at 13–17.)

MNPS principals, including Dr. Kessler, also underwent training provided by McGrath Training Systems that included material regarding how to handle investigations related to bullying. (Tr. Vol. 2 at 9; Def. Ex. 9.) Dr. Kessler testified that the McGrath training instructed her and the other administrators to react to bullying or other comparable incidents with a "systematic response through gathering facts, doing an intake, gathering information, putting things in context when incidents happen, and then taking action." (Tr. Vol. 2 at 11.) MNPS

18

principals, including Dr. Kessler, also received ongoing "professional development" sessions on issues related to their duties. (*Id.* at 13.) Testimony from Hunters Lane assistant principals, however, suggested that the training that they had received regarding Title IX and sexual harassment issues was relatively limited, particularly prior to these events.[5] (*See* Young Dep. at 36–38; Newman Dep. at 29–30; McDonald Dep. at 39–40, 50–51.)

Dr. Kessler also acknowledged that individual Hunters Lane teachers did not receive the level of training on these issues that she did. She testified that she nevertheless tried to serve as a conduit through which the teachers could receive valuable information that had been provided to her:

> So my teachers haven't been trained in the McGrath or necessarily in civil rights. That wouldn't have been covered like in typical teacher trainings, but then I go back, and when I'm doing my in-service with teachers at the beginning of the year, as well as over the course of the year, I'm talking about how important the trainings that we receive, how important the things are that we react to.
>
> And bullying and harassment is something that is always an area of emphasis, just like we do training about the fact that as educators we are mandatory reporters of child abuse. And so that's something that is repeatedly gone over and reminded because there are certain things that are—just like in the code of conduct, some things are more important than other things.

(*Id*. at 13–14.) Dr. Kessler also confirmed that there was a particular form, the Bullying and Harassment Reporting Form, that MNPS administrators were supposed to fill out for incidents of bullying, harassment, or threats. (Tr. Vol. 2 at 44–45; Pl. Ex. 40.)

4. Sally Doe Incident

Sally Doe was also a freshman at Hunters Lane during the 2016–17 school year. (Tr. Vol. 1 at 11.) At some point prior to the precipitating incident at issue in this case, a graphic video depicting Sally Doe engaged in sexual activity with a male student on school grounds began to

---

[5] More assistant principals received training in the ensuing months. (*See* Def. Ex. 8 (McGrath training sign-in sheet).)

circulate. The Sally Doe video was not the dugout video. Sally Doe's mother became aware of this video and met with Assistant Principal Nicole Newman and a school resource officer—that is, a police officer assigned to the school—about the situation. (*Id.* at 14–15.) MNPS's handling of Sally Doe's situation, which this court discussed in *T.C. ex rel. S.C. v. Metro. Gov't of Nashville*, 378 F. Supp. 3d 651, 664, 683–84 (M.D. Tenn. 2019), is no longer directly at issue in this case. What *is* relevant to S.C.'s situation, however, is the fact that, in addition to the general information available to MNPS about issues related to student-on-student harassment, the Sally Doe incident provided further specific notice of the risk of sexual videos circulating at Hunter Lane.

Dr. Kessler acknowledged that she had been aware of the sexual encounter involving Sally Doe around the time that it happened, in February of 2017, but that she did not know until months later that a video had been made and circulated. (Tr. Vol. 2 at 23–24.) While that may be true, the evidence shows that at least some Hunters Lane administrators *did* learn of the Sally Doe video shortly before the incident of April 17, 2017 involving S.C., although they themselves did not, at the time, view the Sally Doe video. (*See id.* at 37–38; see also Newman Dep. at 43–46.)

**B. Incident of April 17, 2017**

A male student named J.J.—S.C.'s eventual alleged assailant—went to Madison Middle and then Hunters Lane with S.C. They were not friends. According to S.C., J.J., at some point during eighth grade, took issue with something that S.C. had said and struck her in the head from behind. (*Id.* at 93–95.) Thereafter, S.C. did not significantly interact with J.J. until, in April 2017, a group of Hunters Lane students began a conversation on the topic of which of the students considered themselves to be virgins. J.J. asked S.C. whether she was a virgin, and she replied

that she was. J.J. asked S.C. for her Snapchat contact information, which she gave him. J.J. used that information to begin pressuring S.C. to have sex with him. (*Id.* at 96–98; S.C. Dep. at 12.)

At lunchtime on April 17, 2017, S.C. saw J.J. in a hallway between the school's cafeteria and library. According to S.C., J.J., who was significantly taller than she, "came up to [her], grabbed [her] arm, turned [her] around[,] and started walking [her] back towards the library with him." (Tr. Vol. 1 at 95, 101.) S.C. asked J.J. what he wanted, and he responded, "You know what I want." (Doc. No. 166 at 100–01.) She did not respond to J.J.'s statement, but she has testified that, at that point, she was already concerned that J.J. "was going to try and have sex with me," which she did not want. (*Id.*) S.C. testified that, as J.J. was leading her, she was scared, but she did not run because she was worried about retaliation from her peers if she did not go along with J.J., particularly if she complained about his behavior to the school. (*Id.* at 102.) That fear, she testified, was at least partly based on the fallout she witnessed regarding the incident involving Sally Doe. It is clear from S.C.'s discussion of the Sally Doe situation that she was concerned about the reprisals that Sally Doe faced but that the male involved did not. (*Id.*)

When J.J. and S.C. reached a place in the hallway that was obscured from view, J.J. dropped his backpack, put his hands on S.C.'s shoulders and, in S.C.'s words, "shoved [her] down on [her] knees" and "made her perform oral" sex on him. (*Id.* at 104.) S.C. had never performed that act before and testified that she did not want to do so at the time. S.C., however, acquiesced when J.J. placed his hand on the back of her head and pushed her towards him. (*Id.* at 104–05.) Eventually, J.J., who had not ejaculated, pulled up his pants and allowed S.C. to stand up. (*Id.* at 105.) S.C. found a nearby friend and spoke with her for "two or three" minutes, until J.J. called her name and grabbed her by the arm again, leading her away to an empty classroom. (*Id.* at 106.)

Once the two were in the classroom, J.J., according to S.C., "pushed [her] up against the wall and made [her] perform oral [sex on him] again." (*Id.* at 108.) After a time, S.C. stood up, believing that she would be able to leave. J.J., however, "turned [her] around and pulled [her] pants down." (*Id.* at 108.) S.C. testified that she told J.J. to stop, but that he pushed her against a wall and, in her words, "told [her] to shut the F up." (*Id.* at 108–09.) S.C. "tried to push off the wall," but she was unable to. (*Id.* at 110.) Contrary to S.C.'s protestations—which she testified that she voiced more than once—J.J. began to have penetrative vaginal intercourse with S.C. She did not scream because, she testified, she was frightened about what would happen if she did. (*Id.* at 109–10.)

At trial, S.C. described her thoughts during the events as follows:

I couldn't move. I couldn't think . . . . I just wanted to leave. I wanted him to get off of me. I wanted to go. I wanted to go home. . . . My mind was black. My thoughts were dark. I didn't want to think about anything. I just wanted it all to go away.

(*Id.* at 112–13.) When asked at trial whether the intercourse had been painful, S.C. responded, "It was my virginity. It hurt more than anything. That was the most [pain] I've ever been in." (*Id.* at 113.) In addition to the pain associated with the penetration itself, S.C. described pain from J.J. striking her buttocks and pulling her hair. (*Id.* at 113–14.) Nothing about the sexual activity, she said, was pleasurable for her. (*Id.* at 117.)

At some point during the intercourse, another female student, S.D., entered the room. She had not been invited—at least not by S.C. At trial, S.C. testified that, when she first saw S.D. in the room, she told S.D. to leave, but S.D. did not. (*Id.* at 110–11.) S.D. began visibly recording the sexual activity with her phone. Ultimately, S.D. captured a video depicting about two minutes of this second encounter, which had been ongoing for several minutes before recording began. (*Id.* at 111–12.)

22

Eventually, J.J. "quit," after which he pulled his pants up and walked out of the room. S.C. testified that J.J. did not say anything—even goodbye—before leaving her alone in the room with S.D. As S.C. sat on the floor crying, S.D. approached her and, rather than expressing concern, asked S.C. whether she would perform oral sex on S.D. as well. S.C. responded by asking S.D. "what the H was wrong with her." (*Id.* at 118.) S.C.'s rebuffing of S.D. was successful, and S.D. left. After taking a few more minutes to cry and to collect herself, S.C. left the room and found a friend in the hallway. S.C. did not, at that time, tell any authority figures about the incident. She testified at trial that she had been worried that "either [she] would get in trouble or . . . the kids [at the school] would bully me." (*Id.* at 120.) She said that she did not think the school would protect her, "[b]ecause they didn't protect anyone else." (*Id.* at 120.)

After the events with J.J. and S.D., S.C. had one class left in the school day. She attended that class, sat in the back, and, in her words, "just sat there"—not interacting with her peers or doing any coursework. (*Id.* at 137.) According to S.C., when the class ended, another female student "came up to [S.C] and showed [her] a video of the incident and asked [her] if it was [her]." (*Id.* at 137.) S.C. walked away from that student without responding. Before S.C. got on the bus to go home, however, S.D. approached her and told her "that the video was out and that everybody in the school had it." (*Id.* at 137.) S.C. responded with resignation, remarking that the video was always "going to get out." (S.C. Dep. at 13.)

After S.C. got on the bus, the unwanted attention continued. A male student asked her if she "was the girl in the video," and, when S.C. asked what video, the male student showed her the video of the encounter on his portable device (presumably a cellphone). (Tr. Vol. 1 at 137) S.C. tried to end the conversation, but the boy "kept trying to talk to" her. (*Id.*) Eventually, S.C. got off the bus at her stop and went home. (*Id.* at 138.) S.C. described the scene when she

returned home as follows:

> I went straight in and I was crying. My mom was sitting on the back porch. And there was a recliner sitting directly towards the back porch. I sat in it, and I said, Mom, I gotta tell you something. And she said, What is it, baby? And I said, Mom, I had sex today. And I started crying, and then she started crying. I ran upstairs and locked myself in my room.

(*Id.* at 138.)

The court found S.C.'s testimony regarding her encounter with J.J. and S.D. to be a credible telling of the underlying events, as she now remembers and understands them. Her memory is probably not perfect, nor could it be expected to be. The experience was traumatic, S.C. was a young, and S.C. has now had to relive those events numerous times, over a period of years, as part of this litigation. As such, her recounting of April 17, 2017 undoubtedly reflects memories that have been filtered through time, experience, and the ordinary, ongoing process of reevaluating and reconsidering significant events in one's life.

