# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

100 EAST FIFTH STREET, ROOM 540

Kelly L. Stephens          POTTER STEWART U.S. COURTHOUSE          Tel. (513) 564-7000
Clerk                      CINCINNATI, OHIO 45202-3988             www.ca6.uscourts.gov

Filed:  November 15, 2023

Mr. Stephen C. Crofford
Law Office
5115 Maryland Way
Brentwood, TN 37027

Ms. Erin H. Flynn
U.S. Department of Justice
Civil Rights Division, Appellate Section
P.O. Box 14403
3742
Washington, DC 20044-4403

Mr. J. Brooks Fox
Ms. Melissa Roberge
The Metropolitan Government of Nashville & Davidson County
Department of Law
P.O. Box 196300
Nashville, TN 37219-6300

Mr. Jason Lee
U.S. Department of Justice
Civil Rights Division, Appellate Section
P.O. Box 14403
Washington, DC 20044-4403

Ms. Mary Ann Parker
Law Office
5115 Maryland Way
Brentwood, TN 37027

Re:  Case Nos. 22-5125/22-5104, *S.C. v. Metro Govt of Nashville*
Originating Case No. : 3:17-cv-01098

Dear Counsel,

The court today announced its decision in the above-styled cases.

Enclosed is a copy of the court's published opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Yours very truly,

Kelly L. Stephens, Clerk


Cathryn Lovely
Deputy Clerk

cc:  Ms. Lynda M. Hill

Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0248p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

────────────────

S.C.,

*Plaintiff-Appellee/Cross-Appellant,*

*v.*

No. 22-5125

METROPOLITAN GOVERNMENT OF NASHVILLE &
DAVIDSON COUNTY, TENNESSEE dba Metropolitan
Nashville Public Schools,

*Defendant-Appellant/Cross-Appellee.*

────────────────

Appeal from the United States District Court for the Middle District of Tennessee at Nashville.
No. 3:17-cv-01098—Aleta Arthur Trauger, District Judge.

Argued: July 25, 2023

Decided and Filed: November 15, 2023

Before: MOORE, GIBBONS, and BUSH, Circuit Judges.

────────────────

### COUNSEL

**ARGUED:** Melissa Roberge, METROPOLITAN DEPARTMENT OF LAW, Nashville, Tennessee, for Appellant/Cross-Appellee. Mary A. Parker, PARKER & CROFFORD, Brentwood, Tennessee, for Appellee/Cross-Appellant. Jason Lee, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Amicus Curiae. **ON BRIEF:** Melissa Roberge, J. Brooks Fox, METROPOLITAN DEPARTMENT OF LAW, Nashville, Tennessee, for Appellant/Cross-Appellee. Mary A. Parker, Stephen Crofford, PARKER & CROFFORD, Brentwood, Tennessee, for Appellee/Cross-Appellant. Jason Lee, Erin H. Flynn, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Amicus Curiae.

GIBBONS, J., delivered the opinion of the court in which MOORE, J., joined. BUSH, J. (pp. 17–22), delivered a separate opinion concurring in the judgment.

---

## OPINION

---

JULIA SMITH GIBBONS, Circuit Judge.  S.C., a high school student at the inception of this case, sued the Metro Nashville Public Schools ("MNPS") under Title IX and 42 U.S.C. § 1983, alleging that MNPS was deliberately indifferent to student-on-student harassment that she suffered related to her sexual assault and later participation in a sexual misconduct investigation.  In her suit, S.C. raised three types of claims: a Title IX "before" claim, alleging deliberate indifference by MNPS before she was assaulted; a Title IX "after" claim, alleging deliberate indifference by MNPS during the school's investigation into her harassment; and Fourteenth Amendment equal protection claims brought under 42 U.S.C. § 1983.

S.C.'s Title IX "before" claim was dismissed at the summary judgment phase, but the remaining claims proceeded to trial.  After a bench trial, the court found MNPS liable for emotional distress and other damages on the Title IX "after" claim, but not liable under § 1983.  The parties now cross-appeal the judgment, and S.C. also appeals the grant of summary judgment to MNPS on the other Title IX claims.

Because the district court lacked the benefit of our ruling in *Doe v. Metro. Gov't of Nashville & Davidson Cnty.*, 35 F.4th 459 (6th Cir. 2022), *cert. denied sub nom. Metro. Gov't of Nashville & Davidson Cnty. v. Doe*, 143 S. Ct. 574 (2023), we vacate and remand the court's grant of summary judgment to MNPS on the Title IX "before" claim and the § 1983 "before" claim.  However, we affirm both the trial court judgment that MNPS is liable on S.C.'s Title IX "after" claim and the damages award.

### I.

#### A.  Factual Background

In 2017, S.C. was a freshman at MNPS's Hunters Lane High School ("Hunters Lane").  On April 17, 2017, S.C. was videorecorded engaging in sexual activity with a male student on school property; however, S.C. did not consent to either the sexual contact or its videorecording.

The video was rapidly shared on social media and third-party websites, including PornHub, and dissemination of the video led other students to harass S.C.

On the evening of the incident, Dr. Susan Kessler, Hunters Lane's Executive Principal, was alerted to the existence of the video.  A school representative then contacted T.C., S.C.'s mother, and arranged for T.C. and S.C. to come to school the following day to discuss the incident.  Students learned of the planned meeting and began harassing and threatening S.C. and her family via social media.  T.C. took down a list of the students who sent the threats.