The question of whether or not S.C. was raped has come up repeatedly in this litigation. Insofar as her interactions with J.J. occurred in the manner that she remembers and describes them, she was. The court finds, moreover, that any suggestion that the video, which was played for the court at trial, could reasonably be construed to *rule out* the possibility of rape would, contrary to the conclusion reached by some witnesses, *see infra*, be mistaken. Indeed, even MNPS's own lawyers do not make or defend such a conclusion in their post-trial briefing. Rather, they urge the court to conclude that "reasonable minds could disagree as to [the video's] interpretation" and that, therefore, "it was not unreasonable for school officials to have interpreted the video as depicting two high school students engaging in consensual sex." (Doc. No. 179 at 5–6.) But MNPS's proposed conclusion does not follow from its premise. The reasonable, appropriate response to a video that does not resolve the question of consent is not

simply to pick one option—rape or not rape—and decide to act like that is the manifest truth. The reasonable response to inconclusive evidence—particularly on an issue as important as a child's potentially having been raped at school—is to acknowledge the evidence's limitations and seek out additional evidence that might better bring the truth to light.

The court stresses, however, that this is not a rape trial, and J.J. himself, who contemporaneously denied that the encounter was a rape, is not a party to these proceedings. This case is against MNPS and is about the responsibilities that the school system had in light of what its personnel knew about this situation in its entirety. While issues of consent or lack thereof may have been *relevant* to aspects of MNPS's duties, nothing in Title IX or § 1983 suggests that the occurrence of a rape is a necessary precondition for a school to have legal obligations in a situation such as this. Indeed, even *Kollaritsch*, as demanding as it is, identifies no such requirement; it requires multiple instances of sexual harassment but does not require *any* incident to rise to the level of rape. By the same token, however, nothing in Title IX or § 1983 suggests that, if one student rapes another on school grounds, the school itself necessarily bears any civil liability. There might be a cause of action against the school in light of the situation as a whole, but the occurrence of the rape alone does not resolve that question. In short, a rape is neither a necessary nor a sufficient condition for finding liability under Title IX or § 1983, generally or in this case in particular.

The court, therefore, concludes that it would be inappropriate to venture too far into the unnecessary task of making findings of fact regarding every detail of the encounter between S.C. and J.J. or reaching a legal conclusion regarding whether J.J.'s actions have been established to meet a particular legal definition of rape pursuant to a particular quantum of proof. The court finds, rather, that the incident was sufficiently traumatic that it—particularly combined with the

circulation of the video afterwards—amounted to a plainly apparent risk of disrupting S.C.'s education, such that, even under *Kollaritsch*, MNPS's Title IX duties were implicated once school administrators became aware of the events. Those duties arose even if the MNPS administrators believed that aspects of the sexual encounter had been consensual, because they knew that the ongoing circulation of the video was not consensual.

That dissemination of the video, moreover, was wide-ranging and swift. In addition to its being shared *between* students, at least one student posted the video on widely viewable social media platforms—Instagram, Facebook, and Snapchat, if not others. (Tr. Vol. 1 at 151–52.) The record in this case never definitively established how far the video spread, nor, the court imagines, could it have. Any given instance of a video released onto the internet may be gone in a second, but the prospect of additional, future dissemination may not *ever* fully go away, no matter how many times the video gets taken down. All that the court can find is that the video was spread widely and that there is no absolute guarantee that the video will not be disseminated again.

## C. Immediate Response to Incident

Dr. Kessler has a policy of making her personal cell phone number available to students and parents in the school's Student Handbook and on a large banner over the door of the school's main office. (Tr. Vol. 1 at 252–53; Pl. Ex. 28 at 559.) At least some members of the community, moreover, knew how to contact Dr. Kessler through Facebook. (*See* Tr. Vol. 1 at 223.) On the evening of April 17, 2017, an adult who apparently was not directly related to any of the individual students involved in this case contacted Kessler through Facebook to inform her of a Facebook post containing the video. (*Id.*) In response, Dr. Kessler flagged the post as inappropriate and began making plans regarding how the school could respond to the situation

the next day. (Tr. Vol. 1 at 228; Tr. Vol. 2 at 52.)

At some point that night, "someone from Hunters Lane" called T.C., informed her of the video and its circulation, and arranged for T.C. and S.C. to come into school the next day. According to T.C., she received a screenshot of the video being circulated as well. (Tr. Vol. 1 at 33–34, 51.) S.C.'s mother and stepfather woke S.C. up to discuss the situation further. As S.C. remembers it, her stepfather began "yelling" at her and repeatedly asking her why she had taken part in the encounter. S.C. repeatedly protested that it was not her fault, although she did not, at that point, describe the situation to her mother or stepfather as a rape or an assault. (*Id.* at 139.)

S.C.'s mother recalls the conversation more or less the same way—as S.C.'s stepfather yelling and S.C. protesting that the events at issue were not her fault but not outright saying she was raped or sexually assaulted. (*Id.* at 33.) When asked, at trial, why she did not tell her mother more at the time, S.C. responded:

> I was scared to hurt her. . . . I felt like it would be better to tell my mom that I had sex, other than just going home and say[ing], Hey, mom, I got raped. I wanted to break it down easy to her. That's why I started yelling it wasn't my fault. I wanted her to figure it out instead of me just coming out and telling her. It was my mom. I didn't want to hurt her.

(*Id.* at 139) S.C. also testified that she was worried that, if she told her mother she had been raped, her mother would tell the school, and S.C. would be considered by other students as having snitched. (*Id.* at 139.)

Unfortunately, one way or another, word of the planned meeting got out among S.C.'s peers, some of whom decided to intervene in an apparent attempt to discourage S.C.'s participation in any investigation. (*Id.* at 51.) That night, some Hunters Lane Students started sending S.C. messages over social media platforms threatening reprisal if S.C. incriminated anyone. (*Id.*) T.C. recounted at trial:

27

Well, the next day they knew we were coming into school, so those threats started that . . . night. And they were starting from Snapchat, Instagram, to my two daughters. So that morning when I got up, knowing I was going to school, I had—my daughter sat down with me, and I took a list of everybody that was on the Snapchat or Instagram that was threatening.

(*Id.*)

Dr. Kessler and her assistant principals came to school early on the morning of April 18, 2017, to begin dealing with the incident. At trial, Dr. Kessler described her initial strategy as follows:

I'm required to be at work at 6:45, but we had gotten there early because we wanted to act on this. And we started acting on it immediately, identifying who the students were in the video, identifying who videotaped, who was posting the video, et cetera. And so we were working on that immediately because we wanted to stop the distribution of the video and make sure that we had assigned consequences and thoroughly investigated.

(*Id.* at 228.) The trial record contains a number of emails sent between Dr. Kessler and other MNPS personnel that morning as they investigated. The court finds that the emails, generally speaking, depict an earnest and focused effort throughout the morning to attempt to understand what had happened and, at least to some degree, how it had been allowed to happen—for example, why the students had had access to an unlocked classroom. (Def. Ex. 3.)

The emails also show that, although Dr. Kessler did not involve MNPS's Title IX coordinator in this process, she did keep MNPS's then-Director of Schools, Dr. Shawn Joseph, apprised of the situation. (*Id.* at 129.) Dr. Kessler admitted that she would not normally have involved Dr. Joseph, but that she did so in this instance because her understanding was that at least one member of the MNPS School Board was aware of the situation and had been in contact with the person who initially informed Dr. Kessler of the video. (Tr. Vol. 2 at 52–53.)

When S.C. and her mother arrived at school, S.C. was asked to provide a written account

of what had happened between her and J.J. She wrote:

> I was in lunch and he brought me in a hallway and started to try to get me to [text scribbled out] do the things that we did. He brought me in a classroom and started to get me to do these things and [S.D.] (the girl that took the video) walked in [and] started to record it. I wanted to stop both of them, but I just couldn't get the urge to say no.

(Pl. Ex. No. 3.[6]) At trial, S.C. testified that, when she wrote "urge," what she meant was "courage." (Tr. Vol. 1 at 141.) After writing the statement, S.C. and her mother were taken to speak to Detective Robert Carrigan, a member of the Metropolitan Nashville Police Department who investigated sex crimes. (Tr. Vol. 1 at 142.)

Detective Carrigan recorded the meeting, and a copy of that recording is in the record. (Pl. Ex. 42.p (USB memory stick); Pl. Ex. 42.t (transcript[7]).) Out of the box, Detective Carrigan refers to the video that had been circulated as a "video that you and another fellow made," assuming that she consented to the filming and, most probably, to the sexual encounter as well. (Pl. Ex. 42.t at 2.) Detective Carrigan told S.C. that the "issue for us"—meaning, seemingly, the police—was that "we['ve] got . . . three people involved in producing what would be considered child pornography," as well as other people distributing that child pornography. (*Id.* at 3–4.)

Detective Carrigan then explained to S.C. that, "[i]f I'm charging one for the distribution, I'd have to charge everybody for the production of it as well." (*Id.* at 4.) Detective Carrigan did not ask S.C. whether she had agreed ahead of time to the sexual encounter or for it to be videorecorded. He pointed out that it was clear from the video, in which S.C. looked at the camera at some point, that S.C. knew she was being recorded, but he conceded that he was "sure

---

[6] J.J. also gave the school a written statement that day. His was a single sentence long, reading: "I didn't force her to do anything at all." (Def. Ex. 2 at 114.)

[7] For ease of reading, the court will, where possible, cite to the transcript that appears in the record and will quote the language as reflected in that transcript. For the most part, but with one important exception, the transcript reflected what the court was able to hear on the audiorecording.

29

[she] didn't know it was going to be put up, uh, or shared." (*Id*.) All of his assumptions were based on an incomplete record of what transpired between S.C. and J.J., as the first encounter was not recorded at all, and the second was only videoed starting in the middle of what transpired.

Once S.C. had the opportunity to speak, she told Detective Carrigan that she and her mother had received threats, including at least one that her mother would be shot as she entered the school building. Detective Carrigan seemed puzzled but not alarmed about the threats and redirected the conversation back to the video's dissemination. (*Id.* at 5.) S.C. explained that she had wanted S.D. to stop recording but had not been able to stop her. Detective Carrigan reacted with skepticism, pointing out that he did not hear S.C. make any such request on the video. (*Id.* at 6.) S.C. explained that she had asked S.D. to leave the room before she ever started recording. Detective Carrigan observed that it "looked to [him]" like S.D. was "acting as a lookout" for S.C. and J.J. and asked whether that was the "original plan." (*Id.* at 6–7.) Detective Carrigan told S.C. that it was "clear on" the video that she and J.J. were "both willing participants."[8] (*Id.* at 8.) When S.C. protested to Detective Carrigan that she had not wanted to go with J.J. into the room that day, he quickly responded that she "went there anyway." (*Id.* at 9.)

S.C. again mentioned the threats that had been sent to her, and she gave Detective Carrigan the name of at least one perpetrator. (*Id.* at 10.) However, again Detective Carrigan did not take the threats seriously and turned to suggesting that S.C. had criminally participated in creating child pornography. (*Id.* at 13.)

Detective Carrigan told S.C. and her mother that the school might take disciplinary action

---

[8] As the court has already pointed out, even MNPS's own lawyers have not defended that characterization and have instead characterized the video as ambiguous and subject to interpretation. (Doc. No. 179 at 5–6.)

against S.C. and/or students involved in disseminating the video as a "school policy issue." (*Id.* at 14.) He explained that Dr. Kessler would discuss that aspect of the situation when they spoke with her. (*Id.* at 15.) At no point during the interview did Detective Carrigan ask S.C. whether his assumption that the sex was consensual was correct. [9]

Near the end of the interview, Dr. Kessler entered the room. With Dr. Kessler present, Detective Carrigan explained that it was effectively impossible to totally scrub the video from existence once it began being disseminated. Dr. Kessler sought to reassure S.C. and her mother, however, that, in her experience, such situations tend to "be yesterday's news" fairly quickly. (*Id.* at 19.)