MNPS internally discussed the incident prior to the meeting.  Kessler involved MNPS's then-Director of Schools, Dr. Shawn Joseph.  Kessler justified this escalation because she learned that at least one member of the MNPS School Board knew about the incident.  Kessler never involved MNPS's Title IX coordinator in the process.

The meeting began with S.C. creating a written account of the sexual encounter.  In that description, she explained that the male student attempted to coerce her into sexual behavior in a hallway before ultimately bringing her into a classroom and "get[ting her] to do the things that [they] did."  DE 182, Findings of Fact & Conclusions of Law, Page ID 5162.  She stated that she "wanted to stop both of them"—referring to the male student and the girl who videorecorded them—"but just couldn't get to urge to say no."  *Id.*  S.C. explained at trial that by "urge" she meant "courage."  *Id.*

Then, S.C. and her mother were taken to meet with a sex crimes detective from the Metropolitan Nashville Police Department, Robert Carrigan.  The meeting was audiorecorded. From the outset, Carrigan assumed the videorecording and sexual encounter had been consensual and repeatedly rejected any statements by S.C. that she had not wanted the sexual encounter or its recording.  S.C. twice told Carrigan about the threats against her and her family by fellow students.  She named at least one of the students who threatened her and explained that one of the threats stated that her mother would be shot as she entered the school.  Carrigan again disregarded this information and "turned to suggesting that S.C. had criminally participated in creating child pornography."  *Id.* at Page ID 5163.

Following the conversation with Carrigan, S.C. and T.C. met with Kessler in her office. This conversation was not recorded, and its substance was disputed at trial. First, S.C. and her mother testified that S.C. told Kessler in the meeting that the sexual activity had not been consensual, while Kessler testified that S.C. said in the meeting that the activity *had* been consensual. The district court weighed the credibility of the witnesses and concluded that even if S.C. may not have described the encounter as a rape explicitly, she more than likely did not describe the encounter as welcome or consensual. Second, T.C. testified that she informed Kessler of the threats made against S.C. and gave Kessler the list of the students sending the threats. She also testified that she told Kessler that they were still receiving threats during the meeting as it was happening, as her other daughter was waiting for T.C. and S.C. in the car and updated them on new threats. Kessler categorically denied being informed of any harassment or threats. Once again, the court found Kessler less than credible. The list of students making threats was found in Kessler's investigatory file, Kessler seemed "defensive and evasive" in her testimony, and Carrigan testified that T.C. and S.C. had planned to tell Kessler of the threats in their meeting directly beforehand. Furthermore, even if Kessler did not know of the threats, she certainly knew that the video was continuing to circulate against S.C.'s wishes, which can be deemed a form of harassment.

At the conclusion of the meeting, Kessler suspended S.C. for three days, after which she was expected to return to Hunters Lane. Days later, Assistant Principal Nicole Newman contacted T.C. about messages exchanged between S.C. and another student on social media. In the call, T.C. raised the issue of threats S.C. had been receiving from other students, but Newman told her to "take it up with the detective." *Id.* at Page ID 5171.

S.C. and her mother no longer felt comfortable with S.C. attending Hunters Lane. After her suspension, S.C. entered an in-patient facility for support and treatment services and continued coursework for Hunters Lane remotely. Two weeks later, S.C. was discharged but continued remote coursework. Because the threats continued even while schooling from home, S.C.'s family moved to a different county for the following school year.

In addition to this disruption of her education, S.C. suffered lasting emotional damage. Her grades dropped substantially, she began abusing drugs and alcohol, she withdrew from socializing, and she engaged in self-harm. At the time of trial, four years after the incident, she still suffered from severe mental health disorders, including Post-Traumatic Stress Disorder.

### B. Procedural History

S.C.'s experience was not the first of its kind. MNPS faced "a widespread problem of students circulating sexual pictures and videos of themselves and their peers in MNPS schools." *Id.* at Page ID 5149. Students widely knew about this practice, called "exposing," and school administration also knew about past videos of sexual conduct filmed on school grounds. When female students were "exposed," they faced bullying and ridicule, while "exposed" male students became popular.

S.C. and three other female students sued MNPS and alleged the same pattern of events: they were videorecorded while experiencing unwanted sexual contact, the video spread among students via social media, and they faced backlash from fellow students that disrupted their education. One of these students, Sally Doe, was a fellow freshman at Hunters Lane at the same time as S.C. and alleged that the unwelcome sexual encounter in her case occurred just two months before the video of S.C. circulated.

Three types of claims were raised by the students: Title IX "before" claims, alleging deliberate indifference by MNPS to widespread, gendered misconduct before the student victims were harassed; Title IX "after" claims, alleging deliberate indifference by MNPS to peer threats after the student victims were harassed; and equal protection violations pursuant to 42 U.S.C. § 1983. Although the students pursued these claims individually, their cases were consolidated in the district court. Following discovery in the consolidated cases, MNPS moved for summary judgment. In June 2019, the district court denied summary judgment on nearly all of the students' claims but certified select issues for interlocutory appeal.

In December 2019, this court decided *Kollaritsch v. Michigan State University*, 944 F.3d 613 (6th Cir. 2019). *Kollaritsch* limited certain Title IX claims by holding that a university could not be liable for a first instance of sexual harassment or its response to that incident

because the school lacked actual notice of that student's harassment.  944 F.3d at 620. Therefore, the students in *Kollaritsch* (who had each only been assaulted once) could not show that the school's action or inaction caused them to suffer harassment.  *Id.* at 625.  The *Kollaritsch* decision required "further harassment . . . inflicted against the same victim" for that student to make out a plausible deliberate indifference claim under Title IX.  *Id.* at 621-22.