After Dr. Kessler directed S.C. and her mother to move into her office, Dr. Kessler continued to whisper with Detective Carrigan about the situation. She did not know she was being recorded. Dr. Kessler says, "Please, I cannot have this be a rape, OK? It's not a rape."[10] Detective Carrigan responds, "It's not. She acknowledged it was consensual" (Pl. Ex. 42.p at 17:13; Pl. Ex. 42.t at 20)—which, of course, S.C. did not do. (*Id.*)

S.C.'s attorneys have repeatedly drawn the court's attention to Dr. Kessler's whispered statement that she could not "have this be a rape," and it is not difficult to see why. It is meaningful evidence of Dr. Kessler's mindset at the time and her approach to the investigation—

---

[9] The defendant's own expert, psychiatrist Dr. Sarah Vinson, was very critical of Detective Carrigan's interview of S.C. After reviewing the transcript of Detective Carrigan's interview with S.C., which she was asked to do in a break during the cross-examination of her at trial, she testified that this was not the way to interview a potential rape victim—by assuming that the encounter was consensual. She testified that Carrigan's initial expressed assumption that the encounter was consensual could well have influenced what S.C. told other people about the incident. Moreover, she testified that it was common for rape victims to initially deny that they were raped.

[10] Dr. Kessler's portion of this exchange appears on the transcript as "[inaudible] [whispering]." Dr. Kessler's statement was also difficult to make out on the courtroom audio system used at trial, but the court has had the opportunity to listen to the exhibit on different speakers, through which Dr. Kessler's statement is clearly heard.

and it is undoubtedly embarrassing for MNPS, as it probably should be.[11] That said, the job of this court is to resolve the case based on all of the probative evidence—not merely the evidence that is the most shocking.

After the interview with Detective Carrigan, S.C. and her mother met with Dr. Kessler. Both S.C. and her mother testified at trial that, when they were meeting with Dr. Kessler, S.C. told Dr. Kessler that the sexual activity with J.J. had not been consensual. (Tr. Vol. 1 at 46, 130.) S.C.'s deposition testimony, however, was that she did not tell Dr. Kessler that the encounter was a rape. (S.C. Dep. at 34.) Whatever S.C. and T.C. might have said about the encounter, Dr. Kessler, according to T.C., responded that the purpose of the meeting was discipline and that any issues related to consent were "in the detective's hands." (Tr. Vol. 1 at 47.) Dr. Kessler, however, offered a different account of this conversation. She testified:

> I asked [S.C.] questions. I said, Did you willingly agree to have sex? She said, Yes. I asked her if she consented. She said, Yes. I asked her if she knew she was being videotaped. She said, Yes.
>
> We talked about the situation and the fact that, well, you're not—you know, it's a rule violation to have sex at school. We even talked about, Are you sure that it was consensual because, if it wasn't, you could press charges. They did not want to press charges against [J.J.] because it was consensual. At no point was I ever told what was described [by S.C. and her mother at trial].
>
> If I had been told that it was nonconsensual, [S.C.] would not have been administered a [punishment] because [S.C.] would have been a victim[12] as

---

[11] Dr. Kessler protested at trial that she was merely expressing her desire for no student of hers to have been the victim of sexual violence. (Tr. Vol. 2 at 62.) The court finds that explanation unconvincing. As the finder of fact, the court concludes, based on the content, context, and tone of the statement, that Dr. Kessler was expressing a desire for the incident not to be *classified as* a rape.

[12] S.C., of course, *was* a victim, even according to Dr. Kessler's version of the facts, because she was a victim of bullying and the unwanted dissemination of child pornography depicting her. Regardless of what one concluded about the initial sexual encounter, S.C. had been viciously humiliated by the unauthorized and unlawful dissemination of a video of her engaged in sexual activity. The significant personal harm caused by such "revenge porn" activity is both widely known and obvious, particularly when the person depicted is a minor. *See In re Boland*, 596 B.R. 532, 550 (B.A.P. 6th Cir. 2019) (explaining that courts had found that dissemination of revenge porn, even of adults, was "substantially certain to cause harm").

opposed to someone who willingly agreed to engage in misbehavior.

(*Id.* at 233–34; *see also* Kessler Dep. at 59 ("She told me she consented.").) Dr. Kessler admitted that she did not ask S.C. whether she had consented to the videorecording itself. (Tr. Vol. 2 at 47.) Dr. Kessler testified that, during the meeting, S.C.'s mother expressed anger at S.C.'s participation in the encounter that, Dr. Kessler concluded, suggested that T.C. believed in the supposedly consensual nature of S.C.'s participation. (*Id.* at 236–37.)

The court finds that the conflicting versions of Dr. Kessler's meeting with S.C. and T.C. may well reflect earnest differences in memory of a high-stress event. The court notes, however, that, during the interview with Detective Carrigan, which immediately preceded the meeting, S.C. had stated that she had not wanted to go into the classroom with J.J. and that she had not wanted S.D. to videorecord her. S.C. similarly stated, in her contemporaneous written account, that she had wanted to ask J.J. to stop but had been unable to make herself do so. S.C.'s documented, contemporaneous versions of the same events, in other words, painted a more complicated picture than one of simple, straightforward consent that one might infer from Dr. Kessler's version of what S.C. told her.

Dr. Kessler's stated desire for the situation not to be considered a rape, moreover, undermines her credibility, because it establishes that Dr. Kessler, at the time, intensely wanted to believe that the sex had been consensual. Indeed, Dr. Kessler has oversimplified facts related to S.C.'s supposed consent in her memory in other ways as well. During her deposition, Dr. Kessler claimed that S.C.'s written statement had said that the encounter was consensual. S.C.'s written statement did, in fact, state that she did not ask J.J. or S.D. to stop, but it was actually silent on the issue of initial consent—which Dr. Kessler admitted when pressed. (Kessler Dep. at 59.) The court does not think that Dr. Kessler was intentionally lying about the written statement,

as she knew that S.C.'s attorneys had it in their possession and could easily impeach her testimony. Rather, the court, as finder of fact, believes that Dr. Kessler's oversimplified recollection of the written statement is consistent with the conclusion that she fervently wanted the sexual encounter to be consensual and that that desire colored her perceptions and has further colored her memories.

Ultimately, the court finds it unlikely that S.C. said anything to Dr. Kessler to suggest that the underlying sexual activity, let alone the taping, had been anything close to welcome.[13] Whether S.C. went so far as to say that the sex was nonconsensual is a more difficult question, but, as the court has already noted, there is simply no requirement that the court find that MNPS administrators were told that S.C. was "raped" in order to conclude that MNPS had legal duties to respond appropriately to this situation, particularly given the post-incident circulation of the video, to which S.C. clearly did not consent.

T.C. testified that she informed Dr. Kessler of the threats that S.C. had been receiving and gave Dr. Kessler a list of students involved, including S.D. The list appears in Dr. Kessler's investigatory file.[14] (Tr. Vol. 1 at 52–53; Pl. Ex. 50.) T.C. also testified that she told Dr. Kessler

---

[13] Earlier in this case, the court already addressed the concept of "welcomeness," its established role in sexual harassment law, and the reasons why an either/or focus on consent cannot replace a consideration of welcomeness without undermining the antidiscrimination purposes of Title IX. *See T.C. ex rel. S.C. v. Metro. Gov't of Nashville*, 378 F. Supp. 3d at 672. For example, persistent, unwelcome sexual overtures may significantly disrupt a student's education in a discriminatory manner, and that disruption is not negated in any way if the student eventually acquiesces to those overtures out of a sense of peer pressure or a moment of worn-down resignation. The same is true for unwelcome, post-encounter harassment; initial consent to sexual activity simply does not preclude later unwelcome attention that disrupts the educational setting from implicating Title IX. A student's having sex—including consensual sex—is not a waiver of Title IX liability for everything that might come before or after.

[14] There was conflicting and, at times, confusing testimony regarding the handwritten lists of students that appeared in Hunters Lane's investigative files and whether that list was supposed to refer to students who circulated the video or students who were harassing S.C. in other ways. (*See, e.g.*, Tr. Vol. 1 at 231; Def. Ex. 2 at 104.) The court finds that, while the evidence may be mixed with regard to some of the details surrounding Hunters Lane's receipt of the list from T.C. and S.C., S.C. has shown, by a preponderance of the evidence and based on the court's assessment of the witnesses' credibility, that Dr. Kessler received

34

that S.C.'s sister, who was waiting in the parking lot during the meeting with Dr. Kessler and providing updates by text message, was continuing to receive threats. (Tr. Vol. 1 at 52–53.) According to T.C., Dr. Kessler did not ask any follow-up questions about the content of the threats, nor did she seek any kind of detailed statement regarding the threats. (*Id.* at 54.)

On the issue of threats, the accounts of the meeting continue to differ. Dr. Kessler testified that, during the meeting, S.C. "didn't notify [Dr. Kessler] that she was being harassed or bullied" and that, therefore, Dr. Kessler "didn't know [S.C.] was being harassed." (Tr. Vol. 2 at 79.) S.C.'s lawyer pointed out in a follow-up question that, even according to Dr. Kessler's version of events, Dr. Kessler at least knew that the video was being circulated against S.C.'s wishes—which would seem to confirm that S.C. was the subject of some harassment, even if Dr. Kessler had not been informed of the threats. The court found Dr. Kessler's response to that question to be defensive and evasive—so much so that it further undermined Dr. Kessler's credibility as a whole. (*Id.* at 79–81.) The court notes, moreover, that Detective Carrigan, who was undisputedly informed of the threats, testified that his understanding, at the time, was that S.C. and T.C. intended to tell Dr. Kessler about the threats as well. (Carrigan Dep. at 86.) Finally, the court notes that S.C. and T.C. exhibited a significant focus on the threats in their audiorecorded meeting with Detective Carrigan, which occurred right before the meeting with Dr. Kessler, and the court finds it unlikely that they would then omit any reference to the threats in that meeting.

Dr. Kessler, by her own admission, failed to fill out a Bullying and Harassment Reporting Form, even though it would have been standard operating procedure to do so. Dr. Kessler testified that filling out the form was unnecessary because she had elected, in her discretion as

_____

the list and was informed that it involved post-incident harassment that extended beyond simply circulating the video.

Executive Principal, to oversee a response that, in her view, was sufficient without the need for additional support from MNPS. (Tr. Vol. 2 at 48; Def. Ex. 6 (MNPS Standard Operating Procedure document)[15].)