Finding *Kollaritsch* relevant to the interlocutory appeal of the consolidated cases, a motions panel of this court granted MNPS's petition to appeal, vacated the district court's summary judgment order, and remanded the matter back to the district court.  *See In re: Metro. Gov't Nashville & Davidson Cnty.*, 19-0508 (6th Cir. Jan. 24, 2020).  On remand, the district court concluded that *Kollaritsch* barred the students' "before" claims.  It therefore granted MNPS's summary judgment motions with respect to all claims by two plaintiff students, Sally Doe and Jane Doe, but allowed the "after" claims of the other two plaintiff students, Mary Doe and S.C., to move forward.[1]

Because the court's order fully resolved the claims of Jane and Sally, the summary judgment order as to their claims was appealable by right, while Mary and S.C. were required to resolve their remaining claims before appealing.  *See* Fed. R. Civ. P. 54(b); *Planned Parenthood Sw. Ohio Region v. DeWine*, 696 F.3d 490, 500 (6th Cir. 2012) ("[W]hen a district court grants summary judgment on some but not all claims, the decision is not a final order for appellate purposes[.]").

In the appeal of Jane and Sally's claims, this court distinguished *Kollaritsch*, holding that it did not control the outcome of their cases.  *Doe*, 35 F.4th at 464-68.  First, *Doe* held that the same-victim requirement does not extend to Title IX "before" claims where a school "remains indifferent to severe, gender-based mistreatment played out on a 'widespread level' among students."  *Id.* at 465 (quoting *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 653 (1999)). And second, *Doe* distinguished *Kollaritsch*'s application to "after" claims by explaining that a high school's elevated disciplinary authority, supervision, and control over students is distinct from the university context and therefore the same-victim requirement does not apply to "after"

---

[1]Although the students were initially referred to as Jane Doe #2, Sally Doe #2, and Mary Doe #2, we have adopted the simplified naming conventions that the district court used in its opinion following the bench trial.

claims against high schools. *Id.* at 467-68. Jane and Sally's cases are pending in the district court at the time of this appeal.

During *Doe*'s time on appeal, the other two cases progressed in the district court. Mary Doe settled with MNPS in March 2021. In July 2021, the district court held a two-day bench trial on S.C.'s remaining claims.

In January 2022, the district court found MNPS liable under Title IX on S.C.'s "after" claim, but not liable for a constitutional violation under § 1983. It concluded that the threats made against S.C. and her family for her participation in Hunters Lane's investigation into the video triggered MNPS's Title IX duties to prevent gendered interference with S.C.'s education. Specifically, the court found that S.C.'s experience—the unwanted sexual encounter and the spread of the video afterwards—was "sufficiently traumatic" that it "amounted to a plainly apparent risk of disrupting S.C.'s education, such that . . . MNPS's Title IX duties were implicated once school administrators became aware of the events." DE 182, Findings of Fact & Conclusions of Law, Page ID 5158-59. That is, the school knew that the video was continuing to circulate, knew that S.C. was being harassed because of the video, knew that threats continued to be made against S.C. for participating in the investigation, and knew that some of those threats were made during school hours by her peers. Yet the school did nothing. The court noted the discrepancy between the school's disciplinary response to the video itself—swiftly issuing three-day suspensions for any students found to have circulated the video—and its utter inaction in response to the threats against S.C. The court thus found MNPS liable on S.C.'s Title IX "after" claim.

Next, the district court found MNPS not liable on S.C.'s constitutional claim. It reasoned that, while the deliberate indifference standard is essentially the same for both Title IX and student-on-student equal protection claims, MNPS is shielded from liability on the § 1983 claim. Municipality liability requires either an official policy or custom, or an illegal final decision of an official with policy-making authority, and the district court found that the evidence did not support causation for the former theory nor an action by a formal policymaker.

Finally, the district court awarded S.C. $75,000 in damages attributable to MNPS's deliberate indifference toward the post-incident harassment. The court explained that the award reflected both lost educational services and emotional damages, without stating how much of the total was attributed to each.

The parties timely cross-appealed.

## II.

In an appeal taken from a bench trial, the district court's factual findings are reviewed for clear error, and the legal conclusions are reviewed de novo. *Chesnut v. United States*, 15 F.4th 436, 441 (6th Cir. 2021); Fed. R. Civ. P. 52(a). "Clear error will be found only when the reviewing court is left with the definite and firm conviction that a mistake has been committed." *Max Trucking, LLC v. Liberty Mut. Ins. Corp.*, 802 F.3d 793, 808 (6th Cir. 2015) (citation omitted).

A district court's grant of summary judgment is reviewed de novo. *Stiles ex rel. D.S. v. Grainger Cnty.*, 819 F.3d 834, 847 (6th Cir. 2016). Summary judgment is warranted when, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. *Id.* (citing Fed. R. Civ. P. 56(a)).

## III.

Title IX prohibits discrimination based on sex in any education program receiving federal funding. 20 U.S.C. § 1681(a); *Chisholm v. St. Mary's City Sch. Dist. Bd.*, 947 F.3d 342, 349 (6th Cir. 2020). Under Title IX, schools can face liability for "deliberate[] indifferen[ce] to known acts of student-on-student sexual harassment" where "the harasser is under the school's disciplinary authority." *Davis*, 526 U.S. at 646-47. As discussed, Title IX deliberate indifference claims have two facets: "before" claims, regarding the school's conduct before the student victims were harassed, and "after" claims, concerning the school's conduct after the student victims were harassed.