The court asked Dr. Kessler whether it was her experience that, once a video of the type at issue in this case begins to circulate, "girls particularly are harassed and bullied and called whores." (Tr. Vol. 2 at 83.) This was Dr. Kessler's response:

> That does happen sometimes. It doesn't happen all the time. There's a wide— sometimes it has to do with who the student is and what the video was and how— how it is—embraced is a poor word[, but embraced] by students. It—I—it absolutely can be very upsetting to the student and sometimes they regret it. But sometimes they don't regret it, and it doesn't upset them and they don't see what's wrong with it because it gets them Instagram likes and that sort of thing. So it increases their social media political capital.
>
> That's all part of sending nudes and that sort of thing. It's the—social media is really—you know, your level on that is sometimes very important to teenagers today. And so kids sometimes make really poor decisions in an effort to have so many stars and so many likes and be, like, people like the Kardashians and all that kind of thing.
>
> And sex is something that—and nudes and all of that is something that, you know, is very provocative. But it's not always something that kids perceive as harmful. It is almost universally accepted that parents perceive it as harmful, that parents are upset about it. And kids are upset when they get in trouble with their parents. And kids get upset sometimes when they get in trouble in general.
>
> But I have to act on what I was told. And if they had told me that there was harassment, I would have acted on it. I would have documented it and I would have gotten it stopped with the child and with the parent to the extent I could.

(*Id.* at 83–84.) Regardless of Dr. Kessler's account of the motivations of teenagers generally, the court finds, based on the evidence presented at trial and incorporated into the trial record, that there was no reasonable basis for assuming that S.C. herself had wanted, encouraged, or

---

[15] There was a substantial amount of back-and-forth between S.C.'s counsel and Dr. Kessler regarding whether this document should be referred to as a "policy" or not. (Tr. Vol. 2 at 45–52.) The court found that Dr. Kessler's hair-splitting in this regard was unpersuasive and generally undermined her credibility by demonstrating her defensiveness and her willingness to attempt to justify her behavior after the fact by

welcomed the distribution of the video in a bid to increase her popularity on social media. Indeed, any suggestion that S.C. had acted out of a desire to "get . . . Instagram likes" would make no sense, because S.C. did not post the video herself and objected to the making of the video.

The court concludes, as finder of fact, that, no later than April 18, Dr. Kessler had notice that S.C. had been made subject to harassment that could interfere with the equal quality of her education and educational opportunities and that, therefore, Title IX was implicated by the situation. While it is possible that S.C. and her mother have overstated the degree to which they emphasized the ongoing threats or harassment to Dr. Kessler, the court finds it implausible that they did not mention the threats at all, particularly given that there is undisputed documentary evidence of their mentioning the manifestly violent threats to Detective Carrigan mere moments earlier and the fact that, since Detective Carrigan clearly had no interest in dealing with the threats, informing Dr. Kessler about them was the main recourse. The court's finding also relies on the court's own assessment, as finder of fact, of the credibility of Dr. Kessler, T.C., and S.C.

Dr. Kessler testified that she believed, based on the information available, that she had no choice but to discipline S.C., because S.C. had broken a school rule that called for discipline based on the written table, or "disciplinary matrix," that Hunters Lane used to set punishments. (Tr. Vol. 1 at 235, 240.) Dr. Kessler informed S.C. and her mother that S.C. would be suspended for three days, after which she would be expected to return to Hunters Lane or be treated as truant. (*Id.* at 48–49.) Dr. Kessler apparently also suggested that S.C. could attend "Twilight School"—a program through which some students facing disciplinary problems attended school from 2:30 to 6:00 p.m. as a way to avoid out-of-school suspension—but S.C. did not pursue that option. (*Id.* at 47–48.)

---

reference to unconvincing technicalities.

A few days later, Assistant Principal Nicole Newman called S.C.'s mother to inform her that S.C. and S.D. were apparently continuing to exchange hostile messages over Snapchat. (*Id.* at 78.) S.C.'s mother apologized for the fact that S.C. had continued to engage with S.D., but she also complained again about the threats S.C. had been receiving from other students. S.C.'s mother testified at trial that Assistant Principal Newman simply told her that she would have to "take it up with the detective." (*Id.* at 67–68, 79.) Assistant Principal Newman testified in her deposition that she was not aware of threats to S.C., but the court notes that, in the same testimony, Newman stated that she did not speak to T.C. about the situation at all—a fact directly refuted by an email that Newman herself sent at the time that, quite unambiguously, has S.C.'s name as the subject line and begins with the phrase "Just talked to mom about the exchanging of text messages." (Newman Dep. at 105; *see* Def. Ex. 3 at 132.) Assistant Principal Newman's testimony, in general, reflected a selective memory, and the court does not find that her testimony significantly undermined S.C.'s evidence that Newman was made aware of the threats being sent to S.C.

At trial, MNPS produced Dr. Kessler's investigative file for the incident and subsequent events. (Def. Ex. 2.) The file shows that several students received three-day suspensions for their roles in spreading the video—the same punishment that S.C. received for the sexual encounter itself. (*Id.* at 98–101.) The file also contains notes that, as explained by Dr. Kessler, reflected an attempt to ascertain which students had been spreading the video. *Id.* at 102. Dr. Kessler testified:

> So when we're investigating something, often—in this case with the video, we'd say, Okay, do you have the video? Yes. We make them delete it off their phone. We discipline for it. We contact their parents. Where did you get the video from? I got the video from Student B. So then we go to Student B; same thing. Remove the video from their phone, stop them from posting, contact parents, issue disciplinary consequence, et cetera.

And then sometimes what happens is there are students who are named who didn't actually have the video, you know, their name [is given, but] through the investigation, it's determined that they aren't involved in this situation, and so some of the names on here, that's where [the notes indicate that] it was a dead end.

(Tr. Vol. 1 at 227.)

**D. Continuing Ramifications of the Incident**

T.C. testified that she viewed S.C.'s three-day suspension as giving T.C. "three days to figure out what [she] was going to do with [her] child because [she] wasn't going to send her back to" Hunters Lane. (*Id.* at 61.) S.C. similarly testified that, by the time of her suspension, she "really didn't want anything to do with that school anymore." (*Id.* at 147.) S.C.'s mother decided to place S.C. in the Oasis Center, a facility that offered support and treatment services for teenagers in need of them. S.C. was at the Oasis Center for about two weeks before being discharged. (*Id.* at 62.) She continued to be enrolled at Hunters Lane and did coursework while at the facility. After the discharge, she did not physically return to the school, but rather continued as a student in Hunters Lane's "Homebound" program for students with medical issues who studied exclusively from home. S.C.'s grades dropped precipitously. (*Id.* at 63–64; Tr. Vol. 2 at 5.)

In the meantime, the video continued to hang over S.C.'s head. By April 19 or 20, 2017, it was viewable on Pornhub, a streaming pornography site, which S.C. and her mother learned because a neighbor showed it to them. (Tr. Vol. 1 at 66–67, 156.) T.C. called Detective Carrigan to inform him of that fact, and, as part of the call, she complained again about the threats that S.C. and her family has received. (*Id.*)

At trial, S.C. testified that she continued to receive threats and harassment from some of the students whom she and her mother had identified to Dr. Kessler, and some of those threats

continued well past the end of the school year. For example, one boy repeatedly texted her, in a menacing manner, that "everybody's waiting for [S.C.] to come back." (*Id.* at 151.) One of that boy's friends had made similar remarks and threatened that S.C.'s mother would be killed for S.C.'s cooperation in the investigation. (*Id.*) S.C. was also mocked and harassed by Hunters Lane students at the mall and even in her own home, by boys "that would run up and down the street in front of [her] house." (*Id.* at 158.) Some of these incidents may have been too far outside of MNPS's supervision or control for MNPS to be held responsible. The court finds, however, that at least some of the threats (1) occurred while S.C. was enrolled at Hunters Lane and (2) were expressly connected to Hunters Lane, the school's investigation, whether S.C. would cooperate in that investigation, and/or whether S.C. would return to Hunters Lane as an in-person student.

The aforementioned email from Assistant Principal Newman to Dr. Kessler on April 21, 2017, confirms that Hunters Lane administrators were, at the very least, aware of a heated text message exchange between S.C. and S.D.:

> Just talked to mom about the exchanging of text messages. Mom apologize[d] and just became aware to the texts when she removed [S.C.'s] phone. The phone is now in the possession of the mother. [S.C.] will be in residential treatment with Oasis until May 5. The step-dad brought me the paperwork this morning . . . .

(Def. Ex. 3 at 132.) Dr. Kessler denied receiving any information about ongoing threats being made to S.C.'s family after she was suspended. (*Id.* at 252–53.)

Ultimately, S.C.'s family concluded that their best option was simply to leave MNPS's jurisdiction altogether; before the 2017–18 school year could begin, they relocated to Wilson County, and S.C. began her sophomore year there. T.C. testified that the reason for the move was "[f]or [S.C.] to start new, to be able to go to a high school where nobody knew her." (Tr. Vol. 1 at 71.) S.C. testified that she was harassed some about the video at her new school in Wilson County, but the students there did not threaten her as she had been threatened at Hunters Lane.

(*Id.* at 154–55.) S.C. went into counseling and eventually required at least two more stints of residential treatment. (*Id.* at 69.) All in all, S.C.'s mother estimated that S.C. attended more than 70 therapy sessions before she turned 18 in late 2019. (*Id.* at 69–70.)

The evidence shows that, even with the benefit of treatment, S.C. suffered lasting emotional damage from the April 17 incident and its aftermath and that that damage manifested behaviorally in a number of ways. Prior to April 17, 2017, S.C. had loved to read and draw; afterwards, however, she mostly stopped reading and her drawings began reflecting dark, anguished subject matter. (*Id.* at 64–65.) S.C. painted her new Wilson County bedroom black and put aluminum foil over the window. (*Id.* at 76.) S.C., despite her prior inexperience, rapidly became sexually active with multiple partners and sometimes snuck out of her home at night to have sex. (*Id.* at 73.) She described this new sexual activity as "like a self-harm" that she engaged in to obtain a temporary respite from her ongoing emotional pain. (*Id.* at 165.) S.C. engaged in more straightforward self-harm as well. She began cutting her arms—which she testified that she had not done prior to the incident—and frequently considered suicide. (*Id.* at 166–67.) She testified at trial that, during this period, she had hoped to die. (*Id.* at 167.)

At the same time, S.C. pulled back from healthy socializing, isolating herself in her room on many days. (*Id.* at 74–76.) She also gained about sixty pounds over a six-month period and started going to school in pajama pants and a sweater instead of "dress[ing] up." (*Id.* at 75.) She explained at trial that, after the events at Hunters Lane, she felt like her dignity had been taken away and her appearance and presentation no longer mattered. She also expressed a desire to avoid unwanted sexual attention to her body. (*Id.* at 93.)

S.C.'s feelings of personal humiliation and worthlessness were exacerbated by S.C.'s view that the incident had represented a violation of her religious beliefs. She testified:

> I had lost the one thing I was supposed to keep safe. It was part of my religion. That's something you're not supposed to give up. In my religion, you're not supposed to give that up until after marriage, but it was taken from me. My dignity was gone. Everything was gone.

(*Id.* at 157.) She stopped going to church or otherwise taking part in religious activities because, she explained at trial, she felt that everyone knew about the events and would judge her. (*Id.* at 162.)