A.  *Title IX "Before" Claim*

For a Title IX "before" claim, a student must show: (1) that the school "maintained a policy of deliberate indifference to reports of sexual misconduct," (2) that indifference "created a heightened risk of sexual harassment that was known or obvious," (3) the risk of harassment was "in a context subject to the school's control," and (4) "as a result, the plaintiff suffered harassment that was so severe, pervasive, and objectively offensive that it can be said to have deprived the plaintiff of access to the educational opportunities or benefits provided by the school." *Doe*, 35 F.4th at 465 (internal citations, quotation marks, and alterations omitted).

The record reflects that a reasonable jury could find "that [S.C.'s] unwelcome sexual contact was a result of MNPS's indifference to the problem of pervasive sexual misconduct in the schools." *Doe*, 35 F.4th at 464.  The experience of Sally Doe at Hunters Lane and the circulation of her unwelcome sexual encounter video ten days before the video of S.C. provides just one example of the extensive sexual misconduct problem at Hunters Lane and MNPS more broadly.  Over one thousand instances of sexual misconduct at MNPS schools were documented during the 2016-2017 school year alone, with nearly 2,500 instances from 2012 to 2016. Moreover, the record supports the finding that videos of that unwelcome sexual contact were spread through Hunters Lane at least "five to ten times" during the 2012-2016 period and over a dozen instances of photographic sexting over the same time.  However, in keeping with the *Doe* opinion, it is for the district court to decide the sufficiency of the evidence in the first instance. *See Doe*, 35 F.4th at 466 n.4.

MNPS argues that *Doe* was wrongly decided and should be overturned.  This argument cannot succeed.  "One panel of this court may not overrule the decision of another panel; only the en banc court or the United States Supreme Court may overrule the prior panel."  *United States v. Ferguson*, 868 F.3d 514, 515 (6th Cir. 2017).  And here, the en banc court and Supreme Court both declined the opportunity to review the decision in *Doe*.  *Doe* remains the law of the Sixth Circuit and ensures Title IX liability when a school is deliberately indifferent to a widespread pattern of sexual harassment.

S.C.'s "before" claim is effectively identical to the claims of Jane Doe and Sally Doe, and the district court did not have the benefit of the proper standard of review when evaluating S.C.'s "before" claim in the first instance. We therefore vacate the district court's grant of summary judgment to MNPS on S.C.'s "before" claim and remand the claim for the district court to consider whether she has presented sufficient evidence of her "before" claim under the *Doe* standard.

### B. Title IX "After" Claim

Student-on-student threats and harassment for participating in a sexual harassment investigation can provide the basis for Title IX liability when a school is deliberately indifferent to those threats. *See Doe*, 35 F.4th at 466-67; *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 695 (4th Cir. 2018) (finding that "an educational institution can be liable for acting with deliberate indifference toward known instances of student-on-student retaliatory harassment"). A school is considered deliberately indifferent to student-on-student harassment where its "response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648. "We ask not whether the school's efforts were ineffective but whether they amounted to 'an official decision . . . not to remedy the violation.'" *Foster v. Bd. of Regents of the Univ. of Mich.*, 982 F.3d 960, 968 (6th Cir. 2020) (en banc) (quoting *Davis*, 526 U.S. at 642).

MNPS does not suggest, and we cannot find, any clear error in the district court's finding that Kessler and Newman were both aware of the continuing and severe threats made against S.C. and their disruption to her education. Unlike the swift discipline that Hunters Lane meted out to students circulating the video of S.C., however, the school did nothing in response to the bullying and threats against S.C. beyond directing her to the police. But as this court explained in *Doe*, "MNPS has Title IX obligations that are separate and apart from any criminal matter." 35 F.4th at 467. And the evidence at trial supports the conclusion that some of these threats were made during school hours or, at a minimum, in connection with the school environment. As a result of the school's inaction, the threats and harassment continued. MNPS failed to act in accordance with its obligations, and thus the district court correctly determined that MNPS is

liable under Title IX for its deliberate indifference to the threats made against S.C. and her family.

MNPS raises three arguments in response. First, it argues that the school lacked "substantial control" over the context in which most of the threats occurred: social media. While the physical location of the threats is relevant to assessing whether the student-harassers were under the school's control, the "[m]ore important[]" consideration is the school's disciplinary authority over the students. *Davis*, 526 U.S. at 646. And it would be erroneous to conclude as a matter of law that schools lack substantial control over student social media messages. *See Feminist Majority Found.*, 911 F.3d at 680, 687-89. This is particularly true in light of the discipline that Hunters Lane undertook in response to the circulation of the video of S.C. via social media, demonstrating exactly how the school could have exercised its authority.

Second, MNPS argues that the threats did not constitute "gender-oriented" conduct because threats were made against S.C.'s entire family. But the threats were based on S.C.'s cooperation with her sexual assault investigation and the video of that incident. As the Supreme Court established in *Jackson v. Birmingham Board of Education*, "retaliation in response to a complaint about sex discrimination is 'discrimination' 'on the basis of sex.'" 544 U.S. 167, 179 n.3 (2005). The logic of *Jackson* applies to S.C.'s claims. The differential treatment exists because of "the nature of the complaint: an allegation of sex discrimination." *Id.* at 174.