Eventually, S.C. began abusing alcohol, cocaine, and methamphetamine. (*Id.* at 77.) She had consumed alcohol before the events of April 17, 2017, but, she testified, only in small amounts; this prior drinking was different in kind and degree from her later, post-incident substance abuse. (*Id.* at 163.) At the time of the trial, S.C. had apparently obtained a period of relative sobriety. (*Id.* at 77, 173.) The record, however, contains medical evidence confirming that S.C.'s journey to a desired, sustainable level of psychological health and stability may still turn out to be a very long one. (*See, e.g.*, Pl. Ex. 55–56.) Even before her substance abuse had the opportunity to further complicate matters, S.C. suffered from symptoms of post-traumatic stress disorder ("PTSD") that led to significant behavioral and emotional disruptions. (See, e.g., Pl. Ex. 56 at 284–91.)

**E. Expert Testimony**

Dr. Charles Ihrig testified as an expert witness on behalf of S.C. (Tr. Vol. 1 at 177.) Dr. Ihrig is a Nashville-based practicing psychologist and consultant. (*Id.*) He examined S.C. at her attorneys' behest on April 10, 2018 and reviewed records of S.C.'s past mental health treatment. (*Id.* at 179–80.) The examination included administering the Minnesota Multiphasic Personality Inventory for Adolescents, a written tool designed to evaluate various psychological conditions, as well as another tool, the Post-Traumatic Stress Disorder Checklist for Children. (Id. at 187–89.) He also reinterviewed S.C. in mid-2021. (*Id.* at 194.) Dr. Ihrig concluded:

42

> Based on my interview of [S.C.] and collateral reporting from her mother, along with supporting treatment records, I concur with the prior diagnosis ascribed to [S.C.] of post-traumatic stress disorder that is the direct result of unwelcomed sexual contact at school, the nonconsensual videotaping of the event, the public release of such video, the blaming of the act on her by school officials and police, and the subsequent harassment from her peers.

(*Id.* at 189–90.) S.C.'s trauma was significantly exacerbated, Dr. Ihrig explained, by the fact that "those in authority did not believe her and held her responsible for the incident in the same way her perpetrators were punished." (*Id.* at 197.) He also opined that S.C. had "developed a personality disorder that involves borderline and antisocial features," which, he explained, "is not an uncommon result for early childhood trauma, particularly associated with sexual trauma." (*Id.* at 199.)

Dr. Ihrig described a number of ways that S.C's trauma had negatively affected her cognition, emotional state, and behavior, including through substance abuse, suicidal ideation, and "frequent fighting behaviors." (*Id.* at 195–97.) He identified a number of ways in which S.C.'s PTSD had had an ongoing, negative impact on S.C.'s life:

> It has caused her to perform poorly at school. It has caused her to have unstable relationships and act out violently and promiscuously. It has caused her to act impulsively and recklessly resulting in criminal charges. It has caused her to struggle emotionally and to view herself in the most negative of terms.

(*Id.* at 213.). He opined that S.C. needed significant amounts of future psychotherapy. (*Id.* at 217.) The court found Dr. Ihrig's testimony to be credible and well-reasoned.

MNPS's expert was Dr. Sarah Vinson, a psychiatrist holding board certifications in adult, child and adolescent forensic psychiatry. (Tr. Vol. 2 at 114.) Dr. Vinson met with S.C. in 2018 and reviewed various materials, including S.C.'s school records, her treatment records, and Dr. Ihrig's evaluation of S.C. (*Id.* at 118.) Dr. Vinson also viewed the video of S.C. and J.J. and examined S.C. again around the time of trial—although that second examination took place after

Dr. Vinson had already formulated and disclosed her initial opinions. (*Id.*)

The court finds that some aspects of Dr. Vinson's testimony elided important facts and relied on deceptively selective recitations of the relevant information. For example, regarding the possibility that S.C. was subjected to significant post-incident harassment, Dr. Vinson stated:

> She was quickly removed from the school following the incident, so there was not an opportunity for her to be exposed to the significant harassment on campus.
>
> She reports that her social media was deleted shortly after the event, thus there was no opportunity for her to be exposed to significant harassment through those platforms.

(*Id.* at 125.) Neither of those statements, however, suggests that S.C. was not harassed. As everyone involved in this case is aware, the post-incident harassment at issue occurred while S.C. was suspended, on medical leave, or enrolled in MNPS but on homebound status. The fact that she was not harassed while physically on campus after the incident, accordingly, is beside the point. Similarly, the fact that S.C. supposedly could not be harassed through messages to her *own* social media accounts simply is not evidence that she was shielded from electronic harassment altogether. The record shows that she could still text and be texted, and messages could still be relayed through her sister or through friends. Dr. Vinson, moreover, offered no reason why it would have been impossible for harassment to occur through public social media messages that S.C. would be expected to see or learn of, regardless of the status of her own accounts.

Dr. Vinson also discussed S.C.'s mental health and the effects of the incident and its aftermath. Dr. Vinson made some observations that legitimately complicated the picture of whether there were additional factors other than the trauma S.C. underwent in association with the incident of April 17, 2017 that might have contributed to S.C.'s ongoing difficulties after the incident. The court, however, did not find Dr. Vinson's broader conclusions, such as her initial

2018 finding that S.C. likely did not suffer from post-traumatic stress disorder, to be persuasive. (*Id.* at 126–27.) The court also notes that, even by Dr. Vinson's own account, many of her conclusions were undermined by (or at least required updating in light of) additional evidence of S.C.'s symptoms that Dr. Vinson later learned of at or around the time of trial. (Tr. Vol. 2 at 190–91.) The court, accordingly, credits Dr. Ihrig's opinion over Dr. Vinson's, by a significant margin.

## III. ANALYSIS & FINDINGS

### A. Scope of Claims in Light of *Kollaritsch* and This Court's Earlier Rulings

Most aspects of S.C.'s claims were already resolved in MNPS's favor after the court was ordered by the Sixth Circuit to reconsider its summary judgment rulings in light of *Kollaritsch*. By the time of trial, in other words, many aspects of the underlying claims and contested events in this case were no longer matters to be resolved.

For example, S.C. has presented a good deal of evidence suggesting that the initial incident in this case might have been prevented if MNPS had properly understood the dangers its students were facing before any of these events occurred. But S.C.'s "before" claim—like the other plaintiffs' "before" claims—was wholly foreclosed by *Kollaritsch*, and this court held as much, granting MNPS's motion for summary judgment as to those claims.[16] (Doc. No. 124 at

---

[16] One could argue that the more expansive portions of the Kollaritsch opinion were merely dicta. *See Kollaritsch*, 944 F.3d at 630 (Rogers, J., concurring); *see also Greene v. Crawford Cty., Mich.*, No. 20-1715, 2022 WL 34785, at *8 (6th Cir. Jan. 4, 2022) ("A 'conclusion that does nothing to determine the outcome is dictum and has no binding force' on a future panel.") (quoting *Wright v. Spaulding*, 939 F.3d 695, 701 (6th Cir. 2019)). The central rule of *Kollaritsch*, however, is expressly identified as a holding—in other words, not dictum. *See Kollaritsch*, 944 F.3d at 618 ("In short, *we hold that* a student-victim plaintiff must plead, and ultimately prove, that the school had actual knowledge of actionable sexual harassment and that the school's deliberate indifference to it resulted in further actionable sexual harassment against the student-victim, which caused the Title IX injuries." (emphasis added)). Admittedly, that formulation of the holding does not include a clear, express statement of the requirement that the initial harassment that provided the notice be specific to the student plaintiff herself—although the description of the later harassment as "further" harassment might be read as suggesting as much, and the more explicit version of that rule was propounded elsewhere in the opinion. *See id.* at 621–22 (stating

30–33.)

However, it is still entirely possible that MNPS bears at least some of the blame for the sexual encounter at issue here. Specifically, it does not appear unreasonable to suggest that MNPS had enough information about these risks that its failure to take better preventive measures amounted to a deliberate disregard for students' safety. Nor is it unreasonable to wonder whether, if MNPS had realized the dangers its students faced sooner, it could have disrupted the environment that led to the events of April 17, 2017. Indeed, even MNPS seems to have come to accept that it could have done better or at least can do better in the future; it has substantially revamped its handling of Title IX issues and peer-on-peer harassment in ways that would make little sense if its prior policies had been adequate. (*See* Tr. Vol. 2 at 88–101 (testimony of new Title IX coordinator Carly Elliott).)  Under *Kollaritsch*, though, none of that matters; no *general* danger of peer-on-peer harassment, even if that danger is both severe and blatantly obvious, is sufficient to create an actionable Title IX obligation to take preventive steps, according to that case.

"Before" claims, moreover, are not the only plausible theories of liability that *Kollaritsch* foreclosed. The court considered and rejected the possibility that a plaintiff might have a Title IX claim based on the fact that a school's handling of the investigation of her harassment was itself traumatic or inappropriate but did not cause any future instances of additional harassment. *See Kollaritsch*, 944 F.3d at 618 ("A student-victim's subjective dissatisfaction with the school's response is immaterial to whether the school's response caused the claimed Title IX violation.").

---

that notice could not be premised on harassment "directed at third parties") (quoting *Pahssen*, 668 F.3d at 363). The majority opinion's understanding of notice, however, was central to its resolution of the appeal. Indeed, the notice requirement and the "further harassment" requirement must function together for the holding to make sense, and the notice requirement must be as exacting as the court held it to be in order for the court's holding to actually resolve the case. The court, accordingly, will continue to apply the rule of *Kollaritsch* as it did following remand.

46

As this court previously wrote:

> Under *Kollaritsch*, a parent whose child was harassed, assaulted, or raped by
> another student and who recognizes that a school is not responding appropriately
> to her child's predicament has no cause of action, under Title IX, until the
> school's improper response leads to at least one additional instance of actionable
> harassment. This is true, under *Kollaritsch*, even if the parent is reasonable or
> even obviously correct that the school is failing to take the danger posed to her
> child seriously. In other words, if a parent's child is, for example, raped by
> another student at school, and the school district and state do nothing to prevent
> her rapist from attacking her again, the parent's options are (1) withdrawing the
> child from school or (2) waiting for her to be sexually harassed again—including,
> potentially, in the form of a second rape—at which point the parent can sue on the
> child's behalf under Title IX.

(Doc. No. 124 at 34.)