Finally, MNPS takes out of context instances where the district court used the word "reasonable" and touts them as evidence that the district court erroneously applied a "reasonableness" standard instead of asking whether the school was deliberately indifferent or "not clearly unreasonable." Although the district court may have used the word "reasonable" at times to refer to what MNPS could have done, its finding of liability was entirely premised on the school's utter failure to act and grounded in the deliberate indifference standard.

The district court correctly found MNPS liable for its deliberate indifference to the threats and harassment suffered by S.C. and her family in response to her participation in the school's investigation. We affirm.

C.  *Section 1983 "Before" Claim*

On appeal, S.C. does not argue that the district court erred in finding MNPS not liable on the § 1983 claim presented at trial.  Rather, S.C. argues that the district court granted summary judgment to MNPS on her § 1983 "before" claim and asks us to vacate and remand for reconsideration of that claim.  MNPS, on the other hand, asserts that there is no claim to remand because the entirety of S.C.'s § 1983 claim was resolved at trial.

Statements by the district court indicate that portions of S.C.'s § 1983 claim were dismissed on summary judgment and did not proceed to trial.  The summary judgment opinion stated that: "The court . . . will not grant MNPS summary judgment with regard to the § 1983 claims of [S.C.] who, after *Kollaritsch*, still [has] viable Title IX claims."  DE 124, Mem., Page ID 4374.  However, in the next paragraph the court went on to say that it would "dismiss [S.C.'s] claims based solely on MNPS's actions prior to the underlying incidents described in their Complaints, but not their Title IX or § 1983 claims based on the events thereafter."  *Id.*  Taken together, these statements imply that either the district court believed S.C. was *only* raising a § 1983 "after" claim or the district court implicitly granted summary judgment to MNPS on the § 1983 "before" claim.

The record strongly suggests the latter—that the district court implicitly granted summary judgment to MNPS on any portions of S.C.'s § 1983 claim that were premised on the defendant's actions before the video incident.  In her amended complaint, S.C. asserted two constitutional violations under § 1983, failure to train and deliberate indifference to ongoing harassment, each of which S.C. claimed injured her at multiple points before and after the video incident.  One of these claims that refers to actions before the incident is S.C.'s assertion that: "The training provided by Defendant to its employees was either inadequate, or completely nonexistent, based on the failure of the Defendant to address the system-wide prevalence of known severe, pervasive, and objectively offensive sexual harassment and bullying, known as 'exposing,' that was occurring within its school system."  DE 6, Am. Compl., Page ID 119.  This statement suggests that S.C. alleged a § 1983 "before" claim.

MNPS's argument that the district court adjudicated S.C.'s whole § 1983 claim at trial is belied by the trial opinion itself.  In its opinion, the district court made repeated references to how *Kollaritsch* had limited pre-incident aspects of S.C.'s § 1983 claim:

> The connection [between failure-to-train and S.C.'s injuries] . . . must apply to the claims that are actually still before the court and not foreclosed by existing caselaw for other reasons—that is, the claims regarding post-incident harassment. S.C. has not demonstrated that better training or different district-level policies would have prevented that particular harassment.  Different policies might have prevented this situation from arising at all, but such a theory of the case is no longer available in this circuit.

DE 182, Findings of Fact & Conclusions of Law, Page ID 5193 (emphasis omitted); *see also id.* at Page ID 5191 n.20.

On this evidence, there is reason to believe that the district court dismissed parts of S.C.'s § 1983 claim centered on the school's pre-incident actions at the summary judgment stage. Therefore, we vacate any grant of summary judgment to MNPS on S.C.'s § 1983 "before" claim and remand for further consideration.

### D.  Damages Award

Finally, MNPS challenges any award of emotional distress damages to S.C. as invalid under the Supreme Court's intervening decision in *Cummings v. Premier Rehab Keller, P.L.L.C.*, 142 S. Ct. 1562 (2022).  At the time of the district court's decision, the Sixth Circuit generally allowed emotional distress damages for Title IX violations, albeit only in unpublished decisions. *See, e.g.*, *Clemons v. Shelby Cnty. Bd. of Educ.*, 818 F. App'x 453, 461 (6th Cir. 2020) (finding standing for student based on emotional injuries allegedly resulting from Title IX violation); *Varlesi v. Wayne State Univ.*, 643 F. App'x 507, 516 (6th Cir. 2016) ("The evidence here demonstrates that the defendants' discrimination and retaliation deprived Varlesi of the opportunity for employment in her chosen field by denying her a graduate degree and denying

her the ability to obtain that degree elsewhere, thus causing actual damages and foreseeable emotional harm.").**[2]**

After the district court awarded S.C. $75,000 for both loss of educational benefits and emotional distress, the Supreme Court decided *Cummings*, which barred emotional distress damages in Spending Clause anti-discrimination statutes. 142 S. Ct. at 1576. Although Title IX was not specifically at issue in *Cummings*, the decision referred to Title IX as part and parcel of the other Spending Clause statutes with implied private rights of action for which emotional distress damages are not available. *Id.* at 1569-70. *Cummings* leaves little doubt that emotional distress damages are no longer permitted for violations of Title IX. *See also* CA6 R. 36, Br. for United States as Amicus Curiae, at 28-30 (agreeing that *Cummings* has foreclosed emotional distress damages in Title IX cases).