In short, most of the traumatic experiences that S.C. underwent on the premises and under the supervision of Hunters Lane have already been forced off the table as grounds for liability by the Sixth Circuit. It is necessary, then, to focus on what is left. This court's discussion of which aspects of S.C.'s "after" claims survived the summary judgment stage was as follows[17]:

> MNPS argues that S.C. cannot prevail on her "after" claims because she "never
> returned to Hunters Lane as a student after" the date of the initial incident giving
> rise to her claims, April 17, 2017. (Doc. No. 123 at 5.) That assertion may be
> true—in a sense—in that S.C. never attended the physical campus of Hunters
> Lane as a student again, and her family eventually moved out of the county.
> MNPS's characterization, however, elides a considerable amount of complexity.
> Contrary to any suggestion by MNPS that S.C. simply left Hunters Lane
> immediately after the incident, she was, in fact, initially suspended from Hunters
> Lane for three days as punishment for her participation in the incident. (Doc. No.
> 92-11 ¶ 9.) The precise details of the days and weeks immediately following the
> incident [were not, on the summary judgment record,] entirely clear . . . , but . . .
> S.C. and her parents did not finally decide to withdraw from Hunters Lane until [a
> later date.] (*Id.* ¶ 17.)
>
> S.C. and her mother also complained to Dr. Kessler, while she was still an
> enrolled MNPS student, that she and her sister were receiving physical threats
> from other students related to the incident. (*Id.* ¶ 13.) S.C.'s mother, T.C., has
> corroborated that they informed Dr. Kessler of the threats on April 18, 2017, and

---

[17] The court typically would not include so lengthy a blockquote, particularly of its own prior ruling. Because the contours of the court's summary judgment determination are of such high importance here, however, the court presents the relevant subsection with only slight abridgement..

that the threats were violent in nature, including gendered and sexualized insults. (Doc. No. 92-12 ¶¶ 9–11.) The threats continued throughout S.C.'s suspension, and the video depicting her was placed on a publicly accessible pornography site. (Doc. No. 92-11 ¶ 16.) . . . .

There was, in other words, a period . . . in which S.C. was still an enrolled MNPS student, and MNPS was aware of harassment being waged against her that arose out of and was intended to thwart an investigation of an on-campus incident. During that period, MNPS allegedly failed to adequately address the matter in a way that would allow S.C. to resume her studies on the same terms as her peers. Such a situation would seem to fit squarely within the claims that *Kollaritsch* would allow to proceed. The only complicating factor is that S.C. was not on the physical Hunters Lane campus when that harassment occurred. The reason she was not on campus, however, was that the school first suspended her and then apparently tolerated her absence while the matter was addressed.

As broad as *Kollaritsch* is, it does not say anything about such a situation. It may be that Title IX does not typically impose duties related to a student's being harassed outside of school, but the Supreme Court has never held that the on-campus/off-campus distinction presents a categorical bar. To the contrary, the Supreme Court's formulation of potential liability for peer harassment notably shied away from drawing a hard line based on geography, focusing instead on whether the harassment was taking place "'under' an 'operation' of the funding recipient." *Davis*, 526 U.S. at 646 (citing . . . *Doe v. Univ. of Ill.*, 138 F.3d 653, 662 (7th Cir. 1998)). The Supreme Court's language has been read by at least one circuit court as requiring only a sufficient "nexus between the out-of-school conduct and the school." *Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist.*, 511 F.3d 1114, 1122 n.1 (10th Cir. 2008) (citing *Davis*, 526 U.S. at 645). Similarly, Department of Education Guidance has suggested that "there is no 'duty under Title IX to address an incident of alleged harassment where the incident occurs off-campus *and does not involve a program or activity of the recipient*' . . . ." *Doe v. Pennridge Sch. Dist.*, 413 F. Supp. 3d 393, 410 (E.D. Pa. 2019) (quoting Dep't of Educ. OCR, "Q & A on Campus Sexual Misconduct" (Sept. 2017)) (emphasis added).

 There are a number of facts in this case suggesting a nexus between the school's authority and interests and the harassment S.C. experienced while suspended and, later, while absent. First and most obviously, the harassment was related to an incident that itself occurred on campus. Second, and perhaps more importantly, the harassment appears to have been directed, at least in part, at preventing S.C.'s cooperation in the school's own disciplinary investigation related to the in-school incident. Third, S.C.'s physical absence from school was, at least at first, school-mandated in light of her suspension. If a school could escape liability simply by removing a student from its physical premises, the incentive in a case such as this would simply be to suspend or even expel every student in S.C.'s position. The court doubts that Congress intended to create an incentive to punish harassment

victims. . . .

Another potential limitation on a school system's liability for off-campus harassment is that "the deliberate indifference standard holds a school liable for harassment only where the school 'exercises substantial control over both the harasser and the context in which the known harassment occurs.'" *Gordon v. Traverse City Area Pub. Sch.*, 686 F. App'x 315, 324 (6th Cir. 2017) (quoting *Davis*, 526 U.S. at 646). The school's suspension of S.C., however, was, in fact, an exercise of substantial control over the setting in which she might be harassed. Moreover, while a school typically does not have substantial control over students' off-campus actions, the threats in this case were apparently attempts to interfere in the school's own investigation. The court is aware of no settled principle that would prevent a school from exercising disciplinary control over students' attempts to interfere directly in a school disciplinary investigation to intimidate a victim. *See Bell v. Itawamba Cty. Sch. Bd.*, 799 F.3d 379, 396 (5th Cir. 2015) (holding that a school can address speech "intentionally direct[ed] at the school community . . . , even when such speech originated, and was disseminated, off-campus without the use of school resources"); *S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist.*, 696 F.3d 771, 777 (8th Cir. 2012) (holding that a school may take action addressed at out-of-school speech to prevent a "substantial disruption to the educational setting"); *Kowalski v. Berkeley Cty. Sch.*, 652 F.3d 565, 573 (4th Cir. 2011) (holding that a school can address off-campus speech based on "nexus" between speech and school's "pedagogical interests") . . . . A reasonable finder of fact could conclude that MNPS's disciplinary authority to protect its investigation translated to sufficient control over the off-campus attempts made by students to thwart it.

The court's prior reasoning regarding S.C.'s "after" claim, therefore, remains largely intact. It may be that *Kollaritsch* limits the evidence on which S.C. can rely to establish her Title IX injuries, because she now must focus on the actual post-incident harassment that she endured rather than broader aspects of the school's alleged mishandling of her case. However, a female student's being hounded out of school by threats and harassment related to her participation in a school's investigation into an on-campus sexual event is well within the core Title IX issues that survive *Kollaritsch*.

(*Id.* at 35–39.) In other words, for S.C.'s claims to succeed, she must have established (1) at least one instance of "actionable" post-incident harassment that (2) has a sufficient nexus to the school[18] and (3) was the result of deliberate indifference by MNPS. No other grounds for

---

[18] The court notes that its prior holding that schools have the power to address off-campus speech with a clear nexus to the school and its educational mission has since found support in the Supreme Court's First Amendment caselaw. *See Mahanoy Area Sch. Dist. v. B. L. ex rel. Levy*, 141 S. Ct. 2038, 2045 (2021) ("[W]e do not believe the special characteristics that give schools additional license to regulate student

liability in this case are viable under *Kollaritsch*.

### B. Whether the Post-Incident Threats Were Harassment On the Basis of Sex

MNPS attempts to bypass even that narrow inquiry by arguing that the threats intended to prevent S.C. from cooperating in the investigation—which account for most of the post-incident harassment in the record—may have been *harassment* but were not *sex-based harassment* and therefore fall outside the concerns addressed either by Title IX or by a § 1983 equal protection claim. Title IX, as the court has noted, provides that "[n]o person in the United States shall, *on the basis of sex*, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.'" 20 U.S.C. § 1681(a) (emphasis added). MNPS argues that a desire to discourage participation in a disciplinary investigation is conceptually gender-neutral; accordingly, if S.C. was harassed for that reason, MNPS argues, she was not harassed on the basis of sex.

The caselaw in this area, however, rejects the premise that a court should rely solely, or even primarily, on a harasser's personal motivation to determine whether harassment gave rise to discrimination on the basis of sex. Rather, a court must look to the "real social impact of . . . behavior," "judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993)). Accordingly, while sexual harassment must be "gender-*oriented*," *Davis*, 526 U.S. at 651 (emphasis added), that determination can be made "irrespective of the harasser's motivation." *Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 271 (6th Cir. 2009).

As the Sixth Circuit has recognized, when harassment involves actions of an explicitly

---

speech always disappear when a school regulates speech that takes place off campus. The school's regulatory interests remain significant in some off-campus circumstances.").

sexual or gendered nature, the question of whether that harassment amounted to sex discrimination is different than it would be in a case where, for example, a supervisor, teacher, or peer was simply accused of being abusive to others in a non-sexual, gender-neutral way. *See Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 271 (6th Cir. 2009); *see also* David S. Schwartz, *When Is Sex Because of Sex? The Causation Problem in Sexual Harassment Law*, 150 U. Pa. L. Rev. 1697, 1700 (2002) (observing that courts have generally recognized that "sexual conduct per se establishe[s] the 'causation' element necessary under Title VII to prove that the conduct was 'because of sex.'"). In a case involving abusive but non-sexual, facially gender-neutral behavior, it is necessary for the plaintiff to introduce additional facts establishing that the abusive behavior was somehow discriminatorily applied—for example, that a supervisor was abusive toward women more often than men. Otherwise, while the behavior may have been worthy of condemnation—and may even have been "harassment" as the term is commonly used—the behavior would not have been discriminatory. *Gallagher*, 567 F.3d at 272. The Sixth Circuit has held, however, that abusive behavior that is explicitly sexual or gender-coded in nature may have a discriminatory effect, even if it is technically visited upon men as well as women. For example, the Sixth Circuit has recognized that the public use of "'sex specific' words," such as "'bitch,' 'whore,' and 'cunt' that . . . may be more degrading to women than men" may, if sufficiently severe and pervasive, amount to sexual harassment, even if men are exposed to the words as often as women. *Id.* (quoting *Reeves v. C.H. Robinson Worldwide, Inc.*, 525 F.3d 1139, 1144 (11th Cir. 2008), *reh'g en banc granted, opinion vacated*, 569 F.3d 1290 (11th Cir. 2009), *same result reached on reh'g en banc*, 594 F.3d 798 (11th Cir. 2010)).

The court has already ruled, based on those principles, that the circulation of sexually explicit videos can give rise to gender-oriented harassment, even if both boys and girls are

51

depicted in the videos. (*See* Doc. No. 101 at 32–35.) MNPS's argument is that this reasoning, even if applicable to a sexual assault or the sharing of a video of a sexual encounter, does not extend to harassment intended to interfere with an investigation of such a video. The court is skeptical of that argument as a general proposition, but the court is even *less* persuaded in light of the record of this particular case. S.C. credibly testified that girls at Hunters Lane who appeared in sexually explicit videos were treated vastly differently by their peers than boys who did. Because of this markedly different treatment, female students, the court finds, would also tend to have a significantly greater need to rely on the school's administrators to protect them in the wake of a video's circulation. Accordingly, any harassment directed at discouraging cooperation with the school's investigation was harassment intended to block recourse for a harm that was not visited equally upon male and female students. The overtly sexual and objectively gender-imbalanced stakes of the situation, in other words, did not stop with the video itself.

As a matter of practical social effect, therefore, the harassment was gender-oriented. The court is not basing its conclusion on generalizations or guessing; the actual evidence presented at trial—which MNPS had every opportunity to rebut—persuasively established that S.C. was in substantially greater need of protection by Hunters Lane in this situation due to her sex and that, therefore, harassment intended to interfere with that assistance created a special hardship for her based on her status as a female student. The evidence shows that the harassment to which S.C. was subjected was tied to her sex. MNPS's argument in this regard, therefore, is without merit.