The question before us is whether MNPS forfeited this argument by not raising it in the district court before *Cummings* was decided. Although this court generally bars a party from raising an issue for the first time on appeal, *see Greer v. United States*, 938 F.3d 766, 770 (6th Cir. 2019), "it is possible for a litigant to overcome the forfeiture rule," *De Morales v. Barr*, 799 F. App'x 364, 367 (6th Cir. 2020). Cases from this circuit suggest that "an intervening change of controlling law" may justify setting aside forfeiture. *Naselroad v. Mabry*, 763 F. App'x 452, 463 (6th Cir. 2019) (quoting *Amen v. Dearborn*, 718 F.2d 789, 794 (6th Cir. 1983)).

To clarify this exception to the forfeiture rule: the court has discretion to reach forfeited issues when there is an intervening change of controlling authority, but "only if the issue was not previously available—meaning there was strong precedent prior to the change, such that the failure to raise the issue was not unreasonable and the opposing party was not prejudiced by the failure to raise the issue sooner." *Stokes v. Stirling*, 64 F.4th 131, 141 n.6 (4th Cir. 2023) (internal quotation marks and citations omitted); *see also Vivint v. Alarm.com Inc.*, 856 F. App'x 300, 306-07 (Fed. Cir. 2021); *United States v. Sevilla-Oyola*, 770 F.3d 1, 14 (1st Cir. 2014);

---

**[2]**MNPS asserted at oral argument that a published decision of our court, *Johnson v. City of Saline*, 151 F.3d 564 (6th Cir. 1998), also supported the award of emotional distress damages for Title IX violations. However, *Johnson* concerned the ADA, not Title IX, and punitive damages, not emotional distress damages. 151 F.3d at 572-74. While the opinion mentioned emotional damages in passing, the case combined its consideration of physical and emotional damages and did not address the availability of emotional distress damages specifically. *Id.*

*Johnson v. Saville*, 575 F.3d 656, 663 (7th Cir. 2009); *Robinson v. Kramer*, 588 F.3d 1212, 1217 (9th Cir. 2009).

MNPS forfeited its arguments concerning emotional distress damages because the issue was not conclusively settled by precedent prior to *Cummings*. With only two unpublished cases supporting emotional distress damages and no Supreme Court precedent conclusively stating that such damages were available, the issue was not beyond argument or debate when S.C. sought emotional distress damages in the district court. Notably, the Ninth Circuit took this forfeiture approach in the context of Title IX emotional distress damages in *Asfall v. Los Angeles Unified Sch. Dist.*, No. 20-55599, 2022 WL 2764747 (9th Cir. July 15, 2022). There, the Ninth Circuit held that a jury's damages award of emotional distress damages for a Title IX student-plaintiff did not require vacatur and remand in light of the intervening *Cummings* decision. *Id.* at *4. Because the legality of Title IX emotional distress damages remained an open question during the pendency of this case, MNPS forfeited any challenge to the issue by not raising it before the district court. We affirm the award of emotional distress damages.

### E. Point of Clarification

One final point deserves mention. The concurring opinion makes what it terms a "technology point" and speculates that Congress, in enacting Title IX, did not contemplate the use of cell phones, which had not yet been invented, as a tool for sexual harassment. And it questions whether *Doe* was correct in reasoning that Title IX liability could be imposed for "after" claims based on cell phone usage after the sexual misconduct and video creation had occurred.

As previously mentioned, this court declined en banc review in *Doe*, and the Supreme Court denied certiorari. Moreover, disconnecting student cell phone use from educational institution responsibility, as the concurrence would apparently do, makes neither practical nor legal sense. *Doe* and this case both involved sexual videos made on school property. Both involved the response of educational institutions to unwelcome student sexual activity. In short, the horrors about which the concurrence speculates with respect to institutional accountability certainly are not implicated by these two cases.

IV.

For the foregoing reasons, we affirm MNPS's liability on S.C.'s Title IX "after" claim and the award of emotional distress damages.  However, we vacate the district court's grant of summary judgment to MNPS on S.C.'s Title IX "before" claim and § 1983 "before" claim, and remand for proceedings consistent with *Doe* and this opinion.

———————————————

## CONCURRENCE

———————————————

JOHN K. BUSH, Circuit Judge, concurring in the judgment.  I join the majority's decision to affirm in part the district court's grant of summary judgment to Metro Nashville Public Schools (MNPS) and to vacate in part that decision for reconsideration in light of *Doe v. Metropolitan Government of Nashville & Davidson County*, 35 F.4th 459 (6th Cir. 2022), *cert. denied sub nom. Metro. Gov't of Nashville & Davidson Cnty. v. Doe*, 143 S. Ct. 574 (2023).  I agree with my colleagues that *Doe* calls into question whether MNPS is entitled to summary judgment on the "before" claims brought under Title IX and 42 U.S.C. § 1983.  The reasoning of *Doe* also supports affirming the district court's finding of MNPS's liability under Title IX for the "after" claims.  And finally, I agree with the majority that MNPS forfeited its challenge to the award of emotional distress damages.

As the majority correctly states, we must follow *Doe* because it is a published decision of a panel of our court, and "'only the en banc court or the Supreme Court may overrule the prior panel.'"  Majority at 11 (quoting *United States v. Ferguson*, 868 F.3d 514, 515 (6th Cir. 2017)).  I write separately, however, to raise an issue concerning the reasoning in *Doe*.