## C. Remaining Elements of Liability Under Title IX

Under *Kollaritsch*, "a student-victim plaintiff must . . . ultimately prove . . . that the school had actual knowledge of actionable sexual harassment and that the school's deliberate

indifference to it resulted in further actionable sexual harassment against the student-victim, which caused the Title IX injuries." *Kollaritsch*, 944 F.3d at 618. The Sixth Circuit has explained that "actionable sexual harassment" means "harassment 'so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit.'" *See Foster v. Bd. of Regents of Univ. of Mich.*, 982 F.3d 960, 965 (6th Cir. 2020) (quoting *Davis*, 526 U.S. at 633).

S.C. has shown that MNPS had actual knowledge of "actionable sexual harassment" of her, in that it had, at a minimum, actual knowledge that the video was being circulated against her wishes. There is no plausible argument that mass circulation of child pornography in the school of the children depicted falls anywhere near short of the level of severity necessary to be actionable.[19] Unsurprisingly, then, multiple courts have found that circulation of sexual pictures or videos and accompanying harassment can rise to the level of severity necessary to support a Title IX harassment claim. *See Butters v. James Madison Univ.*, 145 F. Supp. 3d 610, 619 (W.D. Va. 2015); *Doe v. Town of Stoughton*, No. CIV.A. 12-10467-PBS, 2013 WL 6195794, at *2 (D. Mass. Nov. 25, 2013*); Logan v. Sycamore Cmty. Sch. Bd. of Educ.*, No. 1:09-CV-00885, 2012 WL 2011037, at *5 (S.D. Ohio June 5, 2012). This court has no trouble reaching the same conclusion with regard to these facts: once MNPS personnel were aware that a sexual video involving one of its minor students had been taken at school and was circulating among other minor students, it had notice of "actionable sexual harassment" and therefore incurred a statutory duty to address the situation.

The court also finds that S.C. has shown that she was subject to post-incident harassment that was sufficient to support a Title IX claim. The evidence regarding the threats sent to S.C.

---

[19] Indeed, as a matter of federal law and policy, involvement in the production and distribution of child pornography is not merely frowned upon; it may warrant imprisonment for years or even decades. *See* 18

and her family is unfortunately not as complete as it could be—in part, perhaps, because the school itself made no meaningful efforts to document that aspect of the situation. The court finds, however, that S.C. and her family did receive violent threats, during the period in which she was enrolled in MNPS, that had the objective purpose of discouraging her from seeking the school's assistance in combating gender-oriented harassment. The court also finds that those threats, which were violent and even included the suggestion that someone would *kill S.C.'s mother*, were sufficiently severe and pervasive to count as "actionable" instances of harassment. Finally, the court finds that the threats had a strong connection to the school environment itself. Not only were the threats related to a school investigation, but they were, at times, expressly tied to the possibility of S.C.'s facing reprisal if she returned to school in person—that is, if she resumed her status as an ordinary MNPS student entitled to a free public education by virtue of her age and residence within MNPS's jurisdiction—which she was. Harassment intended to keep a student out of school and, in effect, create a barrier between the student and the education to which she was entitled is about as school-related as harassment can get. S.C., therefore, has established the required elements of an initial incident, actual notice to the school, and additional post-notice incidents of actionable harassment with a nexus to the school environment.

In order to establish liability, S.C. must also have shown that (1) MNPS acted with deliberate indifference to the harassment of which it became aware and (2) that the additional harassment to which S.C. was subjected was a result of that deliberate indifference. As MNPS has persuasively argued, some of the missteps that S.C. identifies on behalf of MNPS lack a plausible causal connection to the threats S.C. received. For example, S.C. has focused a great deal on MNPS's failure to rely more on its Title IX coordinator—both as a matter of policy and in this particular instance. And S.C. may be right that MNPS erred—even significantly erred—in

U.S.C. § 2252A(b)(1).

that regard. What S.C. has not established, however, is that greater involvement by the Title IX coordinator would have prevented the post-incident harassment that S.C. received. Causation is a required element of a "deliberate-indifference intentional tort" under Title IX. *Doe v. Univ. of Kentucky*, 959 F.3d 246, 250–51 (6th Cir. 2020). When it comes to many of the technical errors that S.C. has identified—over-relying on principals, under-relying on the coordinator, failing to fill out an appropriate bullying form—S.C. failed to present persuasive evidence setting forth a specific, plausible path through which observing those technical requirements would have protected S.C. If those technical errors had been all S.C. relied on, then, her claim would fail.

But, technical issues aside, one fact continues to stand out: that Hunters Lane did very little, if anything, to prevent the ongoing violent threats that S.C. and her mother say that they received and reported to both Dr. Kessler and Detective Carrigan on April 18, while S.C. was still enrolled at Hunters Lane. Hunters Lane responded to some aspects of the situation— particularly, the video's existence and the fact that students had had sex on campus. But the school did not address the ongoing threats of which, the court has found, the school was made aware. The Sixth Circuit has made clear—in an *en banc* opinion issued after *Kollaritsch*—that "d[oing] almost nothing" about a known harassment problem is the paradigmatic definition of deliberate indifference. *Foster*, 982 F.3d at 965. What, after all, does "deliberate indifference" mean, if not being aware of a problem and choosing not to use any of the tools available to do anything about it?

All of the relevant evidence suggests that the threats that S.C. has alleged occurred did, in fact, occur and occurred, in part, while S.C. was a Hunters Lane student; indeed, even MNPS itself, in its proposed findings, would have the court find, among other things, that "students were basically threatening S.C. and her mother not to report to the school officials what had

happened" and that the threats "continued" after the meeting with Dr. Kessler. (Doc. No. 179 at 4, 8.) Admittedly, the evidence regarding the extent of MNPS's notice of the threats is more mixed; S.C. and her mother say that they conveyed the nature and extent of the threats clearly, and Hunters Lane administrators testified otherwise. At earlier stages in the litigation, that would have been the end of the court's inquiry, and the question of picking which version to believe would have been kicked down the road to trial. But the trial has now occurred, and it was, by agreement of the parties, a bench trial—meaning that the court must decide whom to believe. All of the relevant witnesses presented some reason to doubt aspects of their memories and versions of events, but, ultimately, the court finds, by a preponderance of the evidence and based on its having observed much of the relevant testimony in person, that S.C. and her mother conveyed the existence, nature, and extent of the threats to Hunters Lane administrators with at least enough clarity that failing to act on those threats amounted to a "'refus[al] to take action to bring the recipient into compliance" with Title IX. *Id.* at 968 (quoting *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998)) And, unlike with the purely technical violations cited by S.C., there is substantial reason to think that this deliberate indifference had real effects.

Indeed, it was, perhaps ironically, MNPS that put forth much of the evidence and argument that has led the court to conclude that acting aggressively against the threats may have significantly curtailed them. Dr. Kessler testified at length about the disciplinary steps she took against the students found to have circulated the video and the school's resulting success at stemming much of that circulation. For example, about one particular student, who had circulated the video, she testified:

> He was one of [the students who received a three-day suspension]. . . . And then he graduated in May 2019, two years later. We had no further incidents of him with any kind of sexual video after this incident, *which I believe relates to the fact that we took it so seriously*. He saw that it was a swift and significant consequence

and that it was behavior that could not be repeated.

(Tr. Vol. 2 at 25 (emphasis added).) And Dr. Kessler is right: the discipline meted out and the fact that the school took the video itself seriously did appear to have the positive effect of discouraging students from interfering with the educational environment by circulating the video further. The court finds, based on a preponderance of the evidence, that taking the threats seriously, as well, would have had a similar likelihood of success—maybe not perfect success, but enough to prevent at least a significant amount of the additional actionable harassment that S.C. endured. Instead, school administrators, insofar as they did anything at all about post-incident harassment other than the circulation of the video itself, appear mainly to have simply deferred to Detective Carrigan and assumed that any threats were his responsibility—even though those threats were plainly connected to the school environment and had pedagogical effects.

The court does not purport to claim that any particular course of action by Hunters Lane was required; as the court has repeatedly emphasized during this litigation, school administrators retain substantial discretion in how they wish to handle individual incidents, and there is no requirement, under Title IX, to be maximally punitive. There is, however, an obligation not to be deliberately indifferent to a known risk of sexual harassment. Hunters Lane administrators, in their handling of S.C.'s predicament, addressed some aspects of the situation in ways that likely fell within the scope of their broad discretion. However, they improperly confined their focus to the initial sexual encounter and the video itself, at the expense of protecting S.C. from the onslaught of harassment that followed. Without that protection, S.C. was denied her statutory right to an equal education regardless of sex. S.C., accordingly, has established the final two necessary elements for her Title IX claim—deliberate indifference and causation of subsequent

instances of sexual harassment—and is entitled to a verdict in her favor on that claim.

## D. The § 1983 Claim

To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States and must show that the violation was committed by a person acting under color of law. *West v. Atkins*, 487 U.S. 42, 48 (1988). S.C. alleges that MNPS violated her right to equal protection regardless of sex under the Fourteenth Amendment, and the Sixth Circuit has recognized that a failure to adequately address student-on-student harassment may indeed give rise to such a violation. *See Stiles ex rel. D.S. v. Grainger Cty., Tenn.*, 819 F.3d 834, 851–52 (6th Cir. 2016). Such allegations are typically evaluated pursuant to a "deliberate indifference standard" that is "'substantially the same' as the deliberate indifference standard applied in Title IX cases." *Id.* at 852 (quoting *Williams ex rel. Hart v. Paint Valley Local Sch. Dist.*, 400 F.3d 360, 369 (6th Cir. 2005)). Insofar as S.C.'s § 1983 claim relies on such a theory, much of the analysis that the court has already discussed would apply to this claim, as well.[20]

An additional obstacle exists, however, to recovery under §1983. Under Title IX, MNPS is the naturally appropriate defendant here because it, not any particular individual official, was the recipient of the federal funds giving rise to Title IX obligations. *See Bose v. Bea*, 947 F.3d 983, 988 (6th Cir. 2020) ("Title IX does not provide for individual liability; only 'a recipient of

---

[20] S.C. nevertheless argues that the core holding of *Kollaritsch* should not be held to apply to § 1983 claims. The court has already considered and rejected that argument. (Doc. No. 124 at 41–42.) S.C. argues that the Sixth Circuit has since reemphasized the fact that non-Title IX claims are not subject to the high "deliberate indifference" bar that governs Title IX claims. *See Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 415 n.3 (6th Cir. 2021). That language, however, expressly dealt with "Title VII employment discrimination cases," not § 1983 claims. *Id.* It is, moreover, unsurprising that *Kollaritsch* would not apply to an employment case; as the court has written, the reasoning of *Kollaritsch* was closely tied to concerns specific to the educational setting. The court will not abandon its prior reading of *Kollaritsch* based on an aside in a footnote in an opinion about a different statute governing a different type of relationship.

58

federal funds may be liable in damages under Title IX' . . . .") (quoting *Davis*, 526 U.S. at 640). The fact that the funding recipient is the only possible defendant under Title IX does not mean that a funding recipient will be liable for every error made by one of its employees; the actual notice and deliberate indifference requirements still exist to bridge the gap between an employee's actions and the school's liability. *See Gebser*, 524 U.S. at 290. The balance struck by § 1983, however, is even less favorable to suits against a governmental entity itself, in favor of a focus on claims against individual perpetrators—made possible by the lack of a federal spending hook that would restrict the scope of the statute in the manner that Title IX is restricted. *See Connick v. Thompson*, 563 U.S. 51, 60 (2011) (discussing individual and vicarious liability under § 1983). The caselaw regarding municipal liability under § 1983, in turn, reflects the fact that governments themselves might not always be the right defendants to sue.