It is a technology point:  many of the egregious facts in *Doe* and in the present case arise from student misuse of smartphones.  As we all know, these devices can be used for texting, emailing, social media communication, internet searching, taking photos and videos, playing video games, and a multitude of other things via cell-phone applications.  But when Title IX was enacted in 1972, as we also all know, there were no smartphones or any other consumer technology that even approached such capabilities.  In fact, the closest analog then available was the landline telephone, which generally enabled only conversation between people in different physical locations.  And, of course, none of those telephones could spread digital content almost instantaneously to anyone, anywhere in the world, who wants access to it.

So it is fair to say that Congress did not enact Title IX with cell phones in mind.  Nor did the Supreme Court consider smartphone technology, much of it yet to be invented, when deciding *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999).  In *Davis*, the Court held for the first time that Title IX liability could be imposed, in certain situations, on a school district for student-on-student sexual harassment.  *Id.* at 633.  *Davis*, however, had nothing to do with cyberbullying or any other nefarious use of smartphones in the virtual universe.  *Id.* at 633–34.  It involved in-school bullying where a fifth grader made vulgar sexual statements and attempted inappropriate touching of another classmate in a classroom and other places on school property.  *Id.*

Likewise, the original disturbing conduct in the present case—students having alleged unwanted and underage sex and filming it—all took place in a physical space at the high school. *Doe* fairly applies *Davis* to impose potential Title IX liability based on in-person activities that occur on high school property that could give rise to sexual harassment.  *See Doe*, 35 F.4th at 463–65.  And *Doe* persuasively distinguishes *Kollaritsch v. Michigan State* University, 944 F.3d 613 (6th Cir. 2019), as involving a university setting (where campus administrators generally have less ability to monitor and control inappropriate student behavior) from the high school context (where school officials have relatively more supervisory authority over students).  *Id.* at 467–68.  *Doe*, therefore, properly supports our decision to vacate and remand for the district court's reconsideration of the "before" claims—that is, those that relate to the school district's liability for the alleged sexual misconduct and wrongful video creation that took place on school property.

I question, though, whether *Doe* is correct in its reasoning that the school district may have Title IX liability for the "after" claims to the extent that those claims are based on cell phone usage after the sexual misconduct and video creation had occurred.  The text of Title IX does not specifically address cell phones or any other technological innovation that might post-date the world in which the statute was enacted, or anything analogous to such devices.

No. 22-5125                 *S.C. v. Metro Gov't of Nashville*                 Page 19

The closest the statutory text comes to addressing any type of technology is to reference an "education program or activity receiving Federal financial assistance":

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under *any education program or activity receiving Federal financial assistance.*

20 U.S.C. § 1681(a) (emphasis added).

But to say that an "education program or activity receiving Federal financial assistance" includes any student usage of private cell phones or other privately-owned electronic devices stretches the statutory text of Title IX too far. More importantly, both our court and the Supreme Court recognize at least some degree of autonomy from school control for students and their parents in the use of cell phones and the like to communicate. That is true even when cell phones are used to communicate in vulgar, offensive, and hostile ways about other people involved in school-related activities. *See, e.g.*, *Mahanoy Area Sch. Distr. v. B.L.*, 141 S. Ct. 2038, 2042 (2021) (holding that a public high school violated a student's First Amendment rights by suspending her from the cheerleading team for a year for having "used, and transmitted to her Snapchat friends, vulgar language and gestures criticizing both the school and the school's cheerleading team"); *McElhaney v. Williams*, No. 22-5903, 2023 WL 5492473, at *1 (6th Cir. Aug. 25, 2023) (holding that a school district and school officials may be liable under the First Amendment for banning a parent from attending school softball games after sending text messages to his daughter's coach critical of the coach's "managerial decisions").

The First Amendment isn't the only potential obstacle standing in the way of imposing liability on school districts based on students' cell-phone misbehavior. There are also serious practical problems in doing so. Communication through social media generally is not linked to any particular physical location or time. True, GPS allows one to pin-point the location of a cell phone, and data can show when a communication from the device was sent. But after its initial transmission, a cell-phone communication, through social media and otherwise, becomes part of the digital universe that can be accessed without regard to physical place or time. So even if a high school were to forbid all cell phones, as well as other digital devices, at school and during school hours, and even if school officials were to discipline students identified as spreading

hostile digital content, those responses still wouldn't completely solve the problem of student-on-student harassment through online communication. When the school day ends, the offensive messages and images would still be waiting in the virtual world, ready to be accessed again. *See, e.g.*, Julie Jargon, *Fake Nudes of Teens Shake a School*, The Wall Street Journal, November 4–5, 2023, at A5 (parent explaining that she is fearful of "how and when" the fake nudes of her daughter will surface and how it could impact her daughter "professionally, academically, or socially"). And cyber regulation by school districts could very well turn into a game of whack-a-mole: as soon as one cell phone text, email, Instagram message, tweet, post, or whatever is shut down, another one pops up, then another, and still another, as the message, image, or video continues to go viral.

Perhaps Congress could come up with ways to impose responsibility on school districts to monitor and control all student cell phone and other device usage in ways to prevent student-on-student harassment consistent with the practical considerations and our constitutional guarantees. But it hasn't done so with Title IX.