Specifically, a government is responsible under § 1983 only for its "own illegal acts. [It is] not vicariously liable under § 1983 for [its] employees' actions." *Id.* (internal citations and quotation marks omitted). The courts have construed that principle to mean that a local government entity can only be held liable under § 1983 if the plaintiff demonstrates that the alleged federal violation was a direct result of a municipal "policy or custom." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 693 (1978)). The caselaw further explains that a plaintiff can make a showing of an illegal policy or custom by demonstrating one of the following: (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom or tolerance or acquiescence of federal rights violations. *Burgess*, 735 F.3d at 478.

S.C. tries to tie the harassment she received to MNPS's since-revised policies for

handling potential Title IX issues and its allegedly inadequate training for its personnel. These arguments, however, run into the same factual obstacles that prevented S.C. from relying on purely technical violations to establish liability under Title IX. What is required for municipal liability is not merely for S.C. to prove that MNPS's policies were flawed and that she was harassed; she must sufficiently connect the former to the latter. *See Plinton v. Cty. of Summit*, 540 F.3d 459, 464 (6th Cir. 2008) (stating that inadequate training cannot support municipal liability unless the lack of training was "'closely related to' or 'actually caused' the plaintiff's injury") (quoting *Hill v. McIntyre*, 884 F.2d 271, 275 (6th Cir. 1989)). The connection, moreover, must apply to the claims that are actually still before the court and not foreclosed by existing caselaw for other reasons—that is, the claims regarding post-incident harassment. S.C. has not demonstrated that better training or different district-level policies would have prevented that particular harassment. Different policies might have prevented this situation from arising *at all*, but such a theory of the case is no longer available in this circuit. With regard to the harassment still under consideration, MNPS's complicity has only been shown to arise from its mishandling of this particular situation on the ground—not any specific district-level technical error or failure to train.[21]

The one route to municipal liability that might fit this case is the possibility that an official with final authority—Dr. Kessler—ratified the school's illegal actions. Although S.C. does not explore this route to municipal liability in much detail, she does raise it briefly, so it is properly before the court. An executive principal of a school occupies a peculiar position on the spectrum of authority that a public servant can possess. From one perspective, the executive

---

[21] Indeed, the court notes that the official seemingly most responsible for the handling of S.C.'s case, Dr. Kessler, was one of the more thoroughly trained MNPS employees depicted in the record. Dr. Kessler received the McGrath training that MNPS still uses, and there is no specific, persuasive evidence that that training was inadequate in any particular way relevant to S.C.'s post-incident harassment claims.

principal is the head of an entity with significant power over numerous employees; yet, from another perspective, it is clear that the executive principal is still not a policymaker in the traditional sense and that all of her power is exercised within boundaries set from higher up in the governmental structure. In light of those limitations, courts in other cases have found that principals did not qualify as officials with final decision making authority, in the sense used in § 1983 caselaw, at least with respect to certain types of actions. *See Delozier v. Bradley Cty. Bd. of Educ.*, 44 F. Supp. 3d 748, 761 (E.D. Tenn. 2014) ("From parties' submissions it appears that the principal of Bradley Central, Shoemaker, did not have final decision-making authority with respect to hiring."); *Glover v. Williamsburg Loc. Sch. Dist. Bd. of Educ.*, 20 F. Supp. 2d 1160, 1168 (S.D. Ohio 1998) ("In the present case, Principal McEvoy evaluated Glover, and Superintendent Campbell made the nonrenewal recommendation to the Board, but neither had final decision-making authority for purposes of § 1983."). The area of student discipline, however, is one at the core of a principal's responsibilities, so it is at least possible that the court could reach a different conclusion.

The evidence suggests that, as a *practical* matter, Dr. Kessler may well have been the final decisionmaker in this matter. The caselaw on this issue, however, distinguishes between officials who possess actual final authority and those that merely have "been granted discretion in the performance of [their] duties." *Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir. 2000). S.C. presented a great deal of evidence that only the latter description applies to Dr. Kessler. Indeed, S.C. has repeatedly argued—persuasively—that MNPS unnecessarily delegated its district-level authority to manage harassment investigations to its principals, without sufficient oversight or assistance. For the purposes of municipal liability, however, the final decisionmaker remains the "policymaker with final policymaking authority," not the lower-level official to whom discretion

was mistakenly granted. *Burgess*, 735 F.3d at 479 (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481–84 (1986) (plurality opinion); *Miller v. Calhoun Cty.*, 408 F.3d 803, 816 (6th Cir. 2005)). The power to make final decisions regarding how harassment investigations would be carried out in MNPS schools resided at the district level—likely with the Title IX Coordinator or the Director of Schools. The evidence does not show that such an official ratified the treatment of S.C. with regard to post-incident threats. MNPS, accordingly, is entitled to a verdict in its favor with regard to that claim, on the ground that it, as a municipality, is not liable under § 1983.

## E. Damages

"[A] damages remedy is available for an action brought to enforce Title IX." *Franklin v. Gwinnett Cty. Pub. Sch.*, 503 U.S. 60, 76 (1992). The damages available may be economic in nature—based on the lost educational benefit—but may also include "emotional distress, pain and suffering, and other non-economic damages," as necessary to fulfill the statute's "broad remedial purpose." *Lopez v. Regents of Univ. of Cal.*, 5 F. Supp. 3d 1106, 1119 (N.D. Cal. 2013); *see also Doe v. Bd. of Trustees of Neb. State Colleges*, No. 8:17-CV-265, 2020 WL 2793558, at *1 (D. Neb. May 29, 2020) (acknowledging that a Title IX plaintiff may seek damages for "emotional distress and the pain and suffering caused by the defendant's conduct"). There is little doubt that S.C. was damaged substantially by the events that gave rise to this case. Her subsequent mental health struggles have been persuasively linked to the ordeal, and there is evidence suggesting that she will require additional mental health treatment for quite some time. Moreover, her education—the service that MNPS was supposed to provide to her and which is at the heart of Title IX—was severely disrupted in multiple ways: first, by her initial, rational fear of returning to Hunters Lane; then, by the need to relocate to a new school system in the middle

of her education; and, throughout all of this, by the damage done to her ability to apply herself effectively to her studies.

At the same time, however, the evidence shows that the driving forces behind the psychological and emotional disruptions S.C. experienced were, at least in significant part, (1) the sexual encounter itself, which appears to have been, at the very least, unwelcome and may have been rape; (2) the fact that the video was circulated; and (3) the fact that Detective Carrigan and Dr. Kessler treated her as a perpetrator, rather than a victim, in these events. S.C. advanced plausible arguments why all of those things might have been prevented, but, ultimately, they were not the basis for the verdict in her favor. The court, accordingly, must determine the extent of the damages reasonably attributable to the conduct for which MNPS is actually liable: the post-incident harassment toward which it was deliberately indifferent.

MNPS argues that any psychological injuries attributable to the post-incident threats and harassing messages cannot be cleanly separated from the injuries attributable to the sexual encounter or other events for which, the court has held, MNPS is not liable under current caselaw. But some version of that difficulty exists in nearly every case involving this type of injury. Trauma is rarely visited upon a blank slate; the way that a person's mind or body reacts to an injury is often, to some degree, hard to separate from the effects of other factors outside the scope of the cause of action at issue. S.C.'s own medical records, however, confirm that, well before this litigation was narrowed in its scope to make the post-incident bullying especially important, the bullying had been identifiable as a meaningful component of the trauma she endured and the severe psychological difficulties that resulted. (*See, e.g.*, Pl. Ex. 55 at 12 (including bullying as a contributing factor to S.C.'s symptoms).) The court, accordingly, finds and holds that MNPS can be held monetarily liable for the portion of S.C.'s pain, suffering, and

educational disruption attributable to the post-incident bullying.

Courts ask juries to wrestle with the quantification of complex non-economic injuries all the time, and there is no exact science to it. Because the court itself is the finder of fact in this case, however, the task of reaching a final conclusion regarding damages falls to it. In light of the full evidence presented, the court finds that the damages specifically attributable to the post-incident harassment in this case amount to $75,000, reflecting a portion of the lost educational services[22] and some non-monetary damages arising out of pain and suffering. The full damages that S.C. incurred from these events as a whole would undoubtedly be much greater, but such damages are not, under current caselaw, within the court's power to award.

S.C. also requests injunctive relief, but the court finds that, insofar as non-monetary remedies are available under Title IX, they would not be appropriate here. S.C. is no longer enrolled in the MNPS system. Indeed, she is now an adult. Outside of money to pay for treatment and/or compensatory education, there is simply not much that MNPS can do for her. The court will not use one student's narrow claim as a pretext for assuming judicial control over administrative matters entrusted to local authorities. *See Fieger v. Mich. Supreme Ct.*, 553 F.3d 955, 966 (6th Cir. 2009) ("[P]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . .) (quoting *Grendell v. Ohio Supreme Ct.*, 252 F.3d 828, 832 (6th Cir. 2001)). The court accordingly will award only money damages.

The court is fully aware that this award, by design, will compensate S.C. for only a fraction of what she has endured. However, under *Kollaritsch*, the range of events for which the school system can be held liable is extraordinarily narrow. For example, S.C. has plausibly argued that MNPS allowed a dangerous environment to develop at Hunters Lane—and quite

---

[22] The court finds that, had S.C. and her family not been threatened after the event, or the school had effectively and swiftly dealt with the threats, S.C. may well have returned to Hunters Lane, and she would

possibly in MNPS schools generally—that put S.C. and other students at unnecessary risk. If that theory of liability had been permitted to proceed to trial, she very well may have established that all of this could have been prevented by addressing that environment before she fell victim to it. Under *Kollaritsch*, though, such a claim is barred, no matter how compelling its basis.

S.C. has also suggested—with persuasive supporting evidence—that the trauma of her experience was severely exacerbated by her school's decision to treat her as, in effect, a perpetrator on par with the people who shared the child pornography depicting her. But, under *Kollaritsch*, that does not matter either, because the school's only duty was not to cause future incidents of harassment against the same student—a narrow responsibility that, as this case illustrates, barely touches on the many ways that a school can mitigate or exacerbate these dangers by its actions or inaction.

S.C. has every right to believe that she has been failed—failed by the police, failed by her school, and now failed by the federal courts, which, under the caselaw of this circuit, must categorically reject many of her plausible grounds for liability, no matter how persuasive or consistent with the purposes of Title IX. This verdict, however limited, is all that is presently allowed within the boundaries set by the Sixth Circuit.

## IV. CONCLUSION

For the foregoing reasons, the court finds the defendant liable under Title IX and not liable under § 1983, and the court awards damages in the amount of $75,000.

An appropriate order will enter.

ALETA A. TRAUGER
U.S. District Judge

---

not have suffered such extensive disruption to her education.