At oral argument, S.C.'s counsel suggested that a remedy the school district could have pursued would have been to confiscate the cell phone of every student. *See* Oral Arg. at 22:15–23:13.[1] And at least one state legislature has decided to implement the route suggested by S.C.'s counsel—limiting cell phone use in schools. In May 2023, Florida passed a law requiring public school districts to impose rules barring student cell phone use during class time. 2023 Fla. Sess. Law Serv. Ch. 2023-36 at 5 (C.S.H.B. 379) (West). One Florida district went even further—banning cell phone use entirely during the school day. *See* Natasha Singer, *A Florida District Bans Phones. Students Agonize but Perk Up.* N.Y. Times, November 1, 2023, at A 1. According to teachers at Timber Creek High School in Orlando, Florida, the students "now make eye contact" and "seem[] more engaged in class." *Id.* at A11. The students also seem to be somewhat receptive to the change. Specifically, some students said that the ban made "interacting with their classmates more authentic." *Id.*

---

[1]Oral Argument Audio, https://www.opn.ca6.uscourts.gov/internet/court_audio/audSearch.html (search Case Number field for "22-5104").

The potential benefits of banning cellphone use as compared to the costs of limiting student freedom of expression is not yet known. *See id.* But one thing is certain amongst lawmakers in Florida: "rampant social media use during school is threatening students' education, well-being and physical safety" and thus something must be done to curtail the negative impacts of cell phone use on students. *Id.*

As the Florida example demonstrates, student cell phone misuse is an issue for legislative study and redress. The solution is not creative judicial interpretation of laws that predate such technology. And in that regard, to the extent that this court in *Doe* purports to extend Title IX to impose liability on a school district for any and all student misuse of cell phones and other devices, that decision, I respectfully submit, goes too far. *See Doe*, 35 F.4th at 467 (explaining that a video of the incident was circulated on social media and describing how the school did not do enough to remedy that problem). Rather, this is an area that is properly left to legislative bodies and the people's elected officials.

It is truly unfortunate what S.C. alleges happened to her because of cyberbullying and other harmful cell-phone communication. But Title IX doesn't require school districts to punish bad behavior in general. It only punishes "discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). There is no allegation that MNPS did anything to discriminate against S.C., and most of the alleged harm inflicted on S.C. through social media did not occur on school grounds, as in *Davis*, or any physical property for that matter, but in the virtual universe.

To this general point, there is one significant exception in this case: the initial misuse of the cell phone—that is, the filming of the sexual misconduct—occurred at school. The act of making the video also can be analogized to filming technology available in 1972. But the subsequent alleged cell-phone abuses are not so easily tied to a physical location at the school, and they have no close comparators from the early-1970s world of Title IX.

For those reasons, absent a more specific indication from Congress that it intends for Title IX to impose responsibility on school districts to regulate cyber interactions of its students in general, we should not interpret the statute to impose this condition simply because of the

school's receipt of federal funds. *See Kentucky v. Yellen*, 67 F.4th 322, 326 (6th Cir. 2023) (Bush, J., issuing a statement regarding the denial of en banc) ("Congress must condition the states' receipt of federal funds 'unambiguously.'" (quoting *South Dakota v. Dole*, 483 U.S. 203, 207 (1987))). Unfortunately, *Doe* could be interpreted to do just that.

And remember, it is an implied right that we are expounding. As Justice Kennedy's dissent in *Davis*—a 5-4 decision—noted: the Supreme Court's majority theory of Title IX liability for student-on-student harassment was not based on any explicit statutory text. *See Davis*, 526 U.S. at 656 ("Title IX does not by its terms create any private cause of action whatsoever, much less define the circumstances in which money damages are available. The only private cause of action under Title IX is judicially implied."). Therefore, given that Title IX liability is judicially implied, particularly as it is applied in the context of this case, it is the responsibility of Congress, not the judiciary, to extend the student-on-student-harassment theory of liability at the federal level. *See Cummings v. Premier Rehab Keller, P.L.L.C.*, 142 S. Ct. 1562, 1576–77 (2022) (Kavanaugh, J., concurring) ("[W]ith respect to existing implied causes of action, Congress, not this Court, should extend those implied causes of action and expand available remedies.").

I thus respectfully submit that either this court sitting en banc or the Supreme Court may want to revisit the reasoning of *Doe* in a future case, if it is interpreted to impose Title IX liability based on cell phone communications not specifically linked with school property. At least with respect to such student smartphone usage, that decision seems to extend Title IX beyond its parameters as set by Congress.

To be sure, student cell phone misuse in general may call for new federal (and state) legislation. But new law must be enacted by elected representatives, not implied by judicial fiat.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 22-5125

S.C.,

    Plaintiff - Appellee/Cross - Appellant,

    v.

METROPOLITAN GOVERNMENT OF NASHVILLE &
DAVIDSON COUNTY, TENNESSEE, dba Metropolitan
Nashville Public Schools,

    Defendant - Appellant/Cross - Appellee.

> **FILED**
> Nov 15, 2023
> KELLY L. STEPHENS, Clerk

Before:  MOORE, GIBBONS, and BUSH, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the district court's grant of summary judgment to Metro Nashville Public Schools on the Title IX and § 1983 "before" claims is VACATED and REMANDED for further proceedings consistent with the opinion filed contemporaneously with this judgment and this court's ruling in *Doe v. Metro. Gov't of Nashville & Davidson Cnty*.  IT IS FURTHER ORDERED that the trial court's judgment that Metro Nashville Public Schools is liable on S.C.'s Title IX "after" claim and its damages award are AFFIRMED.

**ENTERED BY ORDER OF THE COURT**

_____
Kelly L. Stephens, Clerk